# In The Matter Of:

*LARRY SCOTT v.*
*SHERIFF RICHARD ROUNDTREE*

---

*RICHARD RUSSELL*
*April 21, 2021*

---

*Augusta Scribes Court Reporters, LLC*
*4 George C. Wilson Ct.*
*Suite A*
*Augusta, GA 30909*

IN THE UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA
AUGUSTA DIVISION


LARRY SCOTT,                    )
                               )
          Plaintiff,           )
                               )            CASE NO.
          vs.                  )            1:20-CV-159
                               )
SHERIFF RICHARD ROUNDTREE, and )
RICHARD RUSSELL,               )
                               )
          Defendants           )



ZOOM DEPOSITION OF
RICHARD RUSSELL



April 21, 2021
1:00 p.m.


ALL PARTIES VIA ZOOM



Christine Tatum, 5139-6588-4964-8640, CCR

APPEARANCES BY COUNSEL
VIA ZOOM


On behalf of the Plaintiff:

    J. Kyle Califf, Esq.
    Califf Law Firm, LLC
    3540 Wheeler Road, Suite 603
    Augusta, GA  30909
    706.530.1212
    kcaliff@califflawfirm.com


On behalf of the Defendants:

    Randolph Frails, Esq.
    Tameka Haynes, Esq.
    Frails & Wilson LLC
    211 Pleasant Home Road, Suite A1
    Augusta, GA  30907
    706.855.6715
    randyfrails@frailswilsonlaw.com

INDEX

PROCEEDINGS  . . . . . . . . . . . . . . . . . . . . . . .  4

EXAMINATION BY MR. CALIFF  . . . . . . . . . . . . . . .  4

EXAMINATION BY MR. FRAILS  . . . . . . . . . . . . . .  138

COURT REPORTER CERTIFICATION . . . . . . . . . . . . . .  142

PLAINTIFF'S EXHIBITS

| EXHIBIT NO | DESCRIPTION |
|---|---|
| Exhibit No. A | Compilation of Records |

LEGEND OF THE TRANSCRIPT

dashes [--]     intentional or purposeful interruption
[ph]            denotes phonetically written
[sic]           written as said
                    ****
Words are transcribed as spoken.  Proper names have been
phonically spelled when spellings cannot be obtained.
This transcript may contain quoted material.  Such material is
reproduced as read or quoted by the speaker.

PROCEEDINGS

1                  P R O C E E D I N G S

2          [Whereupon, RICHARD RUSSELL was sworn on oath by the court

3   reporter.]

4               MR. CALIFF:  This will be the deposition of Richard

5         Russell taken pursuant to notice and agreement of counsel for

6         all permissible purposes under the Federal Rules of Civil

7         Procedure, and taken in the case of Scott versus Roundtree

8         and Russell, 1:20-CV-00159.

9               Randy, I propose that any (inaudible) regarding

10        objections as the previous deposition.

11             MR. FRAILS:  Yes.

12                      EXAMINATION

13   BY MR. CALIFF:

14      Q.   Good afternoon, Mr. Russell.  My name is Kyle Califf.  I

15   am the attorney for Larry Scott.  I'm going to ask you some

16   questions about what occurred back in December of 2019 and, as

17   well, as some other things.  If at any time you need a break,

18   please let me know.  If you don't understand the question that I'm

19   asking you, please feel free to ask me to rephrase it.

20         Have you ever had your deposition taken before?

21      A.   No, sir.

22      Q.   Will you please state your full name for the record?

23      A.   It's Richard Russell.

24      Q.   Do you have a middle name?

25      A.   Richard Alexander Russell.

1    Q.    Have you ever gone by any other name?

2    A.    No, sir.

3    Q.    And what's your date of birth?

4    A.    10/7/91.

5    Q.    And what's the highest level of education you've

6    received?

7    A.    High school and some college.

8    Q.    Where did you go to high school?

9    A.    Lakeside.

10    Q.    Me too.  Where did you go to college?

11    A.    Augusta Tech.

12    Q.    What year did you graduate from Lakeside?

13    A.    2010.

14    Q.    And when did you begin working for the Richmond County

15    Sheriff's Office?

16    A.    2015.

17    Q.    Will you please describe to me your employment

18    background between 2010, after high school, and 2015, when you

19    began at the sheriff's office.

20    A.    As far as where I worked before I began at the sheriff's

21    office?

22    Q.    Yes, sir.

23    A.    Is that what you're asking?

24    Q.    Yes, sir.

25    A.    I worked for a construction company, I sold cars for a

1    little bit.  Kind of odd jobs, really.

2        Q.   Did you have any work experience prior to working with

3    the sheriff's office that involved law enforcement?

4        A.   No, sir, not paid experience.

5        Q.   What kind of unpaid experience?

6        A.   I was in the Cadet program with Columbia County through

7    High School through their Learning for Life.  It's like the Boy

8    Scouts but it's career based.

9        Q.   This is a Cadet program with Columbia County Sheriff's

10   Office?

11       A.   Yes, sir.

12       Q.   And when did you start that program?

13       A.   I'm not sure on the specific dates.  It was all through

14   High School, like junior year -- or I'm sorry -- sophomore year,

15   maybe.

16       Q.   Did you receive a certificate or, you know, any kind of

17   certification showing that you completed that program?

18       A.   It's -- I think we might be misunderstanding what the

19   program is.  It's not a certification process or anything like

20   that.  It's something that you can participate in, much like the

21   Boy Scouts.  It's actually sponsored by the Boy Scouts under their

22   subset of learning for life, it's the explorer program that

23   Columbia County sponsors.  There's no certification that's gained

24   from that or anything like that.  It's merely a introduction to

25   law enforcement, if you will.

1      Q.   And what kind of activities or what kind of processes

2   did they do to introduce you to law enforcement in the Cadet

3   program?

4      A.   You actually get to go through some of Georgia Law, you

5   get through the rough scenarios.  It's actually competitions

6   hosted around the state and at the national level.  It's different

7   stuff like that.  Go through different types of, I guess, training

8   would be the appropriate word for it.  But again, it's not a

9   certification, it's not something that you can take with you and

10  use as a law enforcement officer, saying that you're certified

11  through the Cadet program.  So I don't want to mislead anybody

12  with that.  But you do get introduced to the domestic violence

13  laws, the competitions that we would go to included  things like

14  responding to domestic calls, responding to traffic stops, DUI

15  enforcement and the like.  It's just a watered-down version,

16  basically.

17     Q.   How did you perform in the competitions?

18     A.   We did pretty well, it was a team effort, though.

19     Q.   How many people were on your team?

20     A.   It varied.  Anywhere from three to eight.

21     Q.   Did y'all ever win a competition?

22     A.   We brought home a few trophies, yes, sir.

23     Q.   Do you remember what those trophies were in?

24     A.   One of them that I got, personally, was for like DUI

25  enforcement.  The DUI scenario that they ran at one of the

1   competitions.  Another one, I believe, is for active shooter

2   response as a team exercise.  There were a couple like overall,

3   they graded us overall, as fair as like how the post itself did

4   and a couple overall trophies that we brought home.

5      Q.   And I understand what you explained to me about it not

6   being any kind of certification that you could use in getting your

7   job with Richmond County Sheriff's Office as a deputy or jailer,

8   or whatever.  I get that.

9       But I am gonna ask you, since you mentioned training,

10  what kind of training in law enforcement did they provide you with

11  in the Cadet program?

12     A.   Again, it's a very watered down version of what we would

13  do as actual law enforcement officers.  But it's hands-on

14  experience of we work with people that have been in law

15  enforcement for a long time, as far as, you know, the post

16  instructors and everything like that.  And when I say post I don't

17  mean Peace Officer Standard in Training through the state, I mean,

18  post as in the explorer post, just to clarify that.

19      But again, we'd go through different types -- it was

20  mostly scenario days, mostly preparing for the competitions and

21  stuff.  We went over Georgia Law, we went over what criteria was

22  there, basic tactics, stuff that you would do in the academy, but

23  again, very broken down for high school age kids.

24     Q.   Did you receive any training in tactics related to the

25  use of force during an arrest?

1      A.    During the explorer program?

2      Q.    As when you were a cadet with the Columbia County --

3      A.    No, we were -- scenarios were not active and real-world

4   based.  It was not gonna be -- the people that put on those

5   scenarios were other officers and role players.  We weren't using

6   force on them, we weren't, you know, putting our hands on them and

7   fighting them.  The only thing we went over really there was like

8   judgmental use of force for pistol simulators and stuff like that.

9      Q.    You said judgmental use of force?

10     A.    Right.  The simulator, the pistol simulator, and use of

11  like deadly force type stuff, as far as that goes for the response

12  to Active Shooter Drills.

13     Q.    Okay.  Other than your participation in the cadet

14  program with the Sheriff's Office of Columbia County when you were

15  in High School did you have any other law enforcement training or

16  experience before beginning to work with the Richmond County

17  Sheriff's Office?

18     A.    No, sir.

19     Q.    You told me you first started working for the sheriff's

20  office in 2015; is that correct?

21     A.    I believe so, yes, sir.

22     Q.    And what position were you hired for in 2015?

23     A.    I was hired as a deputy jailer.

24     Q.    And generally speaking, what are the job

25  responsibilities of a deputy jailer?

1      A.    Supervision of inmates in the population of housing or

2  intake of inmates through the back doors, depending on where

3  you're assigned inside the facility.

4      Q.    Was that a full time position?

5      A.    It is, sir.

6      Q.    How long did you work as a deputy jailer for the

7  sheriff's office?

8      A.    'Til November 2017.

9      Q.    And then in November 2017, is that when you became a

10  deputy sheriff?

11      A.    Yes, that's when I moved to the Road Patrol Division.

12      Q.    Are you still on the Road Patrol Division?

13      A.    Not currently, no, sir.

14      Q.    What positions have you had with the sheriff's office

15  after your position on the Road Patrol Division?

16      A.    I'm currently assigned to our Investigations Division.

17      Q.    Any other positions after the Road Patrols Division,

18  other than your current position with the investigation --

19      A.    No, sir.  I just recently moved over to the

20  investigation side of things from road patrol.

21      Q.    Is there a specific type of criminal activity that you

22  are working on in your role in the investigative division?

23      A.    Narcotics.

24      Q.    And when did you start working in the Narcotics

25  Investigative Division?

1     A.    February of this year, I believe.  Fairly recent.

2     Q.    Did you have to undergo any training in order to get

3  your job as a jailer for the Richmond County Sheriff's Office?

4     A.    Prior to being hired?

5     Q.    Yes, sir.

6     A.    No, sir.  We're hired and trained by the facility once

7  we're hired and once we start our job.  It was not a -- they don't

8  send us somewhere then hire us, we're hired and then go to

9  training.

10    Q.    Where did you complete your training for your position

11 as a jailer with the Richmond County Sheriff's Office?

12    A.    Some of it was done at the detention center, itself, and

13 some of it was done at our training facility out on Greenland

14 Road.

15    Q.    Is there a breakdown of the type of training that

16 would -- required some training to be at the detention center, and

17 others to be at the training facility?  Is there a specific type

18 of training that required y'all to go to the training facility, as

19 opposed to have the training at the detention center?

20    A.    It was just where it was held.  I'm not in charge of our

21 Training Division or where they hold class.

22    Q.    Who's your current supervisor?

23    A.    My current supervisor?

24    Q.    Yes.

25    A.    Sorry, the video is freezing on my end.

1          It's Sergeant Alonzo Bell.

2     Q.    And who was your supervisor before Mr. Bell?

3     A.    Corporal Green was my last supervisor prior to him.

4     Q.    And when did Corporal Green begin being your supervisor?

5     A.    Last six months.  I'm not very sure.  There was a couple

6 of changes that took place.  I was in one area for a while and

7 then kind of got moved to two or three real rapidly, so I'm not

8 sure on the dates.

9     Q.    Who was your supervisor in December of 2019?

10    A.    That was Corporal Michau.

11    Q.    Do you recall how long he had been your supervisor as of

12 December 23rd, 2019?

13    A.    As of 2019, maybe a year and a half.

14    Q.    Have you had any other supervisors, other than the ones

15 you just told me about, in your role as a deputy sheriff?

16    A.    I've had a few supervisors.  As far as direct

17 supervisors, it was from Corporal Michau, to Corporal Trillingham,

18 and then to Corporal Green, if I'm not mistaking my order.

19    Q.    In your role as a deputy sheriff, when you first began

20 that role I assume you received additional training that was

21 required since your position came from deputy jailer to deputy

22 sheriff; is that correct?

23    A.    That is correct.

24    Q.    And did you receive training in the -- excuse me.  Did

25 you receive training in the use of force when you switched over to

1  a deputy sheriff?

2      A.   Correct.

3      Q.   Did you have any training in the use of force when you

4  were a deputy jailer?

5      A.   Yes.  We still covered use of force as part of our

6  yearly.

7      Q.   So based on your general memory, was the training that

8  you received on the use of force when you were a jailer similar or

9  the same as the training you received as a deputy sheriff?

10     A.   Similar in nature, I would say, yes.

11     Q.   You think it was pretty much the same or were there key

12  differences that would be required for a deputy sheriff, as

13  opposed to a jailer, that y'all were taught?

14     A.   As far as the training curriculum, it is a little

15  different for the road patrol, because we carry firearms, versus

16  the jail where we do not.

17     Q.   And you told me that your training took place, when you

18  were a deputy jailer, at the detention center or at a local

19  training facility.  What about when you became a deputy sheriff,

20  where did y'all conduct training, where did you receive

21  (inaudible), local or somewhere different?

22     A.   Still at our same -- it's still at our same, as far

23  as -- let me clarify your question.  Are you talking about the

24  transition from deputy jailer to deputy sheriff, where I attended

25  training or where we tend -- attend our yearly training?

1     Q.   Well, let's -- let's break it down.  When you did the

2  transition where was your training?

3     A.   When I went to the police academy for the State of

4  Georgia I went to Columbia County's training facility.

5     Q.   And your yearly training, where does that take place?

6     A.   Typically conducted at the Richmond County Training

7  Facility off Greenland Road.  In addition to that, we attend the

8  state facility at Forsyth, as well.  That's where additional

9  classes and specialized training is held.

10     Q.   Okay.  When you switched over to being a narcotics

11  investigator did you require additional training in your position

12  of that role?

13     A.   I'm still going through that currently.

14     Q.   Okay.  Regarding your training in the use of force when

15  you were a deputy sheriff, did you receive any training regarding

16  what environmental factors to assess, as far as location and your

17  surroundings, before deciding to use force during an arrest?

18     A.   I don't understand what you're asking.

19     Q.   When you received training as a -- excuse me.  I'll

20  rephrase it.

21         In the course of your training in the use of force when

22  you were a deputy sheriff, were you trained to make any analysis

23  of your surroundings -- other than the perpetrator who you were

24  going to arrest, were you trained to make any other assessments of

25  your surroundings before deciding to use force?

1    A.    I mean, we're always supposed to be cognizant of our

2    surroundings, if that's what you're asking, I mean.

3    Q.    So what kind of surroundings or environmental factors

4    were you trained to consider concerning your decision to use force

5    during an arrest?

6    A.    It's not so much a consideration of environmental

7    factors.  I'm not quite sure what that means, as far as my

8    decision to use force isn't based off environmental factors, it's

9    based off necessity to effect a lawful arrest at the time.  But as

10   far as surroundings, yes, we pay attention to what's going on

11   around us just as much as the individual we're dealing with.

12   Q.    Were you trained to assess whether the subject posed a

13   physical threat to your safety before deciding to use force while

14   making an arrest?

15   A.    That's one of the factors.

16   Q.    So what factors were you trained to consider in

17   assessing whether the subject posed a physical threat to your

18   safety before using force?

19   A.    It really depends on the interaction between myself and

20   the subject I'm dealing with; the individual's belligerent, taking

21   up fighting stances, things of that nature, actually makes verbal

22   threats of physical harm.

23   Q.    So belligerent, taking up a fighting stance, makes

24   verbal threats of physical harm; are there any other factors that

25   you were trained to assess when deciding to use force and your

1  assessment of whether the subject posed a physical threat to your

2  safety?

3      A.   I mean, it's a rapidly evolving situation that's always

4  being reassessed, as far as that goes.  I mean, I can't sit here

5  and list off 100 different things that would be assessed or looked

6  at, especially in the moment.  Situation and the circumstances

7  change in an instant.

8      Q.   Okay.  Well, can you -- let's phrase it this way; during

9  the course of making an arrest, if a subject was not acting

10  belligerently, was not verbally threatening you physical harm, was

11  not actually physically trying to inflict harm, without any of

12  those factors, under your training would it be reasonable to use

13  force upon such a subject?

14      A.   If I have a subject that is completely cooperative and

15  follows instructions that are given, absolutely not.  It would not

16  be reasonable to use force.

17      Q.   That's not exactly what I asked you.

18      A.   Can you rephrase it or clarify?  I mean, you took away

19  the -- will you re-clarify for me, sir?

20      Q.   Yeah.  So I'll give you an idea of what I'm trying to

21  find out and we'll go from there.  What I'm trying to figure out

22  is when you're assessing the behavior of a subject whom you intend

23  to arrest, what factors do you consider before deciding to use

24  force against that subject?  And when I'm saying what factors, I

25  mean, what factors of the subject's behavior or actions?

1     A.    Well, it's completely dependent upon the subject's
2   actions.  If I tell a subject to turn around and place their hands
3   behind their back and they do, I can handcuff the subject, no use
4   of force is necessary.  If I tell them turn around and place their
5   hands behind their back and they don't, we have to go through a
6   continuum there and see.  Based completely upon the actions and
7   how their level of resistence is based on my level of force.
8     Q.    Okay.  So you're trained to assess whether acting --
9   whether they're acting belligerently, posing a physical threat,
10  making verbal threats of violence, and whether they do not
11  complied when you tell them to turn around and put their hands
12  behind their back?
13    A.    That's not the specific curriculum for the training, no,
14  sir.  But that is a few factors involved in it, yes.
15    Q.    Are there any other factors you can think of that you
16  would assess when deciding to use force against a subject during
17  an arrest?
18    A.    Yeah, it's completely situational.  And I can't list off
19  a thousand different factors that would be assessed at one time.
20  It's one of those things that happens as it happens.
21    Q.    As we sit here, you are not able to list off any other
22  factors other than those which we just described?
23    A.    I'm sorry?
24    Q.    As we sit here, you're not able to list off any other
25  factors that you would assess?

1    A.    Not currently off the top of my head, no, sir.

2    Q.    In your training regarding the use of force as a deputy

3    sheriff were you trained to assess alternatives to the use of

4    force before engaging in the use of force during an arrest?

5    A.    That's -- yes, sir.

6    Q.    And what alternatives to the use of force were you

7    trained to assess or consider, as a reasonable police officer,

8    before using force during an arrest?

9    A.    Well, verbal commands is where we start at.  Talking

10   with subjects, talking and giving instructions or trying to talk

11   to them and having them respond.

12   Q.    Give verbal commands.  Are there any other alternatives

13   to the use of force that you were trained to engage in before

14   using force during an arrest?

15   A.    Subject doesn't want to talk to me and follow commands

16   we kind of have to use force at that point to effect a lawful

17   arrest.

18   Q.    So if a subject doesn't talk to you then you have to use

19   force to --

20   A.    That's not what I said.  I said if a subject is under

21   lawful arrest and does not respond to commands or doesn't

22   communicate back and forth, and they are being placed under lawful

23   arrest, yes, force is used at that point and is necessary to

24   effect said lawful arrest.

25   Q.    (Mr. Califf)  Okay.  So the factor alone of a subject

1  not responding to your commands would be sufficient under your

2  training to use force against such a subject while making an

3  arrest?

4      A.   Just to clarify, if that subject is under arrest, yes,

5  or being detained, is not free to go, is under our supervision and

6  a seizure has occurred, yes.  If they're not following the

7  commands that they're being given, if they become, like I said

8  previously, belligerent, things of that nature then, yes.

9      Q.   What type of force would be authorized under the

10  training you received as a deputy sheriff in the use of force upon

11  a subject who does not respond to your commands?

12      A.   We have several different levels of force that could be

13  used and it would be completely dependent upon their behavior.

14      Q.   Okay.  So what kind of levels are these?

15      A.   We go from very much what would be considered soft

16  hands, to where I just put my hands on you and handcuff you.

17  Whether you resist or fight, swing at that point, we could step up

18  the continuum from there.

19      Q.   And how would the continuum step up from there?  I'm

20  trying to get an idea of the different levels of force that can be

21  used upon a subject who is being arrested and who has not made a

22  verbal or other response to your command?

23      A.   All right.  So if I tell somebody to turn around and

24  place their hands behind their back, for example, and they refuse

25  or don't follow that command, and I go to place their hands behind

1 their back and put them in handcuffs; if they were to pull away,

2 snatch from me, things of that nature, that's one level of force

3 where we're now wrestling.  If they punch me in the face, that's a

4 whole 'nother level of force, we're now physically fighting, where

5 I'm going to use force back.  Depending on the size, stature,

6 physical condition, all those things are evaluated, as far as mine

7 versus theirs and theirs versus mine.  Much larger subject I'm

8 gonna have to use a lot more force, versus a much smaller subject

9 than me; and same thing, a much smaller subject than me, I'm not

10 gonna have to use that much force to, in theory, take them into

11 custody.  But force continuum goes all the way from verbal

12 commands all the way up to deadly force, and there's steps in

13 between.

14     Q.   To clarify, you said if a subject were to pull away when

15 you were trying to handcuff them that alone would escalate it to

16 the level of wrestling?

17     A.   Yes, that's a use of force.  That's an act of

18 aggression.

19     Q.   Can you elaborate on what wrestling means to me.  I

20 don't have any education or training in police officer work, nor

21 was I ever in the military, nor have I ever taken martial arts.

22 Can you elaborate for me, just generally, what that entails?

23     A.   It's typically a fight for control without any closed

24 fists or strikes being thrown.  That would be the level of, you

25 know, once we step up to soft hands technique or something like

1    that. When he's pulling away I typically involve like pressure

2    point control tactics and things like that; wrist locks, that

3    nature of things. No impact weapons or no strikes.

4          Q.   Okay. When you give a verbal command --

5               MR. CALIFF: Well, strike that. Let me start over.

6          Q.   (Mr. Califf) In your training regarding the escalation

7    of force, as you described it, what starts the verbal commands, if

8    I'm understanding you correctly, is there any requirement that

9    there's a specific number of verbal commands that must be given?

10   For instance, you must make two commands to stop or turn around

11   and put your hands behind your back before initiating force on a

12   subject who hasn't responded to your command?

13         A.   No.

14         Q.   Is there any requirement that you learned or any

15   verbiage that you learned or practice that you learned that would

16   require a period of time to elapse between you issuing a verbal

17   command and when you may begin using force against the subject?

18         A.   There's not a set period of time. However, I'd like to

19   clarify, that it's not instant. The moment I tell you to put your

20   hands behind your back, if I were to start striking you or using

21   force that would be a little unreasonable. But if there's a three

22   minute window, a two minute window, a one minute window, if that's

23   what you're asking me, no.

24         Q.   And what about a window of three seconds?

25         A.   A lot can happen in three seconds.

1    Q.   If a person has not threatened any physical violence,

2    has not run away from you, has not made any verbal threats, would

3    a window of three seconds be reasonable for you to initiate the

4    use of force after issuing a verbal command to the subject?

5           MR. FRAILS:  Object to the form of the question.

6           You may answer.

7           THE WITNESS:  I'm sorry, sir.

8           MR. FRAILS:  I said, I object to the form of the

9        question, but you may go ahead and answer.

10   A.   It's not a way -- there's not an appropriate way to

11   answer that question without giving a lawful -- like an actual

12   scenario.  I can't speak on behalf of somebody else of what

13   decision they would make in three seconds or I can answer for

14   myself if you give me a specific as to what you're asking me.

15   Q.   (Mr. Califf)  Yeah.  If you issued a verbal command for

16   a person to put their hands behind their back and within three

17   seconds they failed to respond to your command would three seconds

18   be enough time for you to initiate the use of force?

19   A.   Absolutely.  If I'm putting your hands -- if I tell you

20   to put your hands behind your back and within three seconds, you

21   know you -- I believe I know what you're getting at -- but if you

22   do something other than place your hands behind your back when

23   instructed to do so, absolutely.

24   Q.   What level of force would be --

25   A.   A lot can happen in three seconds.

1     Q.    What level of force would be authorized --

2     A.    At that point it would just be -- at that point it would

3  just be a soft hands technique, where I would put my hands on you

4  and place your hands behind your back for you.  I typically let

5  everybody know when I tell them that they're under arrest or to

6  place their hands behind their back, I'm already putting my hands

7  on their hands to handcuff them.

8     Q.    Okay.  So if I'm understanding you correctly, when you

9  issue a verbal command for a person to put their hands behind

10  their back and after three seconds they don't respond to your

11  command the level of force that you are authorized to use is soft

12  hands; is that correct?

13     A.    To a degree, yes.  I'm touching that subject.  When I'm

14  placing him under arrest I'm putting my hands on them.

15     Q.    When is --

16     A.    That's usually about the same time that I'm telling them

17  to place their hands behind their back, less than three seconds.

18     Q.    Okay.  So let's flesh that out.  First of all, will you

19  tell me what soft hands means?

20     A.    I'm touching you.  I've put my hands on you.  I've

21  grabbed your -- your wrist, your arm, something of that nature.

22     Q.    Okay.  And I believe you just said, or correct me if I'm

23  wrong, that usually you are -- you begin to touch a subject and

24  use force at the same time you tell them to put their hands behind

25  their back when issuing a verbal command.

1      A.   That is correct.  If I'm placing somebody under arrest

2   I'm putting my hands on them at the same time.

3      Q.   And that would be true for any offender, regardless of

4   the offense for which you're arresting them?

5      A.   Yes.  I'm gonna have to touch somebody to arrest them,

6   regardless of what the offense is.

7      Q.   In your training as a deputy sheriff of the Richmond

8   County Sheriff's Office were you ever trained in the use of de-

9   escalation techniques or approaches before using force when making

10  the arrest?

11     A.   We do have de-escalation training, yes, sir.

12     Q.   And --

13     A.   Part of the Governor's Initiative, actually.

14     Q.   So what are you trained to do as a de-escalation

15  technique; can you explain to me what a de-escalation technique

16  is?

17     A.   De-escalation is not necessarily a technique, it's an

18  outcome for a situation.  It's not something that you can just do,

19  it's something that happens.  And in order for that to take place

20  the other party has to be a willing participant.

21     Q.   So how would one de-escalate a situation before using

22  force or --

23     A.   You would have to give me a situation.  You'd have to

24  give me a situation.

25     Q.   What did you learn in training regarding de-escalation

1  technique?  I'm just trying to figure out what these classes

2  teach.  I saw them in a list of your courses that you've taken and

3  training that you've taken.  So I'm trying to understand, what is

4  de-escalation techniques; what does that mean?  What are you

5  taught?

6      A.    When we go through that process it'd be something where

7  we can establish communication with somebody.  It's typically for

8  persons in crises, as far as that goes.  Like mental health is a

9  big portion of that.  When we get called out where we can

10  establish communication and open lines of communication with that

11  person where they're talking to me and I'm responding, and vice

12  versa, when I talk to them they respond, enables to help them and

13  walk them through whatever situation that they have going on for a

14  peaceful and reasonable outcome; that's what de-escalation is.

15  It's not a tactic, per se.

16      Q.    And would the de-escalation training that you received

17  apply to a situation where you're making a routine arrest for a

18  traffic stop?

19      A.    No.

20      Q.    And where did you learn -- or where did you take classes

21  or have training on de-escalation?

22      A.    We take them at our training facility, as well as online

23  through the State's website.

24      Q.    Do you recall the name of your instructor?

25      A.    Not for this last (unintelligible).  No, I don't, sir.

1     Q.   Would you agree with me that a police officer should not

2  take any actions while making an arrest that would needlessly

3  endanger the person being arrested?

4     A.   I don't know what your version of needlessly endanger

5  means, so I can't agree or disagree with you.

6     Q.   You don't know what needless means?

7     A.   I don't know your version of needless.

8     Q.   Okay.  Well, would you agree that when an officer is

9  making an arrest he should not take any action that would endanger

10  the person being arrested for no reason?

11     A.   Yeah.  We don't endanger people when we arrest them,

12  that's correct.

13     Q.   Okay.

14     A.   For no reason, just to clarify.

15     Q.   And what would be the reasons to endanger somebody while

16  making an arrest?

17     A.   We typically try not to endanger anyone for any reason.

18  And, again, maybe we have a different definition of endanger.  But

19  you're talking about a subject that's fighting or resisting

20  arrest, they put themselves in that danger and we have to use a

21  necessary level of force to take them into custody.

22     Q.   What about a subject who is not fighting or resisting

23  arrest?  Would you agree then, in that scenario, that an officer

24  should not take any actions that would endanger the subject for no

25  reason?

1    A.    Even if they are fighting or resisting we shouldn't

2  endanger them.  Again, maybe that's a definition thing that we're

3  tripping up on over that.  But, I mean, I'm not gonna put somebody

4  in the middle of the road or put them in a situation that's

5  hazardous while I'm trying to arrest them, but I will use force,

6  if necessary, to take them into custody.  If somebody, again, like

7  I said, is not resisting arrest or not fighting it's pretty

8  simple.  I've made numerous arrests without ever having to use any

9  type of real physical force, other than touching the person.

10    Q.    Do you keep track of how many arrests you've made in

11  your position as a deputy sheriff?

12    A.    I do not.

13    Q.    Do you have any estimate as to how many there have been?

14    A.    More than 50.

15    Q.    More than 50.  How often would you say (unintelligible)

16  arrests which you'd need to use force upon the subject being

17  arrested?

18    A.    I don't have a statistic for you on that.

19    Q.    Would you say it's half the time or more?

20    A.    Less.

21    Q.    But it's a part of the time?

22    A.    It's not very commonplace, as far as a simple arrest, if

23  that's what you're talking about.  And even some of the violent

24  felony arrests I've made, I've -- most of the time I've been able

25  to just put handcuffs on them and we go to jail.

1     Q.   So less than a third?

2     A.   I'd say it's safe to say they're less than a third.

3     Q.   Less than ten percent?

4     A.   I have no idea.  I don't know what you -- I don't have a

5 quantity or a number that I can put on this for you, sir.

6     Q.   And I understand, and I'm not gonna hold you to an exact

7 number.  I'm just trying to get an idea of how often force would

8 be needed --

9     A.   When it's necessary is when it's used.  I mean, I don't

10 have statistics in front of me.  I don't know how many arrests

11 I've made or how many times I've used force versus how many times

12 I haven't.  So I can't answer that 100 percent truthfully for you.

13    Q.   Do you remember the events of December 23rd, 2019 and

14 your interactions with Larry Scott?

15    A.   Yes, sir.

16    Q.   Why did you decide to pull over Larry Scott?

17    A.   Dark tinted windows and a registration violation.  The

18 sticker was expired on the car.

19    Q.   Do you recall what you were doing when you first saw

20 Larry Scott's vehicle?

21    A.   Patrolling my assigned area.

22    Q.   Patrolling your what?  I'm sorry.

23    A.   Patrolling my assigned area.

24    Q.   Okay.  And were you driving when you first spotted the

25 vehicle or were you parked?

1     A.   I was driving.

2     Q.   Do you recall which direction you were driving?

3     A.   I believe it was -- it should be east on Jones.

4     Q.   Do you recall which direction Larry Scott's vehicle was

5 traveling and on which road when you first spotted him?

6     A.   East on Jones.

7     Q.   Okay. And when you first spotted his vehicle were you

8 behind it, in front of it, to the side of it?

9     A.   Behind, if I remember correctly.

10     Q.   Were you traveling behind his vehicle?

11     A.   Yes.

12     Q.   How many cars back from his vehicle were you?

13     A.   One.

14     Q.   And did you first come to be traveling behind Larry

15 Scott's vehicle as you were traveling east from Jones?

16     A.   That is correct. We were traveling east on Jones,

17 approaching 13th Street. I was behind him, saw the registration

18 sticker. And I actually pulled up beside the vehicle at the 13th

19 and Jones light.

20     Q.   Do you remember how long you had been traveling behind

21 Larry Scott's vehicle before you saw the registration sticker and

22 noticed his vehicle?

23     A.   Not particularly, no.

24     Q.   Why did you decide to pull over Larry Scott? You may

25 have already answered that, but I just want to --

1     A.   The expired registration and the dark tinted windows on

2  his car.

3     Q.   Okay.  Was there any particular place you were heading

4  to at the time you spotted Larry Scott's car?

5     A.   Not that I recall.

6     Q.   Was there any place or event that you were coming from;

7  for instance, had you just recently got done pulling over another

8  vehicle, or you were stopped at a gas station?  Was there any

9  place you were coming from before you first noticed Larry Scott's

10  car?

11     A.   I don't recall.

12     Q.   Do you recall what the time of day it was?

13     A.   I went out with the stop at 1:17.

14     Q.   I saw you just looked down when you said that, are you

15  looking at a document?

16     A.   Yes, sir.  I'm looking at the Incident Report from that

17  day.  That's the time I called the stop out.

18     Q.   Did you bring any other documents with you to the

19  deposition?

20     A.   Just the ones that provided the answer to the lawsuit

21  and all that, that was provided by my attorney.

22     Q.   So the first thing you noticed about Scott's vehicle was

23  that the tag was expired; is that correct?

24     A.   Yes, sir.

25     Q.   What did you do when you discovered that the tag was

1  expired?

2      A.   The sticker, I ran it through GCIC in my in-car

3  computer.

4      Q.   Do you recall what came back when you ran it through

5  that?

6      A.   They showed that it was expired.

7      Q.   Did it show Larry Scott's name at all on the

8  registration?

9      A.   I don't recall.

10     Q.   Do you recall if it showed anybody's name on the

11 registration, an owner of the vehicle?

12     A.   If you're asking me if I vividly remember what the NCIC

13 printout said, no.  But I believe the vehicle was registered to

14 Ms. Katherine Taylor, and that would have showed when I ran the

15 tag.

16     Q.   Did you see the Scotts through the windows of their

17 vehicle before you pulled them over?

18     A.   Vaguely.  I mean, as far as outlines of them, yes.

19     Q.   Would you always pull over a vehicle because of tint?

20     A.   What do you mean always?

21     Q.   If you see a vehicle that you believe the tint is too

22 dark, is that something that you would always pull that person

23 over if you had the time and opportunity to do so?

24     A.   For the most part, yes, long as time allotted and

25 opportunity allotted.

1       Q.    Same with an expired tag?

2       A.    Yes, sir.

3       Q.    Do you recall asking the Scotts if they had any drugs in

4  the vehicle?

5       A.    I asked them if they had anything illegal in the

6  vehicle, yes.

7       Q.    Why did you ask them if they had anything illegal?

8       A.    Behavior.

9       Q.    What behavior?

10      A.    Behavior of Mr. Scott and both, Ms. Scott.  Mr. Scott

11 was shaking profusely when I made contact with him, had a freshly

12 cigarette in his mouth.  Ms. Scott was taking over -- or I'm

13 sorry -- Ms. Taylor was trying to take over the conversation while

14 I was trying to talk to him.  All those things are indicative of

15 some sort of, I want to say complete criminal activity, but

16 something not being right with the situation.

17      Q.    And is that something you remember or is that something

18 that you're relying on the document?

19      A.    Both.

20      Q.    So you said that they were shaking profusely?

21      A.    No.  Their hands were shaking as they were trying to

22 talk to me and trying to move documents and stuff around the car.

23      Q.    And you believed that their hand shaking was indicative

24 of some kind of illegal behavior?

25      A.    Yeah.  It's involuntary.

1     Q.   You ever consider that they might be scared of the

2 police?

3     A.   It's a stress response.  I stop a lot of cars, I talk to

4 a lot of people, there's always a reason behind why that's

5 happening.  It's very, very, very -- I could count maybe three

6 times where I've made contact with somebody, as they hand me their

7 driver's license their hands are trembling, whether they're scared

8 of the police or not, that there wasn't actually more to the stop.

9 It's an involuntary response to stress.

10    Q.   Okay.  That's not exactly what I asked you.  I just

11 asked you whether you had considered whether they shaking because

12 they're scared of the police?

13    A.   I don't know why they'd be scared of the police.  We're

14 here to help.

15    Q.   You have no idea why Mr. Scott and Ms. Scott may be

16 scared of the police?

17    A.   No, sir.

18    Q.   Even given the recent matters in the news involving

19 police use of force?

20    A.   That has nothing to do with me or policing here in

21 Augusta.

22    Q.   I'm not saying that it does, why he would be scared, I'm

23 just saying why somebody might be afraid of the police who's an

24 African-American traveling with a white woman?

25    A.   (No response.)

1    Q.   Is that a no?

2    A.   I'm not entertaining that, sir.

3    Q.   The question is whether you considered it?

4    A.   No, I don't consider that people should be scared of the

5    police, because, again, we're here to help, regardless of race,

6    creed, color, religion or any of the like.

7    Q.   You did not consider that the Scotts may be afraid of

8    the police when you approached their vehicle and saw their hands

9    shaking?

10        MR. FRAILS:  I'm going to object.  He's answered your

11        question twice.

12   Q.   (Mr. Califf)  Is it a no?

13   A.   Yes, it is a no.  I did not -- I do not consider

14   anybody, when I talk up to them, that they should be terrified of

15   the police.

16   Q.   And you told me that their hands were shaking.  Was

17   there any other reason that you asked them whether they had

18   something illegal in the car?

19   A.   As far as that goes, the conversation that was taking

20   place didn't quite make sense, whereas Ms. Taylor kept

21   interjecting into the conversation, Mr. Scott wasn't really

22   wanting to look at or talk to me, things like that.  It's also

23   something that I do pretty much on every traffic stop that I

24   conduct.

25   Q.   What is something that you do on every traffic stop?

1       A.    Have an interview with the occupants and driver.

2       Q.    And eventually you ask Mr. Scott to get out of the

3  vehicle; is that correct?

4       A.    That is correct.

5       Q.    And why did you ask him to get out of the vehicle?

6       A.    So that I could watch him and talk to him while I gather

7  his information at my vehicle -- at my patrol vehicle.

8       Q.    Why did you want to watch him while you gathered his

9  information?

10      A.    So that I could see what he's doing, where he's at, and

11 keep constant visual contact with him.

12      Q.    Were you not able to see what he was doing or see where

13 he was if he'd remained inside the vehicle?

14      A.    No, sir.

15      Q.    And why is that?

16      A.    Because I had to step back to my patrol vehicle.

17      Q.    When making traffic stops for traffic violations do you

18 always ask the driver to get out of the vehicle to keep an eye on

19 them?

20      A.    Not always, but a significant amount of time, yes, I do.

21      Q.    And when would you not asked somebody to get out of the

22 vehicle?

23      A.    I don't have an answer for that.

24      Q.    But you do acknowledge that sometimes you don't ask

25 people to get out of the vehicle and most of the time you do ask

1  people to get out of the vehicle when making a routine traffic

2  stop?

3       A.   That is correct.

4       Q.   Are there any factors why you wouldn't feel like you

5  needed to keep an eye on somebody by asking them to get out of the

6  vehicle?

7       A.   It's merely for a safety standpoint.  I can see what

8  they're doing, I can see them, they can see me.  Inside the car,

9  that's not possible.

10       Q.   Was there anything that made you concerned for your

11  safety when you asked Mr. Scott to get out of the vehicle?

12       A.   I don't know what's in his car.

13       Q.   Okay.

14       A.   Which is why I had him -- he didn't have any type of

15  identification on him, nothing with his name or a picture on him.

16  So that's why I had him exit the car, step back to my car while I

17  gathered his information.

18       Q.   He made any indication or any signs that he may be

19  violent before you asked him to get out of the vehicle?

20       A.   Not that I can recall.

21       Q.   Did he make any indications or show any signs that he

22  might flee before you asked him to get out of the vehicle?

23       A.   There's really no signs of fleeing, it's just kind of

24  something that takes off and happens.

25       Q.   Did you have any suspicion that he might flee before you

1 asked him to get out of the vehicle?

2     A.   It's always in the back of my mind with everybody I

3 stop.

4     Q.   So there's nothing specific about Mr. Scott or his wife

5 that gave you suspicion that they, in particular, might flee?

6     A.   Not that I can recall.  At that point in the stop -- let

7 me clarify that, as well.

8     Q.   I was talking about when you asked him before you --

9     A.   When I stepped him out of the -- when I asked him to

10 step out of the vehicle there was...

11     Q.   I'm sorry.  Did you finish your sentence?

12     A.   Yeah.  When I asked him to step out of the vehicle, that

13 was what I was referring to.

14     Q.   Okay.  I'm sorry.  Sometimes when we do this online

15 it's...

16         So after you asked Mr. Scott to get out of the vehicle

17 you patted him down; is that correct?

18     A.   That's correct.

19     Q.   Why did you pat down Mr. Scott?

20     A.   I conducted a Terry frisk for weapons.

21     Q.   Do you always conduct a Terry frisk for weapons when

22 making a traffic stop?

23     A.   When I have the subject exit the vehicle and step back

24 to my vehicle, yes.

25     Q.   And again, there was no specific factor as to why you

1  would ask some people go get out of their vehicle and others not?

2       A.   I base pretty much what I do on the behavior the

3  occupants.

4       Q.   Okay.  So that's gonna lead me to the next question.

5  What in Mr. Scott's behavior or Ms. Scott's behavior led you to

6  ask Mr. Scott to get out of the vehicle and perform a Terry frisk?

7       A.   Again, the fact that he couldn't answer questions,

8  Ms. Taylor had to answer for him; the shaking hands; trembling

9  while they're there; no documents on his person as to who he was;

10  all of these things were factors that were considered which is why

11  he was stepped out fo the car -- or which were why I had him step

12  out of the car.

13       Q.   So those factors led you to a suspicion that he may have

14  weapons?

15       A.   It's the south, everybody has weapons, just about.

16       Q.   So it wasn't those factors that led you to a suspicion

17  that he had --

18       A.   Those factors lead into that something else is going on

19  with a traffic stop; whether that be, like we brought up

20  previously, where I asked about the narcotics, whether it be

21  firearms that are illegally possessed, whether it be any numerous

22  crimes or activities that are taking place.  I can tell you from

23  the conclusion of this event, Mr. Scott's driver's license was

24  revoked.  That was his trigger.  That was what was causing these

25  behaviors.

1    Q.   It's your testimony that Mr. Scott was behaving with

2 shaking hands and his wife's speaking at that same time as him

3 because he had his driver's license revoked?

4    A.   That's not exactly what I would say, but yes.  The

5 triggers, the stress reactions to being pulled over that Mr. Scott

6 was displaying was over the suspended license.  Mr. Scott had no

7 active warrants, there's no anything else going on with Mr. Scott

8 other than driver's license.  But again, the stress reactions are

9 stress reactions.  They're the same any time somebody's placed

10 under stress, typically, with the blue lights behind them.

11    Q.   Did you just read that response or part of that response

12 off the document in front of you?

13    A.   No, I did not.

14    Q.   I saw you referring to the document multiple times; is

15 that correct?

16    A.   The front page of the document is nothing more than

17 Mr. Scott's name and Ms. Taylor's name.

18    Q.   Do you have any notes that -- as to how you should

19 testify in response to my questions in front of you?

20    A.   I do not.

21    Q.   None, whatsoever?

22    A.   No, sir.

23    Q.   When you frisked Mr. Scott, did you find anything that

24 would cause you any concern?

25    A.   No, sir.

1      Q.   Did you feel anything in his pockets or on his person at
2 all?

3      A.   As far as weapons, no, I did not.

4      Q.   What about as far as anything other than weapons?

5      A.   There were items that were not metallic or weapon-like.
6 I don't recall what all they were.  Like just regular pocket
7 items.

8      Q.   After you frisked Mr. Scott you asked him to walk toward
9 your vehicle; is that correct?

10     A.   That is correct.

11     Q.   Why did you have Mr. Scott walk towards your vehicle?

12     A.   So I could get his information and keep an eye on him.

13     Q.   Where did you tell Mr. Scott to stand while you were
14 getting his information and keeping an eye on him?

15     A.   By the spotlight on my car.

16     Q.   Was there any specific reason you told him to stand at
17 that location?

18     A.   Because I can facilitate communication with him there
19 and run his information in my computer at the same time.

20     Q.   And you did try to run Mr. Scott's information through
21 your computer; is that right?

22     A.   That is correct.

23     Q.   And did it retrieve any information at all?

24     A.   It did not.  I also -- go ahead.

25     Q.   You can go on.

1    A.   I'm sure we'll get to it, but there's an error in my

2    report that I'm sure you've seen, as far as the date of birth that

3    was typed in versus what was actually said.  The date of birth

4    that I typed into my report is 3/20/2019.  Obviously, that's not

5    correct.  It was actually 3/20/1968, is what was provided.  I just

6    wanted to go ahead and clarify that.  That was a typo in my

7    report, as far as when the information was provided.

8    Q.   When did you discover that typo in your report?

9    A.   Right around the time that I was served with this and I

10   pulled the report back up.

11   Q.   Okay.  And so what you're telling me is that in your

12   report that you wrote that -- you typed in 3/19/2019 for his

13   birthday?

14   A.    In the actual case report, itself, the report that you

15   have and everybody's a copy of, I typed in what Mr. Scott stated

16   as 3/20/2019.  Obviously, that's not correct.  A grown man telling

17   me they were born in 2019 would be very, very odd.  I mistyped and

18   it should have been 1968.  He provided me March 20th, 1968.  I

19   just wanted to go ahead and clarify that before we got to it.

20   Q.   Yeah, thank you for clarifying that typo.

21        Have you gone back and watched your body camera footage

22   from that day any time after this lawsuit was filed?

23   A.   Yes, sir.

24   Q.   And are you a hundred percent certain that Mr. Scott

25   said to you 3/20/1968?

1    A.    Yes, sir.

2    Q.    Are you sure you didn't misunderstand Mr. Scott?

3    A.    I asked him what his date of birth was on body camera.

4    Q.    I'm not -- I'm asking when he first told it to you.  Are

5    you sure you didn't misunderstand him?

6    A.    From everything that I watched and everything that I

7    recall that day, I'm pretty sure I didn't misunderstand.  Because

8    I asked him on body camera, 3/20/1968, right?  And he said, yes,

9    twice.

10    Q.    Are you sure that Mr. Scott didn't misunderstand you?

11    A.    I have no idea what Mr. Scott understood.  Can't answer

12    for him.

13    Q.    Why did you decide to arrest Mr. Scott?

14    A.    Initially, I went to detain Mr. Scott because I wasn't

15    able to verify who he was and he claimed that he had a Georgia

16    Driver's License.  We have a nationwide system, actually, that

17    will pull up any driver in any state that has a active or

18    suspended registration -- I'm sorry -- active, suspended, revoked,

19    any of those types -- expired driver's licenses will all still

20    show up.  Most states provide all the information for the driver

21    and a picture, as well as a physical description.  Georgia is our

22    home state, so we have a lot of information on those drivers,

23    typically, here.  And nothing was coming up, nothing was being

24    found, nothing in our local files with that name was popping up

25    with that name and date of birth provided.  Typically, I have

1  found through my experiences, when that happens somebody's lying

2  about who they are.

3      Q.   Are you required to enter a subject's date of birth in

4  order for some kind of information to be retrieved from your

5  patrol car computer?

6      A.   To retrieve a driver's license, yes, I need a date of

7  birth.

8      Q.   There's no other way to search for a person and find out

9  if they have a driver's license without their date of birth?

10      A.   Not in my -- not in my current in-car system, no.

11      Q.   Do you recall if that patrol car had a dash camera or

12  some other video camera?

13      A.   No.  It only had my in-car -- or my body-worn camera.

14      Q.   And let me clarify, I think we got a little off topic.

15  Why did you decide to arrest Larry Scott?

16      A.   Well, when I went to detain him and he snatched away and

17  we began our struggle and all of that, that's when he decided he

18  was under arrest.  He was being detained previously.  And the

19  detention was based off the fact that I was not able to actively

20  identify him with the information he was providing.

21      Q.   Okay.  So it's your testimony that you originally

22  intended to detain Mr. Scott?

23      A.   Correct.

24      Q.   And what were you going to do with the detention?  What

25  was the purpose of that versus --

1        A.    Once Mr. Scott was secured we were gonna talk to

2    Ms. Taylor, who was still in the vehicle during all of this, and

3    see if I couldn't actually get a real identification for him or

4    better information and continue my interview roadside.

5        Q.    You said once he was secured you intended to do that?

6        A.    Yes.

7        Q.    What do you mean by secured?

8        A.    Once Mr. Scott is placed in handcuffs and placed in my

9    backseat of my patrol car for roadside detention I could go up and

10   safely talk and interject -- or interact with Ms. Taylor.

11       Q.    Was there any reason that you would need to place

12   Mr. Scott in handcuffs before interacting with his wife?

13       A.    I'm not able to verify his identity and not able to talk

14   to see who he is.  He even, at one point during spelling his last

15   name, misspelled his last name -- or began to misspell his last

16   name, I should say.  So yes, he was gonna be detained until he

17   could be identified through a reliable system, whether that meant

18   through getting his actual information through Ms. Taylor,

19   Ms. Taylor finding an ID card or something in the car, or bringing

20   a fingerprint scanner out, whichever way we had to do it.  But he

21   was gonna be detained until he was ID'd.

22       Q.    But my question was why did you feel the need to detain

23   him in handcuffs while you did that.

24       A.    Because I don't know who he is, I don't know who I'm

25   talking to, I don't know his intentions.  I don't know anything

1    about this man.

2         Q.    Had he done anything --

3         A.    And I'd have to go and interact -- I have to go interact

4    with somebody else, leaving him.  Again, I'm by myself during this

5    encounter, so he was gonna be placed in the back of the car until

6    I could figure out who he was, and it was gonna go talk to her to

7    try to do that.

8         Q.    When you decided to detain Mr. Scott, as you say, had he

9    done anything up to that point that would lead you to believe that

10   he posed a physical threat to your safety?

11        A.    As far as had he made a physical act of violence or said

12   anything violent toward me, no.

13        Q.    Did you have any reason to believe, at that point, that

14   he may act violently toward you?

15        A.    I have no idea what his intentions were at that time,

16   which is why he was being detained.  I can't read his mind, I

17   can't tell you what he's thinking, I can't go through his process

18   and say, oh, well, this is what he was doing; I can't answer any

19   of those questions.  He was being detained based on the fact that

20   I wasn't able to identify him, so that violence didn't take place.

21        Q.    Have you always detain suspects when you're trying to

22   find more information about them by placing them in handcuffs and

23   inside your patrol car?

24        A.    If I'm by myself, yes, typically, they will go in the

25   backseat of my patrol car.  If I help with me and I still can't

1  identify them, the information they're giving me is not correct,

2  it's not verifying in any of my systems, yes, they still are --

3  they are typically placed in handcuffs.

4      Q.   Before placing someone in handcuffs in such a situation

5  would your training with the Richmond County Sheriff's Office

6  require that you issued any verbal commands, such as telling them

7  where to stand or telling them to sit in their own vehicles,

8  perhaps?

9      A.   I'm sorry.  Do what now?

10     Q.   Earlier we talked about different levels of force that

11 can be used and what you would do before using force when making

12 an arrest, correct?

13     A.   Correct.

14     Q.   And one thing you told me that was -- could be done

15 before using force in a situation involving somebody who hasn't

16 made a physical threat to you, would be an issue of verbal

17 command; is that correct?

18     A.   Correct.

19     Q.   So are there any verbal commands that you tried to issue

20 to Mr. Scott before deciding to place him in handcuffs and placing

21 him in the back of your patrol vehicle?

22     A.   Yes.  Turn around and put your hands behind your back.

23     Q.   So my question was, was there any verbal commands that

24 you made prior to deciding to put him in handcuffs and put him in

25 your control vehicle -- or excuse me -- in your patrol vehicle,

1  but telling me that you'd told him to put his hands behind his

2  back tells me that that was a verbal command you made after you

3  decided to put him in handcuffs, correct?

4      MR. FRAILS:  Object to the form of the question.

5      A.   I gave Mr. Scott several commands before that; you know,

6  step out of the car, stand in front of my car, things of that

7  nature.  There was -- the command that I gave him when he was

8  being detained was put your hands behind his back, and that's what

9  he needed to do.

10     Q.   (Mr. Califf)  I'm asking did you give him any verbal

11 commands before deciding to place him in handcuffs and put him in

12 your control -- in your patrol vehicle after you decided you were

13 going to detain him and before you placed -- you decided to place

14 handcuffs on him did you issue any verbal commands?

15     A.   No.  The only command I gave him was put his hands

16 behind his back.

17     Q.   Did you consider that you could have instructed

18 Mr. Scott or commanded Mr. Scott to walk back with you to the

19 vehicle, just like he had walked with you to your vehicle?

20     A.   Yeah, we're -- that's not happening.

21     Q.   Why not?

22     A.   That would -- that's never gonna be considered.  That's

23 never going to happen.

24     Q.   Why not?

25     A.   I'm not gonna take him back to a vehicle when I don't

1  know who he is, I haven't been able to identify him, I haven't

2  searched the car, I don't know what's in the car.  I've given him

3  way too many opportunities to hurt myself or somebody else; that's

4  not happening.  That's a critical incident or some sort of injury

5  waiting to happen.

6      Q.   Would you agree with me that your training at the

7  Richmond County Sheriff's Office taught you to be afraid of all

8  suspects you pull over at a traffic stop?

9      A.   No.

10     Q.   Well, for what reason did you fear that Mr. Scott may do

11 something to threaten your safety if you were to walk with him

12 back to your vehicle?

13     A.   It's not specific to Mr. Scott.  It's not specific to

14 any one person or individual.  I'm not gonna give somebody an

15 opportunity to hurt me or give somebody an opportunity to try to

16 flee.  That opportunity should be limited as much as it possibly

17 can.  And for me to provide it by taking him back to his vehicle

18 is just -- it's asinine.

19     Q.   So it's your testimony that if you have a subject step

20 out of their vehicle and any moment detain them when finding more

21 information about them by putting them in handcuffs, given --

22 you're given them, in your mind, an opportunity (inaudible)

23 threaten your safety?

24     A.   I don't understand the question.  Part of the video

25 broke up there.  So maybe you could rephrase?

1    Q.   I think we'll move on.

2    A.   Restate your question.

3    Q.   I think I have -- I think you've already answered my

4    question.  I think we'll move on.

5         THE WITNESS:  Do you mind if we take a quick break, like

6         five minute --

7         MR. CALIFF:  I don't mind at all.

8         THE WITNESS:  -- recess real fast?

9         MR. CALIFF:  Absolutely.

10   [Off the record.]

11   Q.   (Mr. Califf)  When we left off you told that you had

12   decided to detain Mr. Scott by placing him in handcuffs and you

13   intended to put him in your patrol vehicle, correct?

14   A.   Correct.

15   Q.   And when you made that decision what did you say to

16   Mr. Scott?

17   A.   Put your hands behind your back.

18   Q.   And what happened next?

19   A.   Instead of complying with my lawful order, Mr. Scott

20   threw his hand into his pocket and took of back toward the car.

21   Q.   How long after you said put your hands behind your back

22   did you see Mr. Scott put his hand in his pocket and turn toward

23   his car?

24   A.   I don't know it was a specific time, but it was pretty

25   fast.

1     Q.   When you made the command for Mr. Scott to put his hands

2  behind his back were you already moving toward Mr. Scott intending

3  to place him in handcuffs?

4     A.   Yes.

5     Q.   How long after you gave the command to Mr. Scott to

6  place his hands behind his back was it before you (unintelligible)

7  him with your person?

8     A.   Before I what?

9     Q.   Before you grabbed him, touched him?

10     A.   Like I testified previously, it's pretty instantaneous

11  when I tell you to put your hands behind your back.  All of this

12  happened in a matter of seconds.  I can't tell you how many, but

13  it was fast.

14     Q.   Do you believe that you gave Mr. Scott a reasonable

15  opportunity and enough time to comply with your command to put his

16  hands behind his back before you put your hands on him?

17     A.   Absolutely.  Because instead of doing what I told him to

18  do, he had time to place his hand in his pocket and turn to try to

19  walk away from me.

20     Q.   But previously --

21     A.   -- time to --

22  [Crosstalk.]

23     A.   He had time to do other things other than what I told

24  him.

25     Q.   But you just testified that it was pretty instantaneous

1  from the time you issued the command and when you put your hands

2  on him?

3      A.   Yes.  Very close, yes.  Fast, as in a matter of seconds.

4  Not minutes, not hours, like seconds.  I don't know how many

5  seconds, specifically, but it was all pretty fast.  From my

6  recollection and from -- of my recollection of reviewing the time

7  stamps on the body camera footage this entire event took place

8  from the time that I told him to put his hands behind his back to

9  the time that he was placed in the patrol car -- I'm sorry -- the

10 time he was placed in handcuffs was roughly 40 seconds, if I

11 remember correctly.  I mean, don't quote me and hold me to 40

12 seconds, but it was a very fast situation that took place.

13     Q.   Explain to me how you first put your hands or arms, or

14 whatever you put on Mr. Scott, explain to me when you first made

15 physical contact with him after telling him to put his hands

16 behind his back.

17     A.   His left hand went into his pocket, which is what I

18 grabbed for first to moved it from his pocket, and I attempted to

19 place him in handcuffs with both of my hands grabbing his left and

20 right arms with my right and left arms, respectively.

21     Q.   You said his left hand went into his pocket?

22     A.   Correct.

23     Q.   And then you grabbed his hand out of his pocket?

24     A.   Correct.  Removed it from his pocket.

25     Q.   Okay.  Did you ever tell Mr. Scott to remove his hand

1  from his pocket before you grabbed his hand?

2      A.   I believe the commands I continued to give were put your

3  hands behind your back.  I was able to get his hand out of his

4  pocket relatively rapidly so it wasn't necessary.

5      Q.   Would you agree that you did not give Mr. Scott more

6  than three seconds to comply to your command to put his hand

7  behind his back before you grabbed him?

8      A.   I don't know the time line, sir.  I can't agree or

9  disagree.

10     Q.   But you did just testify that you grabbed him pretty

11  instantaneously with your command to put his hands behind his

12  back.

13     A.   Correct.  That is correct.  But I just can't -- I can't

14  put a number on it for how many seconds took place, how much time

15  had passed, any of that.

16     Q.   Do you think it would have been reasonable to give

17  Mr. Scott an opportunity and put his hands behind his back that

18  was more than three seconds before you grabbed him?

19     A.   Not in this situation, no.

20     Q.   Why not in this situation?

21     A.   Because instead of placing his hands behind his back his

22  hands went into his pockets.  He didn't follow the commands and he

23  attempted to flee back to the vehicle.  Not briskly, not run, but

24  headed back to the vehicle, just to clarify that in case there's

25  any questions.

1          When I instructed him to place his hands behind his back

2   his hand went into his pocket, he turned his back to me and then

3   headed back to his vehicle.  He had plenty of time to comply with

4   the requests and commands that I gave him but chose to do

5   otherwise.  And that -- if you're saying the three seconds time

6   window that took place is how long that took, then, no, it wasn't

7   reasonable to give him more time.

8      Q.   And so why was his putting his hand in his pocket, in

9   your opinion, the reason why giving him more than three seconds

10  was --

11     A.   He could have anything in his pocket.  It could have

12  been anything in the world in his pocket.  Again, he was patted

13  down, I felt pocket items in his pockets, doesn't mean there

14  wasn't other things in there that are illegal that he was trying

15  to destroy, evidence related or whatever.

16     Q.   You did confirm that he didn't have any weapons in his

17  pockets before this event, correct?

18     A.   Correct.  That I felt.  Mistakes do get made.

19     Q.   You did feel -- you told me that you felt that there was

20  nothing metal in his pockets, correct?

21     A.   Just regular pocket items, right.

22     Q.   So were his pocket items large, small; what do you

23  recall?

24     A.   I don't recall a hundred percent off of that.  I just

25  know it was nothing that would resemble a gun.

1   Q.   Did you feel for knives?

2   A.   Yes.  Typically feel for knives, but don't recall.

3   Q.   You don't recall whether you felt for a knife on that

4   occasion?

5   A.   I don't recall feeling a knife or anything like that in

6   his pocket, if that's what you're asking, no.

7   Q.   And you also explained that you thought he might have

8   some evidence he would try to destroy?

9   A.   I'm saying that when an individual is told to place

10  their hands behind their back and the first thing they want to do

11  is dive into their pockets it's typically to destroy evidence, in

12  my experience.  Every time that I've had something like that

13  happen, just about, it was an effort to get something off of their

14  person that they didn't want me to find.

15  Q.   And you believe three seconds was a reasonable amount of

16  time for him to understand that he was about to be placed in

17  handcuffs  --

18  A.   Absolutely.

19  Q.   And that's true even though y'all had just been having a

20  conversation about his name and birth day?

21  A.   Absolutely.

22  Q.   Okay.  Were you aware that Mr. Scott has a difficulties,

23  if not an inability, to read and write?

24  A.   No.

25  Q.   When you were interacting with Mr. Scott before you

1  placed him under arrest or before you intended to detain him did

2  you make any kind of assessment in your mind about whether

3  Mr. Scott was able to understand you a hundred percent clearly?

4      A.    The fact that we were having a conversation was the

5  assessment that was made on that.  He was answering questions and

6  we were able to talk to each other, at the window of the car and

7  back at my patrol car.

8      Q.    But you did explain to me that he had difficulty

9  spelling his own name.

10     A.    Correct.  Which is typically something that happens with

11 either a nervousness or a lie, in my experience when people don't

12 know how to spell their last name.

13     Q.    In your experience, when somebody's nervous and they

14 fear a command to place their hands behind their back is that

15 something they will understand and ascertain immediately and do

16 within a three second time period?

17     A.    In my experience, yes, that is something that most

18 people understand.

19     Q.    Within three seconds?

20     A.    Yes.  I've arrested numerous people on numerous felonies

21 that were displaying some of the same and additional stress

22 related factors that Mr. Scott was displaying and when I told them

23 put their hands behind their back the first thing they did was

24 turn down and put their hands behind their back.

25     Q.    In any other arrests, other than that of Mr. Scott, have

1 you reviewed body camera footage to find the passing of time

2 between you issuing your command to put their hands behind your

3 back and the time where you --

4     A.   I never reviewed my footage to -- as far as a passing of

5 time between when I tell somebody to do -- to place their hands

6 behind their back and whenever the handcuffs are placed on.  I

7 don't review my footage for that, but I do review my body camera

8 footage quite regularly.  As far as that goes, direct quotes is a

9 big thing that I pull from there.  Not the actual events, but the

10 exact words that were said, I'll use the body camera for that a

11 lot.

12     Q.   Before you grabbed Mr. Scott's hand and -- to place him

13 in handcuffs did you explain to him in any way why he was being

14 placed in handcuffs?

15     A.   No, sir.

16     Q.   Do you think that you should have explained to him why

17 he was being placed in handcuffs?

18     A.   To some degree, but I was never given an opportunity.

19 He failed to comply with commands right away and we took the route

20 that we took.  I'm sorry.  He took the route that he took,

21 resulting in the route that we both wound up on.

22     Q.   So you don't think you had to explain to him why he was

23 being placed in handcuffs in that almost instantaneous motion

24 where you grabbed his hand?

25     A.   Well, given your own question right there, no.  If an

1    instantaneous action's taking place there's not really explain to

2    Mr. Scott what's happening.  Mr. Scott could have been placed in

3    handcuffs, I could have explained all of that to him peacefully

4    and politely and -- but that's not the actions that he took.

5         Q.   Do you usually explain to somebody why they're being

6    placed in handcuffs before placing them into handcuffs?

7         A.   No, it's usually after.

8         Q.   And is that something that you've been taught by the

9    Richmond County Sheriff's Office, to make an arrest and then

10   afterward explain to the person why they were being arrested?

11        A.   Correct.

12        Q.   Would you agree that it's the policy of the Richmond

13   County Sheriff's Office to, generally, when making an arrest to

14   arrest the person before explaining to them why they're being put

15   under arrest?

16        A.   No, we're not.

17        Q.   What is the policy, as far as when you would inform --

18        A.   To make a lawful arrest we can explain to the person --

19   if a deputy or individual so chooses to make that explanation

20   beforehand, that's on them.  I don't.  I don't choose to explain

21   to somebody that I'm going to arrest them and why I'm arresting

22   them before they are in handcuffs, the way that I'm more

23   comfortable, that I feel safer doing that.  Some deputies, I've

24   seen do it.  But as far as that goes, there's not a policy in

25   place that says when you have to explain to somebody.  You know,

1  they have to be explained, yes, they are under arrest, but the

2  time, whether before or after being handcuffed, there's not a

3  policy that says that, specifically, that I'm aware of.

4        Q.    Okay.  I understand that your testimony is there's no

5  policy.  I think a few moments ago you did tell me that it is

6  something you were trained to do, to place them in handcuffs.

7        A.    I'm sorry, sir?

8        Q.    You just told me it's not an official policy to explain

9  to somebody why they're being placed under arrest before putting

10  them in handcuffs, and I understand your testimony on that.  But I

11  just wanted to be clear, because I'm pretty sure right before that

12  you told me that it is what you were trained to do by Richmond

13  County, to put somebody under arrest before explaining to them why

14  they're being placed under arrest.

15        A.    Throughout my field training and experiences, yes, that

16  is the way that we have operated for quite a while with --

17              THE WITNESS:  I'm sorry.  Mr. Frails.

18              Can he hear us?

19              There it is.  Sorry about that.  I'm trying to work this

20        Zoom.

21              MR. FRAILS:  I can now.  Was there someone talking over

22        you?

23              THE WITNESS:  No.  I think one of the -- the video

24        accidently got un-muted on your end, sir.

25              MR. FRAILS:  Oh, okay.  Sorry about that.  I had

1    somebody walk in my office.

2         THE WITNESS:  Yes, sir.

3         MR. FRAILS:  All right.  I apologize.

4         THE WITNESS:  No problem at all.

5         MR. CALIFF:  Are you still trying to work your Zoom?

6         THE WITNESS:  No, I gotcha.  All right.  Sorry about

7    that, sir.

8         MR. CALIFF:  No problem at all.

9    A.   Through field training and through experiences in the

10   field, yes, that is the way that I operate and that most of the

11   people I operate around conduct business.  If somebody's under

12   arrest they're placed in handcuffs and then explained why they're

13   being arrested or why they're being detained.

14   Q.   Do you remember who provided that training to you?

15   A.   Off the top of my head, no.  It's just multiple

16   different deputies and multiple different life experiences,

17   learning to be the police, that have made that a better practice

18   than trying to explain or argue with someone before they're in

19   handcuffs.

20   Q.   Do you feel like the practice of getting someone in

21   handcuffs before explaining to them why they're going to be placed

22   under arrest is inconsistent with the use of force policy that

23   would require you to issue a verbal command before using force?

24   A.   No.

25   Q.   Earlier you explained to me that grabbing somebody's

1 hand to put them under arrest is a use of force, correct?

2    A.   It is a part of the force continuum, yes.  As far as

3 that goes, meaning that soft hands techniques, touching somebody,

4 putting my hands -- physically making contact with somebody is a

5 form of the use of force.  It's a seizure, which I'm sure you're

6 well aware of.  Like that's -- all of those things are

7 quote/unquote use of forces, but they're not violent use of

8 forces, they're not harmful use of forces.

9    Q.   Okay.  So you've got Mr. Scott's hand out of his pocket,

10 and will you describe to me what happened next?

11    A.   I attempted to place Mr. Scott's hand behind his back,

12 which he refused to do.  I was able to get Mr. Scott to the front

13 of my patrol car and I used my body as leverage, kind of holding

14 Mr. Scott toward the front of the car and continuing to give him

15 commands to place his hands behind his back, repeatedly placing

16 his hands -- telling him to place his hands behind his back.  He

17 refused.  At one point during this, Mr. Scott actually pushed up

18 off of the car -- off the hood of my patrol car.  At which point

19 he did, we wound up going to the ground where I was able to gain

20 the advantage over Mr. Scott and actually place him into

21 handcuffs, without ever striking, hitting or really hindering him

22 in any way.

23    Q.   You told me you grabbed his left hand out of his pocket,

24 correct?

25    A.   Correct.

1    Q.   And what did you do with his left hand after you grabbed

2 it?

3    A.   I attempted to place it behind his back and tried to

4 handcuff him.

5    Q.   And at this time were you doing anything with his right

6 hand or your right hand?

7    A.   My right hand also grabbed his right hand to try to

8 place it behind his back.

9    Q.   And you said that he refused to place his hands behind

10 his back?

11    A.   That is correct.

12    Q.   And so how did Mr. Scott refuse to place his hands

13 behind his back immediately after you grabbed his hand?

14    A.   That is the part where he began to kinda pull away from

15 me, where we spun to the hood of the patrol car.  And I have a

16 direct quote on the case report in front of me.  Once that

17 happens.  I believe Mr. Scott -- yes, it's a direct quote from

18 Mr. Scott; when I told him to place his hands behind his back he

19 said, I'm trying to smoke a cigarette, and then used a couple

20 expletives behind that.  I believe we all have a copy of the

21 report, so I'm not gonna repeat it, but...  Unless you'd like me

22 to.

23    Q.   Is it your testimony that immediately after you grabbed

24 his hand out of his pocket he said he was trying to smoke a

25 cigarette?

1      A.     No.  It's not my testimony that immediately after I
2   grabbed his hand out of his pocket he said he was trying to smoke
3   a cigarette.  Okay.  Mr. Scott placed his left hand into his
4   pocket; I grabbed his left hand, removed it from his pocket;
5   attempted to grab his right hand, I got -- one hand is on his left
6   hand and one hand is on his right hand, trying to place those
7   behind his back.  He is not complying with those commands to place
8   his hands behind his back, nor does he want to.  He kind of tries
9   to pull away from me and to get free, get back to his car.  I spin
10  Mr. Scott around and we wind up on the hood of my patrol car.
11  This is all very fast, very short of time that this takes place
12  in.  I believe you've seen the video and how this takes place.
13  Mr. Scott is now on the hood of my patrol car where I continue to
14  give him commands to place his hands behind his back, and his
15  response is that he's trying to smoke a cigarette.  He does not
16  comply; he does not place his hands behind his back; he does not
17  do what I tell him to do.  And it's from there he pushes off of
18  the patrol car, we -- I redirect his body weight where we both
19  redirect to the floor -- or the ground, concrete, whatever it was
20  that we landed on, I believe it was the asphalt parking lot -- and
21  at which point in time I was able to gain control of Mr. Scott's
22  hands, place him in handcuffs and it was the end of the event.
23  Again, all this was a matter of like maybe 40 seconds.  Again,
24  don't quote me on 40, but it was pretty fast.
25      Q.     Okay.  So you told me after you grabbed his hand out of

his pocket and told him to put his hands behind his back he refused to comply. How did he refuse to --
A. Correct.
Q. -- comply?
A. Well, obviously, he didn't put his hands behind his back.
Q. When you told me that you had his left hand in your hand, correct?
A. That is correct.
Q. And --
A. When he began to pull away, which I just testified to, that as I grabbed and made contact with him, he tried to pull away from me, he tried to continue on his own path. He would not place his hands behind his back. He would not comply with those verbal commands multiple times that they were given. At no point in time did Mr. Scott say, okay, I'm gonna put my hands behind my back now, sir, or attempt to put his hands behind his back. He attempted to do whatever he wanted to do, complete opposite of what I was instructing him to do.
Q. Do you think that it's possible that Mr. Scott was startled that you grabbed him simultaneously while saying put your hands behind your back after y'all just had a conversation about his name?
A. I have no idea.
Q. If I came up behind you and grabbed one of your hands

1  would you be startled?

2      A.   If you came up behind me and grabbed one of my hands
3  it'd be a problem.  But if a law enforcement officer in a lawful
4  performance of their official duties grabs somebody after telling
5  them to place their hands behind their back, in a marked patrol
6  car, in full uniform, in broad daylight, in the county that
7  they're employed, it makes perfect sense.

8      Q.   If a person is not given more than a couple of seconds
9  before hearing put your hands behind your back and being
10 physically grabbed by the officer, it's your testimony that the
11 person should not be startled that they're being grabbed by that
12 officer?

13     A.   No.  Because everybody knows what put your hands behind
14 your back means when it's said.  And especially if said person has
15 the opportunity to place their hands in their pockets and attempt
16 to walk away from the officer, they shouldn't be startled that's
17 about to happen.

18     Q.   Okay.  So would you agree, based on your testimony, that
19 everybody should expect that after having a conversation with a
20 police officer that they may be grabbed and told to put their
21 hands behind their back at any moment?

22     A.   No.

23     Q.   Well, you did just tell me that they shouldn't be
24 startled when it happens.

25     A.   I'm sorry?

1      Q.    You did just testify that they shouldn't be startled

2  when that happens, correct?

3      A.    When said person makes an attempt to reach into their

4  pocket, turns their back and then tries to walk away, no, you

5  should expect there to be -- I would expect there to be

6  consequences.  If somebody told me to do that and I tried to do

7  the opposite or not comply with those directions I would expect

8  somebody to put their hands on me very forthwith.

9      Q.    It's your testimony, if I'm correct, that you gave

10  Mr. Scott enough time between saying put your hands behind your

11  back and you grabbing his hands and pushed him against your patrol

12  car for him to comply with your command?

13      A.    He was given multiple opportunities to comply before and

14  after he was grabbed the very first time.  Instead of doing what I

15  was instructed him to do Mr. Scott placed his hands in his

16  pockets.  At no point did I say, Mr. Scott, put your hand in your

17  pocket.  At no point did I say, Mr. Scott, give your money to your

18  wife.  None of those things.  Mr. Scott made his assumptions and

19  made -- based his actions off of those assumptions.  Mr. Scott,

20  instead of putting his hands behind his back when instructed to do

21  so, initially, by me, took off to his vehicle, placing his left

22  hand in his pocket all at the same time.  Instead of placing his

23  hands behind his back like I told him to, just turn around putting

24  his hands behind his back and allowing me to handcuff him

25  peacefully, he decided to make all these other steps back toward

1  the vehicle, hand in the pocket, and then when I grabbed him still

2  refused to put his hands behind his back.  Mr. Scott at no point

3  in time complied with any of the commands that were given and did

4  not want to cooperate in the situation.  That's my testimony.  The

5  time frame that that all took place in was based completely on

6  Mr. Scott's actions, not my own.

7     Q.   And you don't believe that you had time to issue another

8  verbal command for Mr. Scott to stop walking or take his hand out

9  of his pocket before you felt the need to grab him?

10    A.   Absolutely not.  I gave him commands before, during, and

11  as all of this was going on, the entire time.  And it was the same

12  command repeatedly, Place your hands behind your back.

13    Q.   Have you seen a copy for the complaint for damages in

14  this case?

15    A.   If you mean the initial filed lawsuit that was -- I was

16  served with, yes, I have.

17    Q.   This is a picture that was included on page three in the

18  complaint for damages.  Are you able to see my screen?

19    A.   I am, sir.

20    Q.   Can you tell me what we're looking at in this picture?

21    A.   This is the part in this altercation or disagreement --

22  which I would call it a minor altercation, I guess, would be the

23  best way to describe it -- that I'm trying to handcuff Mr. Scott

24  on the hood of the patrol car.  I've got my hip placed inside his

25  legs and on his hip trying to gain leverage on him.  Mr. Scott's

1   pushing up off of the car, which is why my arm is across the back

2   of his.  I have his left hand at that point, which was the initial

3   hand that I grabbed, my handcuffs are in my right hand trying to

4   handcuff Mr. Scott.  Mr. Scott is not complying with those

5   commands to place his hands behind his back.  His cigarette is

6   still in his right hand, it's kind of hard to see from this photo,

7   it's a little fuzzy.  But this is just moments before we wind up

8   going to the ground before he pushes off of the car.

9        Q.   Would you agree that this photo shows Mr. Scott's left

10  hand is behind his back?

11       A.   That is correct.  It does show that I have his -- I have

12  control of part of his left hand behind his back.

13       Q.   And can you explain that to me what your right hand and

14  right arm are doing in this photograph?

15       A.   My forearm was applying pressure to Mr. Scott's back so

16  that he doesn't push up.  Because that whole time he's trying to

17  push up off of the car.

18       Q.   Would you say that your right arm being across

19  Mr. Scott's back may have physically made it difficult for

20  Mr. Scott to put his right hand behind his back?

21       A.   No, sir.

22       Q.   And that's even though your forearm is laid across the

23  top of his back where his shoulders are located?

24       A.   Well, if you look, my actual elbow is dropped down below

25  that, it's not across his right arm at all, it's only -- only

1    applying pressure on the left side where I have control of his

2    arm.  His other arm could have come behind his back if he wanted

3    it to, because he uses that arm to push off of the car.  He still

4    has full control of it.

5         Q.   Would you agree with me that this pictures shows in the

6    manner that you're pushing down on Mr. Scott's back and if you

7    were to move his right arm away from the patrol car that his upper

8    body and perhaps his face would slam down on the car?

9         A.   From this still image you could infer that, but I wasn't

10   applying that much pressure to Mr. Scott.

11        Q.   Is your testimony that in his image you weren't applying

12   much pressure to Mr. Scott?

13        A.   I was not applying enough pressure to slam his head and

14   upper body into the car, is my testimony.  You could infer what

15   you just asked me from this picture, but that's not the case.  I

16   wasn't trying to force his head and body and everything into the

17   hood of the car.  I was simply trying to have him place his hands

18   behind his back.

19        Q.   Okay.  Were you aware that Mr. Scott had previously had

20   discectomy surgery or spine surgery before this incident?

21        A.   How would I know that?

22        Q.   I'm just asking.  Is that a no?

23        A.   No, sir.  I had no idea of Mr. Scott's medical history

24   or anything about Mr. Scott up until this very day.  This is the

25   first time I met him.

1    Q.   But you wouldn't be aware that it's physically difficult

2  for Mr. Scott to put his hands behind his back?

3    A.   No, sir.  Again, I would not be aware of any of his

4  medical ailments up until this date.  Until you tell me now,

5  actually.  Even after this arrest occurred I still have no idea

6  what his medical history was.

7    Q.   Would you agree with me that you forced Mr. Scott's body

8  against your police vehicle?

9    A.   I used leverage and my vehicle to try to take Mr. Scott

10  into custody, yes.

11    Q.   Is that a yes, you would agree you forced his body

12  against your police vehicle?

13    A.   My testimony remains the same; I used my vehicle and my

14  body as leverage to try to take him into custody.

15    Q.   And it's your testimony that you never tried to push

16  Mr. Scott's upper body or his head down toward the hood of your

17  vehicle?

18    A.   I never tried to slam his head into the hood of my

19  vehicle.  I applied pressure right here (gesturing) while giving

20  him commands, pushing the left side of him down, but I never tried

21  to slam his head and upper body into my vehicle.

22    Q.   I understand your testimony that you don't think you

23  tried to slam his head or upper body into the vehicle.  But did

24  you try to put his head and upper body onto the hood of your

25  vehicle?

1     A.   At one point during this that did take place, yes.

2     Q.   Is there a name for the technique that you appear to be

3 using in this photograph of when you have one of his arms behind

4 his back and your other arm -- or excuse me -- one of his hands

5 behind his back and then your right arm across the top of his

6 back, and I think you explained your knee was between his legs?

7 Is there a term or a type of hold or --

8     A.   Not that I'm aware of.

9 [Crosstalk.]

10    Q.   -- to explain that technique?

11    A.   Not that I'm aware of.

12    Q.   Where did you learn this technique?

13    A.   That's just kinda the position we wound up in.

14    Q.   So you have never been trained to take a suspect who you

15 are arresting's arm and twist it up behind their back, like

16 Mr. Scott's left arm?

17    A.   His arm's not twisted up, as far as that goes.  Like I

18 had his arm behind his back trying to gain compliance at this

19 point in time.  So I haven't -- at this point in time I haven't

20 applied any strikes or any type of technical term holds, or

21 anything of that nature.  I've got my weight, my body weight, used

22 as leverage against Mr. Scott, which is why I'm centered behind

23 him and I'm leaning into him and I'm trying to gain control of

24 both of his hands.  There's no real super secret technique that's

25 taking place here.  It's -- I mean, we're just struggling for

1 control at this point.

2     Q.   How was Mr. Scott trying to be in control at this point,
3 in your opinion?

4     A.   He's refusing to put his hands behind his back and he
5 keeps trying to push up off the car.

6     Q.   And you did agree with me that you weren't aware of
7 Mr. Scott's physical disabilities at this point.

8     A.   That is correct.  I was completely unaware of anything
9 about Mr. Scott up until the events of this day.

10     Q.   But it's still your testimony that he was refusing to
11 put his hands behind his back?

12     A.   That is correct.

13     Q.   What did Mr. Scott do or say that made you feel like he
14 was refusing to put his hands behind his back?

15     A.   Again, when I tried to talk to him he started yelling,
16 he was trying to get his money to his wife because he wasn't doing
17 expletive.  I instructed him a couple more time to put his hands
18 behind his back, and he responded with he's trying to smoke a
19 cigarette, and then used some more expletives.  Those are pretty
20 clear indicators that he's not doing what I'm telling him to do,
21 he's doing what he wants to do.

22     Q.   Are you a hundred percent certain that Mr. Scott said he
23 was trying to smoke a cigarette?

24     A.   Am I a hundred percent sure that's what he said?

25     Q.   Yes.

1       A.    Yes, I am.

2       Q.    And so you don't think it's possible that Mr. Scott said

3    he was getting burnt with a cigarette?

4       A.    No, that's not what he said.

5       Q.    When's the last time you listened to the audio clip of

6    this arrest?

7       A.    Probably two weeks ago.

8       Q.    Did you at any time instruct Mr. Scott to drop his

9    cigarette or put out his cigarette before attempting to place his

10   hands in handcuffs?

11      A.    Not that I recall.

12      Q.    And is it your testimony that Larry Scott threatened you

13   in any way before you forced his upper body and head on the roof

14   of your vehicle?

15      A.    I'm sorry.  Can you repeat that question one more time?

16      Q.    Did Larry Scott threaten you or threaten your safety at

17   any time before you attempted to push his upper body and head on

18   the hood of your vehicle?

19      A.    Say did he?

20      Q.    Yeah.

21      A.    I'm sorry.  I'm not sure if I'm missing something or is

22   that a question you're asking me or a statement you're making?

23      Q.    That's a question, did he?

24      A.    Did he threaten me?  No.

25      Q.    Moving down to page four of the complaint it has another

1   picture.  Are you able to see this picture?

2        A.   I am.

3        Q.   Can you tell me what's happening in this picture?

4        A.    This is after Mr. Scott was able to regain control of

5   his left arm, snatching it back from behind his back, and using

6   his right hand to push up off of the car, where he pushed back

7   into me.  This is right before I redirected both of our body

8   weights to the pavement.

9        Q.   And so it's your testimony that in this picture,

10  Mr. Scott had regained control of his left hand?

11       A.   Oh, as you can see from the previous picture, I had his

12  left hand in my left hand, and in this picture, which is moments

13  later, his left hand is no longer in my left hand.  I'm trying to

14  get it back behind his back with my left hand, but he snatched it

15  out and snatched it free.  He's also managed, since that last

16  picture was taken, or that still shot was taken, to push up off of

17  the hood of the car, where he's now in a standing position with

18  his body pressed up against mine.

19       Q.   Okay.  Let's break that down.  You said in this picture

20  it's evident that he's pushing off of the vehicle; is that

21  correct?

22       A.    I didn't say that it's evident that he's currently

23  pushing off in the picture.  I'm saying that since the last

24  picture was taken 'til the time that you have this still shot he

25  is now clearly up off of the car and his hands are now not where

1  they were in the last picture, they are free.  He is using both of

2  his hands.  This picture takes one moment in time throughout this

3  whole incident here that is after the other.  The first picture

4  that you showed me, I had control of his left hand, in this

5  picture, I do not; meaning that he was able to free it.

6      Q.  At any point in time did you decide to put your arm

7  around Mr. Scott's neck?

8      A.  That's not his neck, it's his collarbone.

9      Q.  It's your testimony that you never put your arm around

10  Mr. Scott's neck?

11     A.  Define neck.

12     Q.  The neck is a portion of a body underneath the head.

13     A.  My arm went around this portion (gesturing) of

14  Mr. Scott, however, it never interfered with any blood flow,

15  breathing, or anything like that.  I locked around his top of his

16  shoulder and the portion where the neck and the shoulder meet

17  below the head, and was able to pick him up and use balance

18  displacement to take us both to the ground.

19         If you're asking if I ever choked Mr. Scott, grabbed

20  Mr. Scott by the neck, interfered in any type of way with Mr.

21  Scott's blood flow or breathing, the answer is absolutely not.

22     Q.  My question was in this photo or at any time during this

23  event did you place your arm around Mr. Scott's neck.

24     A.  Not all the way around his neck, no.  My right biceps is

25  touching the right side of his neck, but no, I did not grab him

1  around the neck or anything of that nature.  He's grabbed around

2  his collarbone, where his collarbone and his neck meet each other,

3  right through here (gesturing).

4       Q.   Would you agree with me that in this photograph it

5  depicts you leaning back such as you're attempting to use a

6  balance displacement technique, as you described it, to put

7  Mr. Scott onto the ground?

8       A.   To a degree, I guess.  I'm not sure exactly which point

9  in time this picture was taken, as far as what was happening at

10  that point in time.

11       Q.   But at some point in time you did decide that you would

12  attempt to get Mr. Scott from off of the hood of your car and

13  basically throw him to the ground; is that correct?

14       A.   I used a balance displacement technique to take

15  Mr. Scott to the ground to an area where I was able to take

16  control and able to place him into handcuffs.

17       Q.   And you did that --

18       A.   Characterize it as -- yes, I did it on purpose.

19       Q.   You intentionally took him from your vehicle to the

20  ground.

21       A.   Correct.  When he pushed off of the hood of the vehicle

22  I redirected him with momentum to the ground.

23       Q.   And so are you sure that at some point Mr. Scott's left

24  hand actually got free from your grip, as opposed to you deciding

25  to wrap your arms around his body in order to put him to the

 1   ground?

 2        A.   Yes.  I'm looking at the picture right now that shows

 3   where he has pulled his hand free from my grasp.

 4        Q.   You don't think you were just adjusted your arm in order

 5   to --

 6        A.   I know I didn't.  I was trying to get his hands behind

 7   his back, and if I had one there, releasing it is kinda

 8   counterproductive.

 9        Q.   From this picture you're saying you're trying to get his

10   hands behind his back and not trying to put him to the ground?

11        A.   Again, this is a still shot that represents one

12   millisecond of what took place out there.  I can't say that at

13   this point in time this is exactly what was going through my head,

14   this is exactly what was taking place.  No, I can not answer that

15   question.

16             What I can say is that this picture was right before we

17   went to the ground.  In the previous picture that you showed me I

18   had Mr. Scott's left hand under my control to a degree and I was

19   trying to gain control of his right hand.  Mr. Scott did not want

20   to give me his right hand, regardless of whatever reasons and all

21   that we've discussed.  I have lost control of Mr. Scott's left

22   hand, which is what I'm still trying to gain control of in this

23   picture.  And Mr. Scott has now managed to not only free his left

24   hand from my grasp, but also to push off of the hood of the car,

25   putting himself in a position of advantage, as well, where we're

1    now both standing.  Once he pushed off the hood of that car,

2    almost immediately, very quickly, don't have a time frame, don't

3    have a very specific definition for you, I used that balance

4    displacement technique to take Mr. Scott to the ground to take him

5    into custody.  That all happened, again, very quickly.  I can't

6    tell you what exactly happened at this very second or that very

7    second or what this picture depicts or what you interpret this

8    picture to depict, I can only tell you how it happened.

9         Q.   But you would agree at some point you stopped trying to

10   put his arms or his hands behind his back and decided to --

11        A.   No.  I did not decide to stop trying to put his hands

12   behind his back at some point.  Mr. Scott refused to place his

13   hands behind his back, was able to free his hands, resulting in me

14   adjusting my technique.  I did not adjust my technique based on

15   the fact that I wanted or needed to throw Mr. Scott on the ground,

16   if that's what you're implying.  Mr. Scott made his choices.

17   Mr. Scott got his hands back free, and based on his actions I had

18   to adjust to what he was doing.

19        Q.   Is it your testimony that Mr. Scott's own actions

20   resulted in you throwing his body to the ground?

21        A.   Correct.  Yes.

22        Q.   And you never made the decision that you were going to

23   put Mr. Scott onto the ground.

24        A.   Well, I made the decision.  I mean, when he pushed up

25   off of the car the decision was made that that was happening.  He

1 was coming off of the car one way or another, I wanted it to be
2 under something that I had control over, not something that he had
3 control over.
4     Q.   At any point in time did you ever try to force
5 Mr. Scott's right arm onto the hood of the vehicle?
6     A.   Onto the hood of the vehicle?
7     Q.   Yes, sir.
8     A.   Not that I recall trying to force anything onto the hood
9 of the vehicle.  I was trying to get his hands behind his back.
10     Q.   And did Mr. Scott threaten you in any way before you
11 decided to put him on the ground?
12     A.   You mean, did he make physical threats of harm to me?
13 No.  Or verbal threats, rather.  Did he verbalize that he was
14 gonna harm me?  No, he didn't say that.
15     Q.   At this point in time did you fear for your physical
16 safety?  Well, not -- scratch that.
17         Not at this point in time, but the point you decided to
18 put Mr. Scott to the ground did he give you any reason to fear for
19 your safety?
20     A.   The fact that he was resisting arrest; the fact that he
21 was committing the offense of misdemeanor obstruction by trying to
22 pull away from me; failing to comply; all of those things lead me
23 to believe that he might fight harder given the opportunity.
24 Throughout most of that I had an advantage where I was behind him
25 and I wasn't in front of him where he could swing at me or do

1  whatever, and I did have control of one of his arms, briefly.  But

2  once he got up off the car and he put himself in a standing

3  position it's absolutely feasible that he could do anything and

4  anything he wanted to at that point in time.  Which I why I tried

5  not to give up said advantage and we wound up on the ground.

6      Q.   Were you ever trained by the Richmond County Sheriff's

7  Office in the use of a technique that would involve your placing

8  your arm around a suspect's neck during an arrest?

9      A.   If you're asking about a chokehold or something like

10  that -- because you keep referring to neck, and I've clarified

11  multiple times, my arm's not around his neck, it's over his

12  shoulder and down his clavicle.

13      Q.   I'm not talking about Mr. Scott, I'm asking in general.

14  Have you ever been trained in any kind of technique by the

15  Richmond County Sheriff's Office that would involve you putting

16  your arm around a suspect's neck during an arrest?

17      A.   In the manner that's depicted on the screen in front of

18  me, that is something that is acceptable.  If you're referring to

19  chokeholds or blood chokes, or any of the like -- any of the --

20  since you've already touched on it, hot button news media issues

21  that are going around right now, then no, that is not something

22  that I have ever been trained on, nor is it something that I

23  employ or do.

24      Q.   Were you ever trained not to employ a chokehold?

25      A.   Yes.  It is against the Richmond County Sheriff's Office

1 policy to use chokeholds.

2     Q.   Is it against Richmond County Sheriff's Office policy to

3 put your arm around someone's neck during arrest?

4     A.   It is against the policy to use chokeholds.  I've

5 answered this question and repeatedly, I am not on -- you keep

6 saying neck, while you have this picture in front of me frozen on

7 the screen.  If you're referring to this as his neck, it is not.

8 It is his shoulder and it is his clavicle.  He can still breathe.

9 At no point in time was anything interfered with.

10     Q.   What types of chokes -- excuse me.  What type of

11 chokeholds have you been instructed that you are not allowed to

12 use under Richmond County Sheriff's Office policies?

13     A.   We do not use chokeholds or blood chokes at the Richmond

14 County Sheriff's Office unless justified deadly force is

15 authorized, kind of thing.  That is, I believe, the only exception

16 to that.

17     Q.   Would you explain to me what a chokehold is?

18     A.   Where you choke somebody in some sort of way with your

19 body.  I'm not a -- again, we're not trained on chokeholds, we're

20 not versed on chokeholds, we don't employ chokeholds, so I don't

21 use them.

22     Q.   I'm showing you a picture that was put on page five of

23 the complaint.  Have you seen this picture before?

24     A.   I have.

25     Q.   And would you agree with me that in this photograph

1  Mr. Scott is shown laying face down on the ground in the prone

2  position and you're applying pressure to his upper back with your

3  knee?

4      A.   That is correct.

5      Q.   And was that intentional?

6      A.   That is intentional, yes.

7      Q.   And where did you learn that maneuver?

8      A.   It's taught -- as far as detect pressure point control.

9  I have control of Mr. Scott's arm and I used a leverage point,

10  which being -- in this case being my knee right there at his

11  shoulder to inflict pain to get him to put his other arm behind

12  his back.  I was able to handcuff Mr. Scott's right arm and take

13  control of his left arm very shortly after this was employed.

14     Q.   On this picture is it your testimony that you are

15  attempting to inflict pain on Mr. Scott?

16     A.   That is correct.

17     Q.   Is something you were taught to do by the Richmond

18  County Sheriff's Office?

19     A.   As far as the police academy and use of force, when

20  somebody is noncompliant, yes, we can inflict pain to gain

21  compliance, which is what I was doing here, inflicting pain to

22  gain compliance, and it worked.

23     Q.   Why did you decide to intentionally try to inflict pain

24  on Mr. Scott?

25     A.   Because Mr. Scott had been given ample opportunity to

1  stop what he was doing, place his hands behind his back, comply
2  with commands that were given.  He refused to do so on multiple
3  different occasions.  And me wrestling with Mr. Scott on the hood
4  of the car and wrestling with Mr. Scott on the ground was -- had
5  proved ineffective.  He was able to get his hands back from behind
6  his back, as you showed clearly in the pictures.  And at this
7  point in time, I was taking the full advantage of the position
8  that I was given once we went to the ground.  Mr. Scott and I went
9  to the ground, I landed on top of him and I was able to get his
10  arm into a position where I was able to gain control of it, and
11  then pull pain compliance techniques to get his other arm behind
12  his back and handcuff him.

13      Q.   Before you used this maneuver of putting your knee on
14  his upper back and intentionally try to inflict pain on his arm
15  had Mr. Scott threatened you or threatened your safety in any way?

16      A.   While committing the offense of misdemeanor obstruction,
17  snatching away from me, trying to flee, and not complying, all of
18  those are perceived threats.  He has not verbally said he's going
19  to do this or do that or any of that, but all of that is actions
20  that say that he is not gonna comply and then given an opportunity
21  he might do something or could do something to injure me, yes.

22      Q.   And so you've testified that he had not verbally said
23  anything before this point; is that correct?

24      A.   That is correct.  He never verbally said he was going to
25  do this or do that, or do that, or whatever.

1    Q.    And did he make any physical movements that tried to
2  harm you in any way before this point?

3    A.    Every time he pulled away from me, every time he failed
4  to comply with my commands to place his hands behind his back, all
5  of those are movements that are an attempt to flee and/or cause me
6  harm.

7    Q.    So it's your testimony that Mr. Scott attempted to cause
8  you physical harm before this moment where you placed your knee on
9  his upper back?

10    A.    I don't know what his intention was, but the fact that
11  he would not comply with the verbal commands, the fact that he
12  continued to try to gain control of his hands, snatch away from me
13  and pull away from me and escape my grip, all leads me to believe
14  that given the opportunity, had I let it arise, yes, we would have
15  been in a physical fight.  I was able to not give him the
16  opportunity to do such a thing.  Let me rephrase.  I was able to
17  use the situation and the environment that I was surrounded in and
18  take advantage of Mr. Scott's body weight, redirecting all of
19  those things to prevent him from striking me, me having to strike
20  him, or any more serious use of force taking place.  Does that
21  answer your question?

22    Q.    The questions was whether he had done any actions to try
23  to --

24    A.    Yes.  Every time he pulled away from me --

25    Q.    -- injure you or threaten your safety.

1      A.    Every time he pulled away from me, every time he

2  snatched away from me, every time he tried to regain control of

3  his hands, all of those are perceived threats to my safety.  I

4  can't read his mind.  Like I said before, I don't know what his

5  intention is, whether it be to flee, escape, get back to the car,

6  drive -- try to drive off, get back to the car, try to get a

7  firearm.  All of these things are so open ended that I can't say

8  that what he was doing at that point in time.  But every time that

9  he failed to comply and every time he pulled away, all of those

10  are perceived threats.

11      Q.    And is it your testimony that Mr. Scott did attempt to

12  flee or drive away before this point?

13      A.    He wasn't allowed to.  I didn't let him.  He was trying

14  to escape my grip, he was trying to escape my grasp, all of that,

15  for whatever reasons that he wanted, but he was never given

16  sufficient opportunity to complete that task.

17      Q.    Okay.  And you just testified that you weren't sure of

18  his intentions at the point; are you correct -- am I --

19      A.    I'm never sure of his intention.  I'm still not sure of

20  his intentions to this day.

21      Q.    Okay.  If you're unsure of his intentions up to this

22  point what makes you so sure that he was trying to break away from

23  you, as you say, or resist you?

24      A.    Well, I mean, anybody knows what it's like to pull away

25  from somebody, and he continuously did that throughout this entire

1    encounter.  It doesn't take a law enforcement expert or anybody to

2    -- if you were to grab somebody and they pulled away from you, you

3    would know what that feels like without any training whatsoever.

4         Q.    Would you expect --

5         A.    That's what he --

6         Q.    Go ahead.

7         A.    And that is what he continued to do throughout this

8    encounter, until he was placed in handcuffs.

9         Q.    Would you expect somebody to instinctively pull away

10   when a technique is used to try to inflict pain on that person's

11   arms --

12        A.     This was all prior to this.  This is the actual moment

13   right before compliance was gained.  There was no pain inflicted

14   on Mr. Scott prior to this pain compliance right here and those

15   are all the opportunities in which he tried to escape my grasp,

16   pull away from me, and failed to follow commands.  Once we were on

17   the ground and I was able to get leverage over Mr. Scott and used

18   pain compliance to get his other hand behind his back he did what

19   I told him to do.

20        Q.    It's your testimony then that you had not inflicted any

21   pain upon Mr. Scott prior to the moment depicted in this

22   photograph?

23        A.    Correct.

24        Q.    And would your testimony remain the same if you had

25   restrained his arm in such a way that it was being burned by a

1 cigarette?

2     A.   He was not being burned by a cigarette, but, yes.  At

3 this point in time the cigarette's nowhere in play.  Is that what

4 you're referring to?

5     Q.   I'm referring to before this moment.  You testified that

6 you in no way inflicted any pain on Mr. Scott before you had him

7 on the ground with your knee on his upper back.  And so I'm trying

8 to ask you how you're sure about that, having Mr. Scott saying

9 he's being burned by a cigarette.  So are you sure that no pain

10 was being inflicted on Mr. Scott before the moment where you had

11 your knee on his upper back and he was laying --

12     A.   Yes, I'm sure.  I've watched that video multiple times

13 and Mr. Scott said he's trying to smoke a cigarette.

14     Q.   And are you sure that by twisting his left arm around

15 his back you were not inflicting any pain upon Mr. Scott while you

16 had him pushed against your patrol vehicle?

17     A.   That was not an intentional pain compliance technique,

18 no.  That was not something where I was trying to wrench his arm

19 or hurt him, or any of that.  At that point in time that was still

20 fairly early on in this situation that took place and was still

21 trying to just basically overpower and gain -- have him put his

22 hands behind his back, allow him to comply with the commands that

23 I was giving, but he didn't want to do that.

24     Q.   Have you ever received any training as to when placing

25 somebody's arm behind their back may inflict physical pain or

1  cause injury?

2      A.   As far as like different risk locks and arm bars and

3  such like that, yes.

4      Q.   It's your testimony that you never -- or excuse me.

5  It's your testimony that Mr. Scott was never in pain until you had

6  him on the ground?

7      A.   I don't know if he -- what his definition of pain is,

8  but I never intentionally inflicted any kind of pain compliance or

9  tried to place any pain compliance techniques on him until after

10  we were on the ground.

11      Q.   And that includes when you were trying to force his head

12  and upper body upon the hood of your vehicle?

13      A.   Again, we've clarified I wasn't trying to slam his head

14  and body into the top of my car.  I was using my body and leverage

15  against him, while I tried to gain control of his hands.  We've

16  said this multiple times.

17      Q.   I believe you testified that you were trying to put his

18  upper body and head on your -- the hood of your vehicle although

19  you objected to the use of the word slam.  You did agree you were

20  trying to force his upper body and head onto the hood of your

21  vehicle; is that correct?

22      A.   I was pushing his upper body down, yes, toward the

23  vehicle.

24      Q.   And it's your testimony that you didn't believe or you

25  don't believe to this day that that's something that caused

1  Mr. Scott to incur pain?

2       A.   It was not an intentional pain compliance technique, no.

3       Q.   I understand it may not be a compliance -- an

4  intentional pain compliance technique, but just common sense, when

5  you force somebody's body and head down upon a vehicle you

6  wouldn't expect --

7       A.   When I --

8  [Crosstalk.]

9       Q.   -- you wouldn't expect him to experience pain?

10      A.   No.  I can go lay across the hood of any car in the

11 parking lot, just as well as you, and anybody else here, and it

12 not cause pain.

13      Q.   But Officer Russell, he was -- I'm not talking about

14 laying your head down, I'm talking about being forced down.

15      A.   Again, it was not a slam.  It was not being -- it was

16 your -- hang on just one second.  Can y'all...

17           Sorry about that.  I had somebody walk in the office.

18           Anyway, no, as far as that goes, I did not slam his head

19 into it.  Laying your head across a car -- you keep using the

20 words forced, pushed, slam, all of those are synonymous, okay?

21 None of that was what was taking place.  I was trying to gain

22 compliance from him and get his hands behind his back.  I didn't

23 slam him into the car, I didn't beat him up, any of those things.

24 If that hurt him, bending over the car, it was because he was

25 resisting bending over the car, not because I intentionally tried

1   to hurt him at that point in time.

2          The only time that I inflicted any kind of pain

3   compliance -- which has been my testimony -- is once we were on

4   the ground and I was able to get his arm and I was able to pull it

5   back behind his back in a straight lock position; it's typically

6   referred to as an arm bar, it's not exactly textbook in this

7   picture, but sometimes things happen where we can't exactly

8   textbook line up anything in the field.  Once that was done I was

9   able to get a hold of Mr. Scott, place both of his hands in

10   handcuffs, and the situation was over.

11     Q.   So that didn't really answer my question.  My question

12   was by forcing Mr. Scott's body into your patrol car and forcing

13   his upper body and head into the hood of the vehicle, that's

14   something that you would not expect -- is it your testimony that

15   you would not expect those actions of forcing somebody upon your

16   car like that would inflict any pain upon that person?

17     A.   No.

18     Q.   You do realize you're under oath, correct?

19     A.   That is correct, yes.  I mean, what was taking place in

20   that first picture was not designed to inflict pain, nor should it

21   have really inflicted any pain on him.  If your client feels that

22   that inflicted pain on him, that's a feeling.  But to me, I have

23   been the role player in those scenarios that we spoke about at the

24   very beginning of this testimony where I have been placed across

25   the hood of a patrol car like that; it doesn't hurt, it's not

1  something that inflicts pain.  It's just a technique that's used

2  to give the officer the advantage, and the safe advantage.

3      Q.  It's your testimony that you have been forced against a

4  vehicle like that?

5      A.  It's my testimony that I have been placed across the

6  hood of the cars like that, yes.

7      Q.  By whom?

8      A.  During scenarios and role playing, and such like that.

9  Like we talked about at the very beginning of this here situation.

10  Things like that were done in the academy, things like that were

11  done all over the place, as far as the Explorer Program and things

12  like that that we reference back to.

13          Placing somebody across the hood of a car is not a pain

14  compliance technique, nor, should it inflict pain.  If it did to

15  Mr. Scott, that's something that I can't say I did on purpose, nor

16  is that something that I was trying to do.

17  [Crosstalk.]

18      A.  If he perceives pain --

19      Q.  Will you please give me the name of the person who

20  forced you against a patrol vehicle --

21      A.  I don't have the names of these people.

22      Q.  Will you please tell me when that occurred.

23      A.  This is, again, we go back to the Explorer Program and

24  all of that that I was talking about.  Training scenarios and all

25  of that throughout the academy and throughout the Cadet program is

1  when this happened, so.

2      Q.   How many times have you been in that situation?

3      A.   Again, you keep using the word I was slammed against the

4  car or forced against the car.  These words that you're using are

5  not an appropriate description of what took place, okay?

6  Mr. Scott was pushed up against the car by my hip and pinned

7  between me and the car.  There was no massive amount of force that

8  took place, there was no me slamming him into the car.  You're --

9  the words you're using and the picture you're trying to paint are

10 not what took place, nor is it the testimony that I'm attempting

11 to give.  Okay.  Mr. Scott was placed on the hood of the car while

12 I tried to gain compliance with his hands.  That should not have

13 caused Mr. Scott any pain.  There was no intention to cause

14 Mr. Scott any pain.  And, again, being placed across the hood of a

15 car, myself, while being handcuffed in scenario based practices

16 prior to this, that is not a painful situation to be in.

17 [Crosstalk.]

18     Q.   -- man who had had back surgery when he was placed --

19 placed delicately upon a car?

20     A.   I was not.  I was also not trying to resist a lawful

21 arrest either.

22     Q.   Okay.  I think I have your testimony.  If you do -- you

23 do not believe that Mr. Scott would be in pain by your forcing him

24 against the vehicle; is that correct?

25     A.   He should not have been, nor was it an intentional

1  infliction of pain.  If his process of resisting me while he was

2  on the hood of that car caused him pain that is his fault, not

3  mine.

4      Q.   Will you just answer the question?  The question is, you

5  do not expect by forcing somebody against a vehicle and trying to

6  put their head and upper body upon the hood, you do not expect

7  that that would be something that could inflict pain?

8      A.   No.  I've answered that question three times.

9      Q.   The answer is no?

10     A.   I've said no.  I've answered no to that question three

11 times.

12     Q.   Okay.  The photograph we're looking at now, and your

13 knee is upon Mr. Scott's upper neck, correct?

14     A.   No, it's not.  It's on his shoulder.

15     Q.   Excuse me.  Upper back.  I did not mean to say neck.

16          Your knee is on his --

17     A.   It's on his shoulder blades.

18     Q.   -- upper neck -- or back, excuse me.  Shoulders you're

19 saying?

20     A.   You keep saying -- yeah.  You keep saying neck, I

21 mean --

22     Q.   Yeah, I'm tired, man.

23          Your knee is upon his back and shoulders; is that

24 correct?

25     A.   Yes.

1    Q.   Okay.  And where did you learn this maneuver?

2    A.   It's taught in the academy, as far as pain compliance.

3 It's called an arm bar.  Again, it's not perfect; it's not done

4 appropriately like typically -- I say appropriately -- let me back

5 up and correct that language.  It is not done textbook, because

6 nothing in the field is textbook either.

7        But basically, I've got his arm straight, brought out to

8 his side at an angle where I can bend it back and inflict a little

9 bit of pain to gain compliance with Mr. Scott.

10    Q.   And where did you learn this maneuver?

11    A.   Police Academy.

12    Q.   And did the Police Academy instruct you, provide any

13 instruction or education, as to the physiological effects of

14 somebody forced in a prone position on the ground by your -- an

15 officer's knee?

16    A.   The theological effects, as in theory; is that what

17 you're asking?

18    Q.   Physiological; bodily.

19    A.   Yeah.  It hurts.

20    Q.   And why does it hurt, to your understanding?

21    A.   Because I'm bending your arm in a position that's not

22 natural.

23    Q.   Did you ever receive any training or instruction that

24 forcing your knee upon somebody's upper back like that could cause

25 them to incur injury, including but not limited to injury to their

1  back, shoulder, and/or lack of oxygen or air?

2      A.   Injury to the back and shoulder, yes.  Lack of oxygen

3  and air, no.

4      Q.   You've never received any instruction --

5      A.   And pain.

6      Q.   You've never received any education or instruction by

7  the sheriff's office that putting your knee upon somebody's upper

8  back in this position can cause them to have a deprivation of

9  oxygen?

10      A.   Sir, there's a thing called positional asphyxia, which

11  is extended periods of time left in a position like that, where

12  you're prone, where, yes, you could suffocate if you're left in

13  that position where your chest is not given an opportunity to

14  rebound or you aren't given an opportunity to take in air.  While

15  the pain compliance technique is being employed, though, that's

16  not a sufficient amount of time for that to take place, nor does

17  it interfere with his normal breathing, to a degree, if that's

18  what you're getting at.  This is not designed, nor did it,

19  interfere with his breathing or in any way his air pipe or any of

20  that.  This was merely pain compliance, which was designed to

21  inflict pain upon him to gain compliance with him.  It was

22  designed to hurt his arm and his shoulder.

23      Q.   Is a maneuver of placing your knee or forcing your knee

24  upon somebody's upper back and pushing them into the ground in a

25  prone position something that's authorised by the Richmond County

1  Sheriff's Office Use of Force Policy?

2      A.   The Use of Force policy does not specify specific

3  techniques that can be used.  A reference is Graham versus Conner;

4  what's reasonable given the circumstances.

5      Q.   In your training were you never told that this is an

6  acceptable technique?

7      A.   Absolutely.

8      Q.   And you were never told that this is a technique that

9  should not be used during an arrest?

10     A.   An arm bar?

11     Q.   No.  Placing your knee upon his upper back and forcing

12  him into the ground in a prone position.

13     A.   Again, I'm placing my knee in his shoulder blade as a

14  position of leverage.

15     Q.   It's your testimony that your leg is not on his back in

16  this picture?

17     A.   It is his shoulder blades, which is attached to his

18  back; it's where it's at.  My leg is there so that I could bend

19  his arm upward.  It's the leverage -- it's the fulcrum point in

20  that pain compliance.

21     Q.   Do you have any understandings of the injuries that

22  Mr. Scott claims he received in this incident?

23     A.   No, sir.

24     Q.   Did Mr. Scott ever tell you that he was in pain?

25     A.   Not that I recall.

1     Q.   He never asked for medical attention while in your

2  custody?

3     A.   Not that I recall, no, sir.

4     Q.   Did you have your body camera on when you transported

5  Mr. Scott to jail?

6     A.   I did not.  I don't believe I -- I turned it off after

7  the event was over and I cleared the scene.

8     Q.   Why did you turn it off?

9     A.   I typically turn it off once the call for service is

10  over.

11     Q.   In this situation, during this arrest allegations were

12  made against you that the arrest was racial in nature and that you

13  had used police brutality; is that correct?

14     A.   Yes, sir.

15     Q.   And nevertheless, you felt that it was appropriate to

16  turn off your body camera while you were transporting Mr. Scott to

17  the detention center?

18     A.   That is correct.

19     Q.   Did you make any stops on your way to the detention

20  center?

21     A.   Did not.

22     Q.   You didn't stop in a neighborhood or go on another call

23  on your way to the detention center?

24     A.   No, sir.

25     Q.   You're certain about that?

1      A.   I'm certain about that.

2      Q.   Okay.  Well, I asked you several times in the course of

3  showing you these photographs whether Mr. Scott has posed any

4  physical threat to you or made any physical threats or any

5  physical behaviors or actions that would endanger your safety, and

6  each time you told me not up to that point.  Is there any time

7  that he ever show any actions that threatened your safety or said

8  anything to threaten your safety?

9      A.   Yeah.  He started making the threats after he was

10  handcuffed.

11      Q.   After you had handcuffs on him he made threats to you?

12      A.   Yeah.  After he was handcuffed he began to threaten me.

13      Q.   Okay.

14      A.   I believe his words were, Take these handcuffs off of me

15  and I'll... Yeah, there is it.  I bet you won't take these

16  handcuffs off, and then he said, I'll whoop, and use some

17  expletives there.

18      Q.   And be clear, he never made any oral threats to you

19  before the handcuffs were on, correct?

20      A.   Correct.  No verbal threats were made.

21      Q.   And no physical threats, physical actions of trying

22  to --

23      A.   Yes.  Again, I've clarified that multiple times.  His

24  actions of snatching away from me, his actions of not complying,

25  his actions of pulling his hands back free from himself, all of

1  those are perceived as a threat.  He is committing the offense of

2  misdemeanor obstruction in the State of Georgia, and all of that

3  is what is the threat.  That is why the force was used.

4      Q.   Okay.  So other than your perceived -- your perception

5  that he was trying to pull away from you did he make any physical

6  actions or make any physical moves that were intended or appeared

7  to you to threaten your safety?

8      A.   No; other than the physical moves that he made that were

9  clearly a threat to my safety, he did not make any physical moves

10  to threaten my safety.

11      Q.   And those physical moves that you just explained were

12  your perception that he was trying to pull away from you?

13      A.   It was the fact that he was trying to pull away from me,

14  yes.

15      Q.   Other than trying to pull away from you, as you

16  described, did Larry Scott resist arrest in any other manner, in

17  your opinion?

18      A.   No, he did not resist arrest, other than in the manner

19  in which he resisted arrest.

20      Q.   Is it your opinion that he resisted arrest in any manner

21  other than trying to pull away from you after you grabbed him to

22  put on handcuffs?

23      A.   That is correct.  Him snatching away from me, pulling

24  away from me, is the manner in which he resisted.  In no other

25  manner did he resist.

1          THE WITNESS:  Also, if you don't mind, is there an

2      opportunity to take a short break again?

3          MR. CALIFF:  Absolutely.

4          THE WITNESS:  Coming up, I mean.  Is it okay if we take

5      it no or?

6          MR. CALIFF:  Yeah.  We can take it whenever you want.

7          THE WITNESS:  Perfect.  I really appreciate it.  I will

8      be right back with you.

9  [Off the record.]

10     Q.   (Mr. Califf)  Deputy Russell, when did you first view

11  your body camera footage from this incident?

12     A.   The first time was shortly after, that same day.

13     Q.   And why did you review your body camera footage the same

14  day?

15     A.   I typically review my body camera footage after all

16  incidents that involve a detailed report and, again, to pull

17  quotes and things like that from the report -- from the body

18  camera.

19     Q.   When did you write the report from this incident?

20     A.   Shortly thereafter.  It was (unintelligible) completed

21  the same day.

22     Q.   Did you review your body camera footage before writing

23  the report or while writing the report?

24     A.   Yes.

25     Q.   Did anybody help you prepare the police report?

1    A.    No.

2    Q.    Anybody review the report before it was finalized?

3    A.    No.  It's before -- it's submitted to my supervisor, who

4    reviews it before it's submitted to our system, if that's what

5    you're asking.  But if you're saying did I have somebody else

6    write the report for me or go through it, no.

7    Q.    I'm just wondering if anybody reviewed it or made any

8    changes to it before it was finalized.

9    A.    Again, it goes to a supervisor, who reviews the report,

10   and then it's sent through our system.

11   Q.    Were any edits made to the report after your supervisor

12   reviewed the report?

13   A.    No.  Once it's merged, it's merged.

14   Q.    Did any other person at the Richmond County Sheriff's

15   Office review the body camera footage within a week or so of the

16   incident?

17   A.    I have no idea.

18   Q.    Did you ask anybody else to review the body camera

19   footage within a week of the incident?

20   A.    Not that I recall.

21   Q.    When was the first time, to your knowledge, somebody

22   else reviewed the body camera footage from Mr. Scott's arrest?

23   A.    I have no knowledge of when, nor if, the body camera

24   footage was reviewed by another individual.

25   Q.    Nobody ever asked you to take a look at the body camera

1  footage at the sheriff's office?

2      A.  Like, are you saying that another --

3  [Crosstalk.]

4      Q.  -- anybody ask you if they could take a look at it?

5      A.  No.  It's submitted in a system that -- like I don't

6  have access to it once it's submitted, or I did not at that time.

7      Q.  Before it's submitted are you able to make any changes

8  to the body camera footage?

9      A.  No.

10     Q.  Are you able to see my screen right now?

11     A.  Yes.

12     Q.  This was produced to me in discovery, and I'll purport

13 to you that it is -- appears to be a Use of Force Policy related

14 to a Use of Force Report.  Have you ever seen this document

15 before?

16     A.  Yes.

17     Q.  And what is this document?  What are we looking at here?

18     A.  That's a copy of the policy to the sheriff's office.

19     Q.  Would you agree that under this policy, the Use of Force

20 Report should have been made on the arrest of Larry Scott?

21     A.  No, sir, not for that.

22     Q.  You don't believe that a Use of Force Report should have

23 been made after the arrest of Larry Scott?

24     A.  Correct.

25     Q.  Would you agree that during the arrest of Larry Scott

1  you used weaponless physical force?

2       A.   No, I would not.  Because if you look around at the very

3  bottom; weaponless physical force will be defined as hard hand

4  techniques.  I never struck Mr. Scott, never kicked Mr. Scott,

5  punched or any of the like, which is what is defined as hard

6  hands.

7       Q.   So is it your testimony that hard hand techniques would

8  not include maneuvers designed to inflict pain upon Mr. Scott

9  during weaponless use of force?

10      A.   To me, no, that is not hard hands.

11      Q.   Okay.  What kind of technique would you call it when you

12 twist somebody's arm with your knee forcing them down on their

13 back in a prone position (inaudible) additional effort to inflict

14 pain?

15      A.   That would still fall under the soft hand techniques, as

16 far as come-alongs, wrist locks, arm bars, things of that nature.

17      Q.   So it's your testimony that that was a soft hand

18 technique?

19      A.   Correct.

20      Q.   Can you show me -- I have the entire use of force policy

21 here and I'm not sure if you have it in front of you.  Do you have

22 it in front of you?

23      A.   I do not.  I do not have a copy of the entire policy in

24 front of me.  It's like 700 pages.

25      Q.   And is it your testimony that the Use of Force Policy,

1    to the best of your knowledge, explains that placing your knee

2    upon someone's back who is in the prone position on the ground and

3    twisting their arm in a mutual effort to inflict pain is included

4    in the list of things defined as soft hands techniques?

5        A.   From my understanding, that's what that is, yes.  I

6    don't have the definitions of everything in front of me currently,

7    no.  But hard hands is actual physical strikes.

8        Q.   Okay.  What about if you were to wrap your arm around

9    somebody's neck and force them to the ground, is --

10       A.   Again, I never wrapped my arm around his neck.  You

11   keep -- you keep referring back to me like wrapping an arm around

12   his neck; I never interfered with his neck.  So no, again, is the

13   answer to that question.

14       Q.   If you had wrapped you arm around his neck and threw him

15   to the ground, would that be included in soft hand technique, in

16   your understanding?

17       A.   If I wrap my hand his neck to employ some sort of

18   chokehold or interference with his breathing I'd have been

19   terminated.  It's not a policy that we employ here.

20       Q.   That wasn't the question.  The question was --

21       A.   I do not --

22   [Crosstalk.]

23       Q.   -- consider a soft hand technique or a hard hand

24   technique?

25       A.   The balance displacement that I used in this is still --

1  falls under the same class as the pressure points and wrist locks,

2  and all of that.  We went to the ground.  I never struck him,

3  never punched him, never hit him.

4      Q.   Okay.  I understand that you don't believe that your arm

5  made contact with his neck.  Is it your testimony that putting

6  your arm around his collarbone, as you've said, and then slamming

7  him to the ground is defined within soft hands techniques and not

8  hard handed techniques?

9      A.   Correct.  But I object to the whole slamming to the

10  ground.  It was, again, displacement; we went from the car to the

11  ground.  I didn't imply some excessive amount of force or insane

12  amount of force to slam him or what would typically be associated

13  with the word slam.

14      Q.   When using your legs to offset someone's balance and

15  basically hurt them to the ground  be included in hard hands

16  technique or soft hands technique?

17      A.   Soft hands.  Again, to kind of clarify this question

18  that you've asked several times:  Hard hands techniques would be

19  defined as actual physical blows and strikes.  So unless I punched

20  him in the face with a closed fist or hit him about his body, or

21  knee strikes or kicks, things of that nature.  Anything short of

22  that is not considered a hard hands technique.  Just to clarify

23  anymore questions along the same lines.

24      Q.   And would force --

25      A.   All the stuff that I did throughout this process fell

1  under that soft hands techniques.

2      Q.   And is it your understanding and your position that
3  forcing somebody's upper body and head upon the hood of a patrol
4  car and pushing their body against the patrol car, is that soft
5  hand techniques, to your understanding?

6      A.   Yes.  Again, to answer the same questions along these
7  lines that we've gone over; everything that had happened in the
8  course of this arrest was a soft hands technique.  There were no
9  blows or strikes thrown, so no hard hand techniques were applied.

10     Q.   And you don't believe that you forced your knee upon him
11 in anyway that could be classified as a blow or a strike?

12     A.   I do not.

13     Q.   So it's your testimony that a Use of Force Report is not
14 required.

15     A.   That is correct.

16     Q.   I just pulled up what we've previously marked as Exhibit
17 A to Sheriff Roundtree's deposition, and it's a policy that was
18 produced to me labeled 5.2 Patrol Operations.  Are you able to see
19 the policy?

20     A.   I can see the top of it and like two of the definitions,
21 yes.

22     Q.   Have you ever seen this policy before?  I'm trying to
23 zoom out for you.

24     A.   I have.

25     Q.   And what is this policy?  Can you explain to us what the

1  policy --

2      A.   Deals with handling combative subjects.  Different types

3  of things that are prohibited, as well as what takes place,

4  definitions is basically where this portion of this page is.

5      Q.   And do you believe that your arrest of Larry Scott or

6  any matter leading up to the arrest would fall under this policy,

7  to your understanding?

8      A.   Well, it wasn't an in-custody death, or positional or

9  restrain asphyxia, or hog-tying, or excited delirium.  So the page

10  that I'm looking at, I would say, no, this doesn't really apply to

11  his arrest.

12      Q.   There's a second page that I don't think --

13      A.   That might be what we're looking at.

14      Q.   Okay.  And feel free to review the policy for as long as

15  you'd like before you answer the question.

16      A.   Okay.  In this part of it, dealing with combative

17  persons, does apply to some degree to this arrest, yes.

18      Q.   And can you explain to me why this policy, to some

19  degree, in your opinion would apply to this arrest?

20      A.   Well, he was not compliant, so that therefore, by

21  nature, makes him combative.  And as far as the amount of force

22  which is abjectly reasonable to use to restrain the person and all

23  that applies to this portion of it.

24      Q.   Would you agree that under this policy a Use of Force

25  Report was required concerning the circumstances regarding the

1    arrest of Mr. Scott?

2         A.    I'm sorry.  What was the question?

3         Q.    I'm looking at the bullet point that's about halfway

4    down the page before the words initial contact; are you with me?

5         A.    Well, yeah. Use of Force will (unintelligible) --

6         Q.    It starts with Use of Force Report.  Are you there?

7         A.    Correct.

8         Q.    Would you agree that under this policy -- because you

9    contend that this policy would encompass the arrest of Larry

10   Scott, would you agree that under this policy a Use of Force

11   Report was required to be made after the arrest of Mr. Scott?

12        A.    Still stand by no, because no actual physical blows were

13   used or no hard hand techniques were used.  So there were

14   supervisors on scene that made the same decision.

15        Q.    And where in this policy does it say that a Use of Force

16   Report is only required with physical blows and hard hand

17   technique.

18        A.    Well, it goes back to the previous page that you

19   referenced, as far as that goes.  Weaponless physical force, which

20   is defined as hard hand techniques.

21        Q.    Okay.  So that doesn't really answer my question.  I'm

22   asking where in this policy it provides that a Use of Force Report

23   is only required in circumstances of blows or hard hand technique?

24        A.    This page doesn't say that.  You reference back to the

25   previous page that you pulled up, that's where it says it.

1    Q.   Let's look at that previous page.  Will you please show

2  me where it says a Use of Force Report was only required under

3  this policy in the circumstance of physical blows or hard hand --

4    A.   I'm sorry.  The previous section that you pulled up.

5  Let me clarify.  Not this specific page that you've re-pulled back

6  up, but the previous page -- section of policy that you have,

7  where it defines when the use of force should be done and all of

8  that.  This was not a situation where Mr. Scott was experiencing

9  excited delirium or cocaine psychosis, or any of these events that

10  you have in front of me right now.  Mr. Scott merely refused to

11  put his hands behind his back, for a brief period of time we

12  struggled, very brief period of time.  When you look at the grand

13  scheme of things, Mr. Scott was taken into custody without

14  incident; no blows, no strikes, no significant force was used

15  against Mr. Scott that would justify a Use of Force Report.  No

16  weapons were used, none of the like that is in practice with our

17  everyday operations.

18    Q.   Okay.  And you did testify that you believe this policy

19  that we're looking at now, which is 5.2-3, would apply in the

20  arrest of Mr. Scott; is that correct?

21    A.   I said portions of these sentences.  But you're

22  taking -- you're clipping parts of it.  Some of it doesn't apply,

23  like the detainee being hog tied and the definitions of hog-tied

24  and excited delirium, that doesn't really apply to this arrest.

25  Other portions of it do.

1     Q.   And what would apply?

2     A.   The amount of force which is objectively reasonable and
3  necessary to control and restrain the combative person.  The very
4  first bullet point applies because that's what took place.

5     Q.   So is it your understanding and your testimony that
6  under this policy you would consider Mr. Scott to be a combative
7  person?

8     A.   To a degree, yes, he was combative.  That's been the
9  testimony the whole time.

10     Q.   In the course of discovery in this case I was provided
11  with documents from your personnel file and from internal affairs
12  investigations.  I'd like to ask you a few questions about them.
13  Let me share my screen again.

14          MR. CALIFF:  All right.  And we can mark this, this

15          compilation of internal affairs and employment records, as

16          Exhibit A to this deposition.

17          We haven't marked any, have we?

18          THE COURT REPORTER:  No, sir, this is the first one.

19          MR. CALIFF:  Okay.

20     Q.   (Mr. Califf)  And again, feel free to let me know if you
21  need me to move the screen in any way so you can review as much as
22  you want to.  I'm not trying to ask you questions about something
23  that you've never seen or are not familiar with.

24          So my first question, that being said, is have you ever
25  seen this document before that's shown on this first page here?

1     A.   I have, but it's been a few years.  Yes.

2     Q.   And this document describes a verbal altercation with an

3 inmate while you were working as a deputy jailer; is that correct?

4     A.   That's what the document says, yes.

5     Q.   Do you recall this verbal altercation?

6     A.   I do not.

7     Q.   Do you recall this incident at all?

8     A.   I recall parts of it, yes.

9     Q.   What do you recall about the incidents described on this

10 document?

11     A.   Very little, as far as the inmate interaction goes.  He

12 was trying to get extra trays, I sent him to his room and locked

13 him down.  And then went up to the cafeteria to get more trays for

14 -- since he took the trays or whatever, and got into it with one

15 of the kitchen staffs up there over the count.

16     Q.   Okay.  Would you agree with the statement in the second

17 paragraph of this document that says, on July the 25th, 2015, when

18 you were serving lunch trays you became angry that the inmates had

19 taken an extra tray and immediately ordered Deputy (inaudible) to

20 turn off the phones and television, even though some inmates were

21 using the phone and had nothing to do with what was happening with

22 the lunch trays?

23     A.   I do not agree with that.

24     Q.   Why not?

25     A.   It wasn't something that was done out of anger, it was

something that was done, as far as maintaining order inside the
facility.  It's not because I got angry over the trays, it was --
as far as that goes.  And it was under the policy at the time.
And as far as the jail control goes, we had say-so over the
phones, televisions, and all of that stuff.  I don't recall all of
the details behind this, by any means.  This was so insignificant
on the radar of events that I can't even tell you the inmate's
name or where I was standing.  But nothing that I did in there was
out of -- based off of anger or something like that.

The inmate was taking trays.  He needed to go lock down.
And G-Pod, if you're not familiar, is actually one of our most
violent pods.  It's where we house everybody that's charged with
murder, ag assault, gang members, all of those things.  They
typically form up together inside the pod, so if one person's
getting punished and they don't agree with it, two or three or
four or ten or fifteen people will all rise up at the same time to
voice those concerns.  So more than likely, without saying, yes,
100 percent that's what happened, there was a lot more to this
incident, as far as that goes, as to why group punishment or
pod -- that particular block was locked down versus just the one
inmate.  So, but again, I don't recall the name of the inmate, I
don't recall the time of the day, or anything remotely relative to
this.

Q.   And you don't recall being angry, as it says?

A.   No.

1   Q.   Okay.  Looking at the third paragraph --

2   A.   Poor wording on the choice of a poor supervisor.

3   Q.   Okay.  On the third paragraph it says on July 26th,

4   2015, Ms. Shirley Stevenson a Trinity worker in the kitchen, came

5   to the office and stated to me that you were yelling at her and

6   made a gesture with your hands saying in a loud voice, I need more

7   trays.  She stated to you that the count was right and that she

8   and Deputy Wilds had counted the trays.

9        Do you recall this incident?

10  A.   Maybe.

11  Q.   Maybe?

12  A.   Very, very vague details on this.

13  Q.   You don't recall yelling at a Trinity worker?

14  A.   I didn't yell at her.  I have a very deep and loud voice

15  by nature.

16  Q.   So you disagree with --

17  A.   I disagree with everything that Sergeant Gwendolyn

18  Johnson has ever written up on me, yes, 100 percent.

19  Q.   Okay.  But it's your testimony that Sergeant Johnson was

20  incorrect in writing that you --

21  A.   Absolutely, 1,000 percent.  She's incorrect about --

22  never mind.  I'll strike that last comment.

23  Q.   Well, the fun thing about a deposition is now I'm gonna

24  ask you about that last comment.

25       Why do you disagree with everything that Gwen Johnson

1  ever wrote about you?

2      A.   I disagree with her completely.  She's a bad supervisor.

3      Q.   Why do you contend that she was a bad supervisor?

4      A.   It's an opinion, how's that?

5      Q.   There was nothing specific that she ever did in the

6  supervision of you that would make you think she's a bad

7  supervisor?

8      A.   Nothing that's relevant, by any means, at all.

9      Q.   Relevant to what?  I'm just asking you.

10     A.   To anything that we have going on today.  It's just a

11 waste of the time to go off on that tangent, sir, respectfully.

12     Q.   Did you get in any verbal disagreements with Sergeant

13 Johnson while you were a deputy jailer?

14     A.   We had a few disagreements, yes.  I don't recall every

15 last one of them.  I don't recall even what they were over or if

16 they matter, because, honestly, they didn't.

17     Q.   Do you know if Sergeant Johnson still works for the

18 sheriff's office?

19     A.   She doesn't.

20     Q.   Okay.  The next -- I'm scrolling down to -- this is a

21 compilation, there's several documents in this exhibit.

22          The next document is several pages, and I'll try to

23 summarize it with you and ask you few questions.  It says Richmond

24 County Sheriff's Office Probationary Employee Evaluation Details

25 Division; are you with me?

1      A.   Yes.

2      Q.   Under this first header, Safety, there's an evaluation

3  and then there's some comments that are underlined.  And the

4  comments state, Deputy Russell understands the use of restraints

5  on inmates, but he needs to work harder differentiating between a

6  compliant and a noncompliant inmate.

7           Do you recall receiving this evaluation where you had

8  trouble differentiating between a compliant and noncompliant

9  inmates?

10     A.   No, I don't actually receiving this evaluation.  How old

11  is this?

12     Q.   I can scroll down a few more pages and see if we could

13  find a date, but it looks like when you were a probationary

14  employee of the jail.

15     A.   Yeah, that would be --

16     Q.   No, this is a different document.  I don't see a date,

17  but this was produced to me in discovery.

18     A.   Yeah, I have no idea.  I don't remember seeing this.

19     Q.   Okay.  Would you agree that while you were a

20  probationary employee that you had trouble differentiating between

21  a compliant and a noncompliant inmate?

22     A.   In that one sentence along right there?  No, I don't

23  agree with that one sentence.

24     Q.   You think in your career in law enforcement you've ever

25  had trouble differentiating between compliant and noncompliant

1  inmates or arrest subjects, or any subjects, whatsoever?

2      A.    No.  It's pretty self-explanatory.

3      Q.    Yet your answer is no?

4      A.    No.  A compliant person is a compliant person, and a

5  noncompliant person is a noncompliant person.  There is no --

6  again, same thing, I guess, no magical formula for that.  Anybody

7  can look at somebody and tell this person's being compliant and

8  this person's not being complaint; it's not something that I feel

9  I've really struggled to differentiate between the two.

10     Q.    Okay.  So you would disagree with this comment?

11     A.    I would disagree with that comment, yes.

12     Q.    Okay.  Looking at the next subject, Control of Conflict,

13 Number 2, Verbal Communications and Commands.  Looking down at the

14 comments again, are you able to see them.

15     A.    I am.

16     Q.    Says, Deputy Russell has the ability to control

17 situations with voice commands.  Deputy Russell is young and tends

18 to get excited during situations, which causes his voice to become

19 loud and sounds harsher than intended.

20           Have you ever seen this comment or received this kind of

21 evaluation before?  Do you recall this?

22     A.    I don't recall this particular evaluation.  I mean,

23 obviously, it happened, I just haven't seen it in over five years,

24 so I don't recall everything that was written on it.  But yes, I

25 believe I signed this at one point in time during my career.

1     Q.   Would you agree that in the past, at least, you've

2  tended to get excited during situations and --

3     A.   Yeah.  Within my first three months in a jail, not being

4  well versed in situations or any of that, going from a calm

5  reality outside of the jail walls and outside of law enforcement

6  to the chaos that ensues in there, absolutely, I get excited.

7     Q.   And you would agree that your voice has become loud and

8  sounds harsher than intended when you were working at the

9  detention --

10     A.   My voice is pretty -- my voice is pretty loud

11  regardless.  So, I mean, I don't -- I don't know how it sounds

12  harsh or whatever, but when I'm -- I'm assuming in this particular

13  situation they're talking about when I'm dealing with situations

14  or in the midst of something exciting, i.e. a physical altercation

15  or several people wanting to revolt inside a block, or something

16  like that.  So yeah, I'm sure my voice was pretty loud and harsh.

17     Q.   Would you agree or disagree with this comment?

18     A.   Agree, I guess.

19     Q.   Okay.  Moving down to the third subject here, Control of

20  Conflict, Physical Skills.  Again, I'm looking at the comments at

21  the bottom that are underlined.  It says, Deputy Russell has been

22  involved in a couple of physical altercations with inmates and

23  appears to be able to handle himself.  Deputy Russell is slightly

24  built but is capable of controlling inmates in a physical

25  altercation.

1          Would you agree with that comment?

2     A.   To a degree, yeah.

3     Q.   And you said this was your first couple of months on the

4   job when this would have been filled out?

5     A.   Yes, sir.

6     Q.   So in your first couple of months as a deputy jailer you

7   had already been involved in a couple of physical altercations

8   with inmates?

9     A.   Yep.

10     Q.   Do you remember those altercations?

11     A.   Not a clue.

12     Q.   Would any reports have been made of those altercations?

13     A.   I have no idea.  The jail -- I didn't do paperwork in

14   the jail.

15     Q.   You don't recall any physical altercations with inmates

16   within your first few months of working there?

17     A.   I mean, that was over five years ago.  I was -- that's

18   pretty much a consistent thing inside the jail.  I mean, it's five

19   years ago, I don't have any idea what that's referencing.

20     Q.   Okay.  The next one is a positive comment.  It says you

21   do not have a problem dealing with ethnic groups.  And I'm gonna

22   assume you'd agree with that, correct?

23     A.   Yes, sir.  That is correct.

24     Q.   Okay.  The next one's positive, as well.  It says you

25   adhere to the chain of command, you're respectful to your

1    supervisors, you take criticism and make every effort to correct

2    anything you may be doing wrong.  I assume you agree with that.

3        A.    Correct, sir.

4        Q.    And the next one is about your uniform, as well.  I

5    assume you agree with that.

6              The next one is you are compliant with programs and

7    procedures.  I'm sure that you'd agree with that, as well.

8        A.    Yes, sir.

9        Q.    And the next one is about you being able to learn

10   quickly, and I'm sure you agree with that.

11             But you don't remember this evaluation at all, just to

12   be clear?

13       A.    Yes.  I don't remember any of those comments, no, sir.

14   Obviously it happened.  It's there and I'm sure I signed for it,

15   but I'm not -- I don't even remember who may have given me this

16   evaluation, to be honest with you.

17       Q.    Okay.  I'm just trying to understand the information

18   that was produced to me.

19             The next page is also multiple pages for the next

20   document.  It starts with RCSO Performance Appraisal Report Form,

21   annual, it says, from January 1st, 2016 to December 31st, 2016.

22             Do you remember this document?

23       A.    I can't say that I do, no.  Not off the top of my head,

24   sir.

25       Q.    Okay.  Well, let's go through it and see if you remember

1  the comments made in here.  These are a bunch of boxes that

2  basically include a category and there's checkmarks; satisfactory

3  or needs improvement, and that sort of thing.  It looks like thee

4  are checkmarks in every single box under MS, which means here,

5  Meets Expectations, I believe, except for one.  There's only one

6  that's different, and it's marked under NI, and that's the one

7  that says interpersonal skills and attitude under number 9.

8          Do you recall being given a needs improvement evaluation

9  during this time period for interpersonal skills and attitude?

10      A.   No, sir, I don't.

11      Q.   Here are some comments.  Looking specifically at number

12 two, it says in the comments, Deputy Russell has a hard time

13 expressing himself in the correct tone.  Inmates sometime mistake

14 his tone for a bad attitude.

15          Do you recall being given that assessment or evaluation?

16      A.   Again, I don't recall this.  I don't recall this

17 document.  I'm sure I saw it at some point in time, but it's been

18 so long since I've seen it.  And I don't...

19      Q.   That's okay.  It's not -- it's not a memory test; if you

20 don't remember, you don't remember.

21      A.   No.  I mean...

22      Q.   Would you agree with this comment here that during 2016

23 you had a hard time expressing yourself in the correct tone, that

24 your -- sometimes inmates would mistake your tone for a bad

25 attitude.

1     A.   I agree with inmates make mistakes.  I agree with that

2   portion of that comment.  My tone is my tone and I've -- I mean,

3   this is kind of something I've dealt with my entire life.  It's

4   not a -- some people can understand it, some people think it's

5   harsh, some people think it's this, that or whatever; it's just

6   the voice that I have.  It's not me being rude or disrespectful,

7   it's not me being confrontational or argumentative, it's just the

8   tone of voice that I was born with and I've kind of dealt with

9   this off and on forever.  Some people understand it, some people

10  don't.

11        But I definitely agree with the inmates make mistakes

12  for a bad attitude.  It's not that I'm having a hard time

13  expressing myself in the correct tone, it's just the tone that I

14  have.

15     Q.   Okay.  Scrolling on down.  Your overall perforce

16  summary, this is in the same report, it says:  Deputy Russell is

17  working hard toward improving tone, becoming a stronger employee.

18        Do you remember making efforts or working hard to

19  improve your tone --

20     A.   I try to every day, all the time, whenever I speak to

21  people.  Sometimes it just -- it's the voice I have, sir.

22     Q.   Did Richmond County Sheriff's Office refer you to any

23  training on communications with the inmates due to these

24  performance evaluations?

25     A.   I can't change my voice, sir.  It was nothing really

1 that can be attributed to how I talk differently.

2 Q. And I'm not criticizing your voice, I'm just asking if

3 they sent you to any training in light of these performance

4 evaluations.

5 A. No, sir. There's no voice training, I guess, as it

6 were.

7 Q. Okay. Moving on down. It looks like another

8 Probationary Employee Evaluation, Jails Division, dated 12/29/15.

9 This was your -- it looks like there's a signature. Is that your

10 signature here where it says I agree with the evaluation?

11 A. That is correct.

12 Q. This page might be out of place, because we just went

13 through 2016. In any event, the next page here, another document

14 produced to me in discovery. It starts with your name, employee

15 ID, and the date of a violation occurring on May the 30th, 2017

16 for unsatisfactory performance, 4.26. Are you with me?

17 A. Yes, sir.

18 Q. Do you recall this -- this incident?

19 A. I do recall this incident, yes.

20 Q. And it says that you were involved in a heated

21 discussion with several supervisors at the Columbia County Fire

22 Department?

23 A. That's subjective. It was not several supervisors, it

24 was one particular supervisor.

25 Q. All right. Would you tell me what happened in this

1  incident?

2      A.   Yeah.  One of the guys that works at the Columbia County

3  Fire Department got upset because I had a gun on me, even though I

4  have permission from both the acting chiefs at the time, the

5  assistant chief, and the instructor in the class.  He like kind of

6  pulled me aside from that, got me away from everybody and

7  proceeded to tell me what I was and wasn't gonna do, and how he

8  felt about (unintelligible).

9      Q.   Would you agree that you were in a heated discussion

10  because of this incident with supervisor, one or more, of the

11  Columbia County Fire Department?

12      A.   He was pretty heated.  I wasn't.

13      Q.   You weren't angry in this incident?

14      A.   No, I did everything I was supposed to do the way I was

15  supposed to do it, as far as everything went with the fire

16  department and all that.  I had permission from everybody that I

17  needed permission from and there was no issue from any of those

18  people that wee well above him.  Matter of fact, what you don't

19  have here is that this is actually really good friends with

20  Lieutenant Silas, they're like best friends outside of work, the

21  person that -- who made this initial complaint, and the two of

22  them hang out a lot, all that good stuff.  Like I said, they're

23  very close friends.  And that individual was actually reprimanded

24  at the fire department for his behavior during this event.

25      Q.   Okay.  So here we have another incident where it looks

1  like you've been evaluated or written up for becoming angry; but

2  you disagree that you were angry?

3      A.   Yes.  Nobody that even wrote this here, including

4  Lieutenant Silas, was there for this.

5      Q.   Okay.

6      A.   There was no -- it's all subjective.  It's all based on

7  the opinion of one individual at the fire department that didn't

8  like something that he wasn't allowed to do that I was.

9      Q.   Do you agree with the conclusion here that says the fact

10 that you have a civilian carry permit does not allow you to carry

11 a firearm while wearing any clothing representing the Richmond

12 County Sheriff's Office?

13     A.   Yes.  That was -- I agree that that statement is on the

14 page.

15     Q.   And did you agree with being written up for a violation

16 of the --

17     A.   I did not agree with the write up, but rather than argue

18 and try to cause a scene and do any of the like, out of respect

19 for the supervisor and the people that supervised me directly, I

20 signed that write up and moved on with my life.

21     Q.   Okay.  Next page is a violation of similar form from

22 June 21sat, 2017, Violation 3.7-1, neglected duty.  It involves

23 the failure to verify the amount of money that was confiscated

24 from an inmate.  Do you recall this incident?

25     A.   I do.

1     Q.   And what happened in this incident?

2     A.   I was working booking intake, actually -- or booking and

3 the intake section of the jail this day.  And one of the deputies

4 off of road patrol brought this guy in with -- on trafficking

5 charges of methamphetamine, from my latest review of this,

6 actually.  So anyway, regardless of that, he left all his money in

7 his wallet, all his personal items and belongings in a bag.  And

8 it was like 5:45, so I put it in the property bag, signed the

9 form, and prepared for shift change without doing my due

10 diligence.  There was a $20 discrepancy between the money that was

11 in the wallets that was written down or whatever versus when they

12 actually went back and found the money in the property room.

13     Q.   Okay.  Would you agree with the statement at the end of

14 the first paragraph; after watching the video it was obvious that

15 you did not check the contents of his wallet.  This type of

16 negligence is unacceptable?

17     A.   Yeah, I didn't check the contents of his wallet at all.

18 Like I said, I threw it all in a bag that it came in and I put

19 faith in somebody else doing a job that I should have verified at

20 that point in time and I didn't.

21     Q.   Okay.  And you agreed with -- you wrote that you agreed

22 with this violation statement; is that correct?

23     A.   I agreed that it happened.

24     Q.   And this next page is a statement regarding that, I

25 think we've already gone through that.

1          The next page is dated 12/1/2019, it says Overall

2    Performance Summary at the top.  In the middle section it says,

3    review, comments, and signatures; and under the comments it says,

4    Deputy Russell is a very proactive deputy and works hard.  Deputy

5    Russell has applied for the lots of -- I can't make that out -- to

6    help better --

7          A.   Classes.

8          Q.   -- classes to help better himself.  Deputy Russell need

9    to work on how he talks to people, he needs to show more concern

10   and empathy when talking to people.

11         Do you recall this comment or evaluation?

12         A.   Briefly, yes, I do.

13         Q.   Do you know why the lieutenant here said that -- or had

14   the opinion that you need to show more concern and empathy when

15   talking with people and work on how you talk to people?

16         A.   It goes back to that whole tone of voice thing when it's

17   misconstrued.  It might sound like I'm being sarcastic, it might

18   sound like I'm being disrespectful or I don't care, or something

19   of that nature, but it's not necessarily the case.  It's just

20   kinda how the voice comes out.

21         Q.   This wasn't written in regard to any event or events --

22         A.   Not that I'm aware of.

23         Q.   Okay.  But again, we have a report where somebody has

24   written up that you are showing lack of concern and empathy in

25   talking -- well, excuse me.

1          MR. CALIFF:  Let me strike that.

2     Q.   (Mr. Califf)  Again, we have a report where it shows you

3 need to work on your communication skills, essentially, and you

4 disagree with the report; is that correct?

5     A.   I didn't really say I disagree with the report.  I'm

6 just saying that it goes back to the tone.  The same conversation

7 we've had twice now, I believe.  It's just the way I talk

8 sometimes.  I'm not meant to be rude or disrespectful, or any of

9 the like, it just kind of happens, like as far as it's perceived

10 in a way, rather.

11    Q.   Okay.  Do you agree with your report; yes or no?

12    A.   I give you the same answer that I gave you last time; I

13 agree that sometimes my tone can be misconstrued and that I try to

14 work on that.  That's where I'm at with that.

15    Q.   Okay.  The next page is a -- looks like another

16 violation report dated August 20th, 2020, unsatisfactory

17 performance, parole operation, vehicles --

18         THE WITNESS:  Not to interrupt you, I apologize.  I just

19    checked.  Is anybody else supposed to be in this video?

20    Everybody's muted their mics and all, but I'm just making

21    sure that they were still there.  Okay.

22         MR. FRAILS:  Oh, we're listening.

23         THE WITNESS:  Okay.  I just wanted to make sure

24    everybody was still here.

25         MR. FRAILS:  Ms. Haynes is here, and I'm here.

1          THE WITNESS:  Awesome.

2          MR. FRAIL:  Both of your attorneys are here.

3          THE WITNESS:  Okay.  I appreciate it.  I just wanted to

4     make sure that the video feed wasn't cut.  Sorry about that.

5     I apologize for the interruption.

6          MR. FRAILS:  No, that's okay.  You did the right thing

7     by asking.

8     Q.   (Mr. Califf)  Do you recall the incident described in

9     this violation report?

10    A.   Yes, sir.

11    Q.   And would you explain to me what happened in this

12    incident?

13    A.   Politely and respectfully, I had a bowel situation

14    taking place and slung the car in park and ran inside.

15    Q.   Okay.  And so you were written up for leaving your car

16    unlocked; is that correct?

17    A.   That is correct.  Back story to this, like real quickly.

18    Like I said, I had that situation taking place where I had to run

19    inside, but there's actually video footage that I pulled of this.

20    I did lock my car.  I'm not sure how it became unlocked while I

21    was inside.

22          And to address the shotgun and AR thing, because I know

23    we're going straight to that, none of that was actually in the

24    car.  And I can say that 100 percent.  So typically, yes, I will

25    ride with my shotgun and my AR-15 up front, as well as some

1    additional magazines for the rifle, that way it's all accessible

2    in the front seat of the car while I'm patrolling while I'm on

3    duty.  This particular day I'd actually left the range from the

4    EVOT course and had to secure all of that stuff in the trunk,

5    otherwise I would have flung it out the damn door and all over the

6    car in the process of trying to drive around the EVOT course at

7    high speed and make times, as well as doing the threshold braking

8    and stuff.  All of that was responded to in an email that should

9    have been attached to this, but I don't believe it ever was, just

10   to clear that up.

11          And the other incident was for a 2008 Crown Victoria

12   that like the transmission fell out of while it was parked.

13   That's at the very bottom of that page there.

14   Q.   Okay.  And so do you agree with the information

15   contained in this report?  It sounds like you do not.

16   A.   I don't necessarily agree with every fact and asset of

17   it, but I do agree with some of it.  Yeah, the car was there and

18   it was running.

19   Q.   Where you did mark that you agreed with it; is that

20   correct?

21   A.   That's -- yes.

22   Q.   Is that your signature?

23   A.   No.  That's the corporal's signature.

24   Q.   Okay.  Did you write the mark on the agree box?

25   A.   No.  That's actually his portion where he wrote in the

1  agree box.  Mine should be on the next page, maybe.  I'm not

2  really sure.

3       Q.   Okay.  Well, maybe you didn't write that you agreed with

4  this one.  It doesn't seem to contain your signature; is that

5  correct?

6       A.   That should be correct, yes.

7       Q.   So this incident from 8/2020, you written up and you

8  disagreed with the disciplinary action and some of the narrative

9  contained here; is that correct?

10      A.   Some of the narrative, that's correct.  I mean, the fact

11 the car was running, yes, but other than that...

12      Q.   And the next page involves an incident July the 2nd,

13 2020.  It looks like another incident involving your patrol

14 vehicle, leaving the vehicle running, dropping off HIPAA work.  Do

15 you recall this incident?

16      A.   I do.

17      Q.   And do you disagree with the report made in this

18 incident or the description of the incident?

19      A.   I agree that all of that happened, but actually this was

20 all just taken care of.  The reason I can recall this so vividly,

21 this was taken care of a few months ago, whereas the car was

22 actually found to be at fault for the backing into the building.

23 I just -- told me not to keep the car running.  But that was the

24 precursor to the one we just talked about.

25      Q.   Okay.  And were you given an eight hour suspension

1  because to this incident?

2      A.  Yes.

3      Q.  And did you sign at the bottom?  Is this your signature?

4      A.  It is.

5      Q.  The next incident is April 24th, 2020, it looks like a

6  traffic accident.  Do you --

7      A.  Oh, yeah.

8      Q.  -- recall this incident?

9      A.  Yes, sir.

10     Q.  Do you agree or disagree with this description?

11     A.  All day long.

12     Q.  Agree or what?

13     A.  Agree.  Yeah, absolutely.  I rear-ended a car.  I

14  mean...

15     Q.  Okay.  The next incident is 2021, January the 11th.  It

16  looks like it's multiple pages.  Isn't that your signature at the

17  bottom?

18     A.  It is.

19     Q.  And do you recall what this incident is about?

20     A.  I do.  This should be -- this like a combination of

21  multiple things.

22     Q.  It looks like there are multiple narratives written up

23  here.  Have you reviewed all of these narratives?

24     A.  Not in their entirety, but I have a decent understanding

25  of both of these situations.  They're pretty current, still.

1      Q.    Rather than reviewing each (unintelligible) pretty

2   lengthy, would you agree that there is a violation of 4.26

3   unsatisfactory performance in regard to the violation --

4      A.    I do not.  I do not agree with that at all.

5      Q.    And why don't you agree?

6      A.    I disagree with the comments that were made and the

7   interpretation made by the lieutenant.  Which, if you'll note, all

8   of these were by the same lieutenant and same sergeants, if you

9   paid attention to any of that.  That's been a kinda an ongoing

10  thing.

11         So I disagree with it, but rather than argue and try to

12  take it through the appeals process and extend or continue the

13  feud that's taking place, I signed my writeup and take the 16

14  hours.

15     Q.    Okay.

16     A.    Sometimes we just gotta take it on the chin.

17     Q.    So in this incident, it's another incident where you

18  were written up for a violation of --

19     A.    It's all one thing.  It's all one -- it's all under that

20  one 16 thing -- the 16 hours.  It's not individual -- individual

21  events took place, but it was one writeup that he compounded over

22  the course of a couple of weeks or months, so however long it

23  took.

24     Q.    Okay.  Would you agree that you refused to put a COVID

25  mask on during, looked like two of these incidents?

1    A.    Yeah.

2    Q.    Did you agree that you violated policy by refusing to

3    put a COVID mask on?

4    A.    No.

5    Q.    Do you know whether it was the policy of Sheriff

6    Roundtree to require a COVID mask in January of this year?

7    A.    Yeah, inside the buildings and such.  I was outside for

8    these events.  It's only at the sheriff's office.  And it wasn't a

9    policy change, it was like an email or memorandum, or something

10   that went out.  I don't even recall the wording behind it.

11   Q.    Okay.  This comment says that Deputy Russell should have

12   been able to see that the driver did have some hearing issues.  Do

13   you agree with that comment?

14   A.    Not even a little bit.  She responded to everything I

15   said.

16   Q.    So this comment was made by somebody who reviewed the

17   video footage of the incident described?

18   A.    It was made by Deputy -- or by Lieutenant Silas.  Yes,

19   that comment was made by them.  But again, if you'll notice a

20   trend?

21   Q.    I notice a few trends.

22         Do you agree with this statement in this paragraph;

23   Deputy Russell has very good intentions but needs to learn how to

24   de-escalate things to his advantage?

25   A.    No, sir.  I mean, I don't know what he was trying to

1 convey by this whole sentence here.  So, I mean, the situation was

2 de-escalated.

3     Q.   In your opinion, do you have a problem with escalating

4 situations needlessly?

5     A.   No.  Not needlessly.

6     Q.   This is your statement, correct?

7     A.   Yes, that's my typed statement.

8     Q.   And did this incident get resolved, or you said it's

9 ongoing?

10    A.   All this is resolved.

11    Q.   Did you write that you agreed with the violation and

12 recommended actions?

13    A.   For the 16 hours for the one thing; is that what you're

14 referring to, what we just talked about?

15    Q.   (Inaudible.)

16    A.   That encompassing whatever it is there?  Yeah, I did

17 sign that.

18    Q.   Okay.  The last page here is from, it looks like, a job

19 application screening form.  And this page was not written on or

20 signed by you, but it does reference that the checked box here,

21 that says, criminal history.  Do you have a criminal history?

22    A.   Yeah, I was arrested.

23    Q.   How many times have you been arrested?

24    A.   Once.

25    Q.   And what were you arrested for?

1    A.   A charge of aggravated stalking.

2    Q.   And what happened in that incident; why were you

3 arrested for aggravated stalking?

4    A.   That incident was dismissed.  It's been adjudicated

5 already.

6    Q.   What happened that led to your arrest for aggravated

7 staling?

8    A.   A phone call that took place to a 911 communication

9 center, of all places.

10   Q.   And why did --

11   A.   You want like a whole rundown or -- I mean, what are you

12 getting at?

13   Q.   Yeah.  I want to know why you were arrested for

14 aggravated stalking.

15   A.   It's 2010, maybe, 2011.  I don't know.  Quite a

16 while ago.  A deteriorating relationship took place.  Childish

17 bullshit --  I apologize.  Childish things were taking place back

18 and forth between myself and somebody else.  There was an order of

19 no contact placed in there for her not to contact me or me to

20 contact her.  I actually wound up moving away from the state at

21 that point in time.  I received a phone call from my mother -- to

22 preface this a little bit, the quote/unquote victim in this here

23 incident lived a couple doors down from where my mother and family

24 lived at the time.

25        Mom called me while I was in another state to ask me if

1  I had sent a patrol car -- call dispatch and have them send a

2  patrol car by the house because there was fighting and carrying on

3  going on in the street.  I did so.  Based off of what she told me,

4  the deputy arrived and found that wasn't going on.  And through

5  whatever means an investigation that (unintelligible) took place

6  after that case, they felt that I -- I believe their initial

7  argument or their only argument was that I used the sheriff's

8  office as a means of contact, somehow.

9      Q.   Was this in Columbia County?

10     A.   It was in Columbia County.  Yes.

11     Q.   And the no contact order, was that in Columbia County?

12     A.   Yes.

13     Q.   You said that arrest was dismissed?

14     A.   Yes.

15     Q.   Did this involve an ex-girlfriend or something?

16     A.   Yes.  That was first part of the testimony.

17         MR. CALIFF:  Let's take a short break and I may done and

18     I may have one or two questions for you.  But I'll be back in

19     two or three minutes.  Does that work for you?

20         THE WITNESS:  Sure.

21  [Off the record.]

22     Q.   (Mr. Califf)  I just have a few more questions for you,

23  sir.  Other than those performance evaluations and other documents

24  related to your employment record that we just reviewed

25  (inaudible), are you aware of any other disciplinary actions that

1  have been taken against you or any allegations of misconduct have

2  been made against you at your employment with the Richmond County

3  Sheriff's Office; anything other than what we went through?

4      A.   Not particularly, no.  I mean, there are some complaints

5  that were not mentioned, but other than that, no.  I don't recall

6  every specific complaint.

7      Q.   Do you recall any complaints that are not mentioned?

8      A.   One, as far as my driving one day.  Somebody complained

9  about how fast I was going.

10      Q.   Did you agree with that complaint?

11      A.   Oh, yeah.  I was flyin'.

12      Q.   Any other complaints other than the one about your

13  driving?

14      A.   I can't recall off the top of my head, sir.

15      Q.   Has there been any other complaints ever made against

16  you for using excessive force against either an inmate or a member

17  of the public?

18      A.   No, sir.

19      Q.   Has there ever been any complaints made against you, to

20  your knowledge, regarding any unlawful arrest that you've made?

21      A.   No, sir.

22      Q.   You described during the arrest of Mr. Scott that after

23  you told him to put his hands behind his back he put his hand in

24  his pocket.  When did you first become aware of Mr. Scott's claim

25  that he was trying to give money that was in his pocket to his

1 wife?

2    A.    That was one of the things he yelled out while we were
3 struggling on the hood of the car.

4    Q.    And did you know at that time whether there was money in
5 his pocket?

6    A.    No.

7    Q.    Did you believe him when he told him he was trying to
8 give money to his wife?

9    A.    No.

10    Q.    And why is that?

11    A.    I had no reason to believe anything that he was saying.
12 He wouldn't comply with what I was saying.  He wanted to go back
13 to his car, he wanted to get away from me.  That was all something
14 that could have been sorted out a lot more civilly at a different
15 -- very shortly after he was placed in handcuffs we could have
16 sorted all that out, no problem.  But when you don't do what
17 you're instructed to do, much as Mr. Scott did, where he tries to
18 take off back to the car, I don't really believe anything that
19 you're saying at that point in time.  It could be found out later,
20 but at that point in time, no, not until I have actual physical
21 proof and the situation is a lot calmer than this one was.

22    Q.    Okay.  So you thought Mr. Scott was lying about trying
23 to give money to his wife?

24    A.    No, I just didn't believe him.  I don't believe what he
25 was saying.  It's not that I think he's a liar, I just don't

believe what he was saying at the time.  I mean, I have nothing to

substantiate that, and I'm not gonna take his word on anything

that he's saying, would be a better way to phrase that.  I don't

want to call him a liar.

Q.   Okay.  Did you become angry when you believed that

Mr. Scott gave you the wrong date of birth?

A.   No.

Q.   You weren't angry in any way, shape, or form at that

moment?

A.   No, sir.

MR. CALIFF:  I don't have any more questions for you.

Thank you for being here and bearing with me.

THE WITNESS:  Yes, sir.

MR. FRAILS:  I've got just a couple follow up questions,

Deputy, that I'd like to ask you.

THE WITNESS:  Yes, sir.

EXAMINATION

BY MR. FRAILS:

Q.   Earlier you testified that you -- that all of the

complaints that opposing counsel brought up were the only

complaints that you were aware of; is that true?

A.   There's like, as far as written IA complaints, things

like that, yeah, that's what I'm aware of.  There's -- I said one

about driving, and then there's been just phone call complaints,

but I don't recall any of the contents of any of those.  It's more

1  or less some of these brought up in passing, like, hey, somebody

2  said this or somebody said that; it's not a formal actual writeup

3  or anything of that nature.

4      Q.   Okay.  And you're not -- are you certain that there

5  aren't more complaints that may be out there that you're unaware

6  of?

7      A.   There could very well be all kinds of things out thee

8  I'm unaware of.

9      Q.   Okay.  Have you ever sat down with Internal Affairs and

10  went over any complaint log as it relates to you?

11      A.   Not specifically, no.

12      Q.   Okay.

13      A.   Only time I've sat down with them was to talk about

14  another incident that didn't have anything to do with me.

15      Q.   Okay.  So you'd agree with me, there could be more

16  complaints out there other than the ones that were brought up

17  today?

18      A.   Absolutely.  Yes, sir.

19      Q.   And the ones that you just mentioned today, correct?

20      A.   Yes, sir.

21          MR. FRAILS:  Okay.  All right.  I don't have any other

22      questions.

23      A.   I'm not privy to all of that information that they have,

24  so there could be -- there could be anything out there.

25          MR. FRAILS:  I don't have any further questions.  Any

1    follow up?

2              MR. CALIFF:  No, sir.

3              Thank you for being here Deputy Russell.

4                              *

5         [Whereupon, the deposition concluded at 4:40 p.m.]

6    [Reading and signing of this deposition was reserved by the

7                         deponent.]

8    //

9    //

10   //

11   //

12   //

13   //

14   //

15   //

16   //

17   //

18   //

19   //

20   //

21   //

22   //

23   //

24   //

25   //

DISCLOSURE

DEPONENT:  RICHARD RUSSELL

STATE OF GEORGIA

COUNTY OF RICHMOND

Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:

I am a Georgia Certified Court Reporter.  I am here as a representative of Augusta Scribes Court Reporters, LLC.

Augusta Scribes Court Reporters, LLC, was contacted by the offices of Califf Law Firm, LLC to provide court reporting services for this deposition.  Augusta Scribes Court Reporters, LLC, will not be taking this deposition under any contract that is prohibited by O.C.G.A. Sec. 15-14-37(a) and (b).

Augusta Scribes Court Reporters, LLC, has no contract/agreement to provide reporting services with any party to the case, any counsel in the case, or any reporter or reporting agency from whom a referral might have been made to cover this deposition.  Augusta Scribes Court Reporters, LLC, will charge its usual and customary rates to all parties in the case, and a financial discount will not be given to any party to this litigation.

Dated:  04/21/2021; Christine Tatum, CCR

CERTIFICATE

STATE OF GEORGIA:
COUNTY OF RICHMOND:

I hereby certify that the foregoing transcript was taken down, as stated in the caption, and the colloquy, questions, and answers thereto were reduced to typewriting under my direction; that the foregoing pages 4 through 140 represent a true, complete, and correct transcript of the evidence given.

The above certification is expressly withdrawn and denied upon the disassembly or photocopying of the foregoing transcript, unless said disassembly or photocopying is done under the auspices of Augusta Scribes Court Reporters, LLC, and the signature and original seal is attached thereto.

I further certify that I am not related to or are of counsel to the parties in the case; am not in the regular employ of counsel for any of said parties; nor am I in any way interested in the result of said case.

This, the 5th day of May 2021.



CHRISTINE TATUM, 5139-6588-4964-8640, CCR

# ERRATA SHEET

I, RICHARD RUSSELL, the witness herein, do hereby certify that I have read all questions propounded to me and all answers given by me on the 21st day of April 2021, taken before Christine Tatum, and that:

_____ 1)  There are no changes noted.

_____ 2)  The following changes are noted:

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

ERRATA SHEET (CONTINUED)

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____

Page _____ Line _____ should read:_____

Reason for change:_____


_____

RICHARD RUSSELL

Sworn to and subscribed before me

on this _____ day of _____, _____.


_____

Notary Public

My commission expires: _____

**$**

**$20 (1)**
124:10

**/**

**// (18)**
140:8,9,10,11,12,
13,14,15,16,17,18,19,
20,21,22,23,24,25

**[**

**[Crosstalk] (7)**
50:22;70:9;88:8;
90:17;91:17;101:3;
103:22
**[Off (3)**
49:10;99:9;135:21
**[Reading (1)**
140:6
**[Whereupon (2)**
4:2;140:5

**A**

**ability (1)**
115:16
**abjectly (1)**
106:22
**able (41)**
17:21,24;27:24;
35:12;42:15;43:19;
44:13,13;45:20;48:1;
52:3;55:3,6;60:12,
19;62:21;66:18;73:1,
4;74:5,17;75:15,16;
77:13;81:12;82:5,9,
10;83:15,16;85:17;
89:4,4,9;101:7,10;
105:18;115:14;
116:23;118:9;132:12
**above (1)**
122:18
**absolutely (16)**
16:15;22:19,23;
49:9;50:17;54:18,21;
66:10;74:21;79:3;
95:7;99:3;112:21;
116:6;130:13;139:18
**academy (8)**
8:22;14:3;81:19;
90:10,25;93:2,11,12
**acceptable (2)**
79:18;95:6
**access (1)**
101:6
**accessible (1)**
128:1
**accident (1)**
130:6

**accidently (1)**
58:24
**acknowledge (1)**
35:24
**across (11)**
67:1,18,22,25;
70:5;88:10,19;89:24;
90:5,13;91:14
**act (3)**
20:17;45:11,14
**acting (4)**
16:9;17:8,9;122:4
**action (2)**
26:9;129:8
**actions (22)**
16:25;17:2,6;26:2,
24;57:4;65:19;66:6;
77:17,19;82:19;
83:22;89:15;97:5,7,
21,24,24,25;98:6;
133:12;135:25
**action's (1)**
57:1
**active (6)**
8:1;9:3,12;39:7;
42:17,18
**actively (1)**
43:19
**activities (2)**
7:1;38:22
**activity (2)**
10:21;32:15
**actual (12)**
8:13;22:11;41:14;
44:18;56:9;67:24;
85:12;103:7;104:19;
107:12;137:20;139:2
**actually (30)**
6:21;7:4,5;15:21;
16:11;24:13;29:18;
33:8;41:3,5;42:16;
44:3;60:17,20;69:5;
75:24;111:11;
114:10;122:19,23;
124:2,6,12;127:19,
23;128:3,25;129:19,
22;134:20
**addition (1)**
14:7
**additional (6)**
12:20;14:8,11;
55:21;102:13;128:1
**address (1)**
127:22
**adhere (1)**
117:25
**adjudicated (1)**
134:4
**adjust (2)**
77:14,18
**adjusted (1)**
76:4
**adjusting (1)**

**77:14**
**advantage (9)**
60:20;76:25;78:24;
79:5;82:7;83:18;
90:2,2;132:24
**affairs (3)**
109:11,15;139:9
**afraid (3)**
33:23;34:7;48:7
**African-American (1)**
33:24
**afternoon (1)**
4:14
**afterward (1)**
57:10
**ag (1)**
111:13
**again (46)**
7:8;8:12,19,23;
26:18;27:2,6;34:5;
37:25;38:7;39:8;
45:4;53:12;62:23,23;
69:3;71:15;76:11;
77:5;80:19;87:13;
88:15;90:23;91:3,14;
93:3;95:13;97:23;
99:2,16;100:9;
103:10,12;104:10,17;
105:6;109:13,20;
111:21;115:6,14;
116:20;119:16;
125:23;126:2;132:19
**against (29)**
16:24;17:16;19:2;
21:17;65:11;69:8,12;
70:22;73:18;79:25;
80:2,4;86:16;87:15;
90:3,20;91:3,4,6,24;
92:5;96:12;105:4;
108:15;136:1,2,15,
16,19
**age (1)**
8:23
**aggravated (4)**
134:1,3,6,14
**aggression (1)**
20:18
**ago (6)**
58:5;72:7;117:17,
19;129:21;134:16
**agree (69)**
26:1,5,8,23;48:6;
52:5,8;57:12;64:18;
67:9;68:5;69:7,11;
71:6;75:4;77:9;
80:25;87:19;101:19,
25;106:24;107:8,10;
110:16,23;111:15;
114:19,23;116:1,7,
17,18;117:1,22;
118:2,5,7,10;119:22;
120:1,1,11;121:10;
122:9;123:9,13,15,

**17;124:13;126:11,
13;128:14,16,17,24;
129:1,19;130:10,12,
13;131:2,4,5,24;
132:2,13,22;136:10;
139:15**
**agreed (6)**
124:21,21,23;
128:19;129:3;133:11
**agreement (1)**
4:5
**ahead (5)**
22:9;40:24;41:6,
19;85:6
**ailments (1)**
69:4
**air (4)**
94:1,3,14,19
**Alexander (1)**
4:25
**allegations (2)**
96:11;136:1
**allotted (2)**
31:24,25
**allow (2)**
86:22;123:10
**allowed (3)**
80:11;84:13;123:8
**allowing (1)**
65:24
**almost (2)**
56:23;77:2
**alone (2)**
18:25;20:15
**along (3)**
104:23;105:6;
114:22
**Alonzo (1)**
12:1
**altercation (6)**
66:21,22;110:2,5;
116:14,25
**altercations (5)**
116:22;117:7,10,
12,15
**alternatives (3)**
18:3,6,12
**although (1)**
87:18
**always (11)**
15:1;16:3;31:19,
20,22;33:4;35:18,20;
37:2,21;45:21
**amount (9)**
35:20;54:15;91:7;
94:16;104:11,12;
106:21;109:2;123:23
**ample (1)**
81:25
**analysis (1)**
14:22
**and/or (2)**
83:5;94:1

**anger (2)**
110:25;111:9
**angle (1)**
93:8
**angry (8)**
110:18;111:2,24;
122:13;123:1,2;
138:5,8
**annual (1)**
118:21
**answered (6)**
29:25;34:10;49:3;
80:5;92:8,10
**anymore (1)**
104:23
**apologize (4)**
59:3;126:18;127:5;
134:17
**appeals (1)**
131:12
**appear (1)**
70:2
**appeared (1)**
98:6
**appears (2)**
101:13;116:23
**application (1)**
133:19
**applied (4)**
69:19;70:20;105:9;
125:5
**applies (2)**
106:23;109:4
**apply (8)**
25:17;106:10,17,
19;108:19,22,24;
109:1
**applying (6)**
67:15;68:1,10,11,
13;81:2
**Appraisal (1)**
118:20
**appreciate (2)**
99:7;127:3
**approached (1)**
34:8
**approaches (1)**
24:9
**approaching (1)**
29:17
**appropriate (4)**
7:8;22:10;91:5;
96:15
**appropriately (2)**
93:4,4
**April (1)**
130:5
**AR (1)**
127:22
**AR-15 (1)**
127:25
**area (4)**
12:6;28:21,23;

75:15

**argue (3)**
59:18;123:17;
131:11

**argument (2)**
135:7,7

**argumentative (1)**
120:7

**arise (1)**
83:14

**arm (53)**
23:21;67:1,14,18,
25;68:2,2,3,7;70:4,5,
15,16,18;73:5;74:6,9,
13,23;76:4;78:5;
79:8,16;80:3;81:9,11,
12,13;82:10,11,14;
85:25;86:14,18,25;
87:2;89:4,6;93:3,7,
21;94:22;95:10,19;
102:12,16;103:3,8,
10,11,14;104:4,6

**arms (8)**
51:13,20,20;70:3;
75:25;77:10;79:1;
85:11

**arm's (2)**
70:17;79:11

**around (35)**
7:6;15:11;17:2,4,
11;19:23;21:10;
32:22;41:9;46:22;
59:11;62:10;65:23;
74:7,9,13,15,23,24;
75:1,1,25;79:8,11,16,
21;80:3;86:14;102:2;
103:8,10,11,14;
104:6;128:6

**arrest (85)**
8:25;14:17,24;
15:5,9,14;16:9,23;
17:17;18:4,8,14,17,
21,23,24;19:3,4;23:5,
14;24:1,5,10;25:17;
26:2,9,11,16,20,23;
27:5,7,22;42:13;
43:15,18;46:12;55:1;
57:9,13,14,15,18,21;
58:1,9,13,14;59:12,
22;60:1;69:5;72:6;
78:20;79:8,16;80:3;
91:21;95:9;96:11,12;
98:16,18,19,20;
100:22;101:20,23,25;
105:8;106:5,6,11,17,
19;107:1,9,11;
108:20,24;115:1;
134:6;135:13;
136:20,22

**arrested (12)**
19:21;26:3,10;
27:17;55:20;57:10;
59:13;133:22,23,25;

134:3,13

**arresting (2)**
24:4;57:21

**arresting's (1)**
70:15

**arrests (6)**
27:8,10,16,24;
28:10;55:25

**arrived (1)**
135:4

**arts (1)**
20:21

**ascertain (1)**
55:15

**aside (1)**
122:6

**asinine (1)**
48:18

**asphalt (1)**
62:20

**asphyxia (2)**
94:10;106:9

**assault (1)**
111:13

**assess (8)**
14:16;15:12,25;
17:8,16,25;18:3,7

**assessed (2)**
16:5;17:19

**assessing (2)**
15:17;16:22

**assessment (4)**
16:1;55:2,5;119:15

**assessments (1)**
14:24

**asset (1)**
128:16

**assigned (4)**
10:3,16;28:21,23

**assistant (1)**
122:5

**associated (1)**
104:12

**assume (4)**
12:20;117:22;
118:2,5

**assuming (1)**
116:12

**assumptions (2)**
65:18,19

**attached (2)**
95:17;128:9

**attempt (6)**
63:17;64:15;65:3;
75:12;83:5;84:11

**attempted (8)**
51:18;52:23;60:11;
61:3;62:5;63:18;
72:17;83:7

**attempting (4)**
72:9;75:5;81:15;
91:10

**attend (2)**

13:25;14:7

**attended (1)**
13:24

**attention (3)**
15:10;96:1;131:9

**attitude (5)**
119:7,9,14,25;
120:12

**attorney (2)**
4:15;30:21

**attorneys (1)**
127:2

**attributed (1)**
121:1

**audio (1)**
72:5

**August (1)**
126:16

**Augusta (2)**
5:11;33:21

**authorised (1)**
94:25

**authorized (4)**
19:9;23:1,11;80:15

**aware (14)**
54:22;58:3;60:6;
68:19;69:1,3;70:8,
11;71:6;125:22;
135:25;136:24;
138:21,23

**away (41)**
16:18;20:1,14;
21:1;22:2;43:16;
50:19;56:19;61:14;
62:9;63:11,12;64:16;
65:4;68:7;78:22;
82:17;83:3,12,13,24;
84:1,2,9,12,22,24;
85:2,9,16;97:24;98:5,
12,13,15,21,23,24;
122:6;134:20;137:13

**Awesome (1)**
127:1

---

# B

**back (182)**
4:16;10:2;17:3,5,
12;18:22;19:24;20:1,
5;21:11,20;22:16,20,
22;23:4,6,10,17,25;
29:12;31:4;35:16;
36:16;37:2,23;41:10,
21;45:5;46:21,22;
47:2,8,16,18,25;
48:12,17;49:17,20,
21;50:2,6,11,16;51:8,
16;52:3,7,12,17,21,
23,24;53:1,2,3;54:10;
55:7,14,23,24;56:3,6;
60:11,15,16;61:3,8,
10,13,18;62:7,8,9,14,
16;63:1,6,14,16,17,

22;64:5,9,14,21;65:4,
11,10,23,24,25;66:2,
12;67:1,5,10,12,15,
19,20,23;68:2,6,18;
69:2;70:4,5,6,15,18;
71:4,11,14,18;73:5,5,
6,14,14,14;75:5;76:7,10;
77:10,12,13,17;78:9;
81:2,12;82:1,5,6,12,
14;83:4,9;84:5,6;
85:18;86:7,11,15,22,
25;88:22;89:5,5;
90:12,23;91:18;
92:15,18,23;93:4,8,
24;94:1,2,8,24;95:11,
15,18;97:25;99:8;
102:13;103:2,11;
107:18,24;108:5,11;
124:12;125:16;
126:6;127:17;
134:17;135:18;
136:23;137:12,18

**background (1)**
5:18

**backing (1)**
129:22

**backseat (2)**
44:9;45:25

**bad (6)**
113:2,3,6;119:14,
24;120:12

**bag (2)**
124:7,8,18

**balance (6)**
74:17;75:6,14;
77:3;103:25;104:14

**bar (3)**
89:6;93:3;95:10

**bars (2)**
87:2;102:16

**base (1)**
38:2

**based (18)**
6:8;9:4;13:7;15:8,
9;17:6,7;43:19;
45:19;64:18;65:19;
66:5;77:14,17;91:15;
111:9;123:6;135:3

**basic (1)**
8:22

**basically (7)**
7:16;75:13;86:21;
93:7;104:15;106:4;
119:2

**bearing (1)**
138:12

**beat (1)**
88:23

**became (4)**
10:9;13:19;110:18;
127:20

**become (5)**
19:7;115:18;116:7;

136:24;138:5

**becoming (2)**
120:17;123:1

**beforehand (1)**
57:20

**began (8)**
5:19,20;12:19;
43:17;44:15;61:14;
63:11;97:12

**begin (4)**
5:14;12:4;21:17;
23:23

**beginning (3)**
9:16;89:24;90:9

**behalf (1)**
22:12

**behaving (1)**
39:1

**behavior (11)**
16:22,25;19:13;
32:8,9,10,24;38:2,5,
5;122:24

**behaviors (2)**
38:25;97:5

**behind (117)**
17:3,5,12;19:24,
25;21:11,20;22:16,
20,22;23:4,6,9,17,24;
29:8,9,10,14,17,20;
33:4;39:10;46:22;
47:1,8,16;49:17,21;
50:2,6,11,16;51:8,16;
52:3,7,11,17,21;53:1;
54:10;55:14,23,24;
56:2,6;60:11,15,16;
61:3,8,9,13,18,20;
62:7,8,14,16;63:1,5,
14,16,17,22;25;64:2,
5,9,13,21;65:10,20,
23,24;66:2,12;67:5,
10,12,20;68:2,18;
69:2;70:3,5,15,18,22;
71:4,11,14,18;73:5,
14;76:6,10;77:10,12,
13;78:9,24;81:11;
82:1,5,11;83:4;
85:18;86:22,25;
88:22;89:5;108:11;
111:6;132:10;136:23

**Bell (2)**
12:1,2

**belligerent (3)**
15:20,23;19:8

**belligerently (2)**
16:10;17:9

**belongings (1)**
124:7

**below (2)**
67:24;74:17

**bend (2)**
93:8;95:18

**bending (3)**
88:24,25;93:21

**beside (1)**
29:18
**best (3)**
66:23;103:1;
122:20
**bet (1)**
97:15
**better (5)**
44:4;59:17;125:6,
8;138:3
**biceps (1)**
74:24
**big (2)**
25:9;56:9
**birth (10)**
5:3;41:2,3;42:3,25;
43:3,7,9;54:20;138:6
**birthday (1)**
41:13
**bit (4)**
6:1;93:9;132:14;
134:22
**blade (1)**
95:13
**blades (2)**
92:17;95:17
**block (2)**
111:20;116:15
**blood (4)**
74:14,21;79:19;
80:13
**blow (1)**
105:11
**blows (7)**
104:19;105:9;
107:12,16,23;108:3,
14
**blue (1)**
39:10
**bodily (1)**
93:18
**body (55)**
41:21;42:3,8;51:7;
56:1,7,10;60:13;
62:18;68:8,14,16;
69:7,11,14,16,21,23,
24;70:21;72:13,17;
73:7,18;74:12;75:25;
77:20;80:19;83:18;
87:12,14,14,18,20,
22;88:5;89:12,13;
92:6;96:4,16;99:11,
13,15,17,22;100:15,
18,22,23,25;101:8;
104:20;105:3,4
**body-worn (1)**
43:13
**booking (2)**
124:2,2
**born (2)**
41:17;120:8
**both (14)**
32:10,19;51:19;

56:21;62:18;70:24;
73:7;74:1,18;77:1;
89:9;122:4;127:2;
130:25
**bottom (5)**
102:3;116:21;
128:13;130:3,17
**bowel (1)**
127:13
**box (4)**
119:4;128:24;
129:1;133:20
**boxes (1)**
119:1
**Boy (3)**
6:7,21,21
**braking (1)**
128:7
**break (7)**
4:17;14:1;49:5;
73:19;84:22;99:2;
135:17
**breakdown (1)**
11:15
**breathe (1)**
80:8
**breathing (5)**
74:15,21;94:17,19;
103:18
**brief (2)**
108:11,12
**briefly (2)**
79:1;125:12
**bring (1)**
30:18
**bringing (1)**
44:19
**briskly (1)**
52:23
**broad (1)**
64:6
**broke (1)**
48:25
**broken (1)**
8:23
**brought (8)**
7:22;8:4;38:19;
93:7;124:4;138:20;
139:1,16
**brutality (1)**
96:13
**building (1)**
129:22
**buildings (1)**
132:7
**built (1)**
116:24
**bullet (2)**
107:3;109:4
**bullshit (1)**
134:17
**bunch (1)**
119:1

**burned (3)**
85:25;86:2,9
**burnt (1)**
72:3
**business (1)**
59:11
**button (1)**
79:20

## C

**Cadet (8)**
6:6,9;7:2,11;8:11;
9:2,13;90:25
**cafeteria (1)**
110:13
**CALIFF (27)**
4:4,13,14;18:25;
21:5,6;22:15;34:12;
47:10;49:7,9,11;59:5,
8;99:3,6,10;109:14,
19,20;126:1,2;127:8;
135:17,22;138:11;
140:2
**call (9)**
66:22;96:9,22;
102:11;134:8,21;
135:1;138:4,24
**called (5)**
25:9;30:17;93:3;
94:10;134:25
**calls (1)**
7:14
**calm (1)**
116:4
**calmer (1)**
137:21
**came (6)**
12:21;31:4;63:25;
64:2;112:4;124:18
**camera (23)**
41:21;42:3,8;
43:11,12,13;51:7;
56:1,7,10;96:4,16;
99:11,13,15,18,22;
100:15,18,22,23,25;
101:8
**can (59)**
6:20;7:9;16:8,18;
17:3,15;19:20;20:19,
22;21:25;22:13,25;
24:15,18;25:7,9;
28:5;36:7,8,8,20;
37:6;38:22;40:18,25;
46:11;48:17;57:18;
58:18,21;66:20;
67:13;72:15;73:3,11;
76:14,16;77:8;80:8;
81:20;88:10,16;93:8;
94:8;95:3;99:6;
102:20;105:20,25;
106:18;109:14,21;
114:12;115:7;120:4;

121:1;126:13;
127:24;129:20
**capable (1)**
116:24
**car (100)**
28:18;30:2,4,10;
32:22;34:18;36:8,12,
16,16;38:11,12;
40:15;43:5,11;44:9,
19;45:5,23,25;47:6,6;
48:2,2;49:20,23;
51:9;55:6,7;60:13,14,
18,18;61:15;62:9,10,
13,18;64:6;65:12;
66:24;67:1,8,17;68:3,
7,8,14,17;71:5;73:6,
17,25;75:12;76:24;
77:1,25;78:1;79:2;
82:4;84:5,6;87:14;
88:10,19,23,24,25;
89:12,16,25;90:13;
91:4,4,6,7,8,11,15,19;
92:2;104:10;105:4,4;
127:14,15,20,24;
128:2,6,17;129:11,
21,23;130:13;135:1,
2;137:3,13,18
**card (1)**
44:19
**care (3)**
125:18;129:20,21
**career (3)**
6:8;114:24;115:25
**carry (3)**
13:15;123:10,10
**carrying (1)**
135:2
**cars (4)**
5:25;29:12;33:3;
90:6
**case (10)**
4:7;41:14;52:24;
61:16;66:14;68:15;
81:10;109:10;
125:19;135:6
**category (1)**
119:2
**cause (9)**
39:24;83:5,7;87:1;
88:12;91:13;93:24;
94:8;123:18
**caused (3)**
87:25;91:13;92:2
**causes (1)**
115:18
**causing (1)**
38:24
**center (8)**
11:12,16,19;13:18;
96:17,20,23;134:9
**centered (1)**
70:22
**certain (5)**

41:24;71:22;96:25;
97:1;139:4
**certificate (1)**
6:16
**certification (5)**
6:17,19,23;7:9;8:6
**certified (1)**
7:10
**chain (1)**
117:25
**change (4)**
16:7;120:25;124:9;
132:9
**changes (3)**
12:6;100:8;101:7
**chaos (1)**
116:6
**Characterize (1)**
75:18
**charge (2)**
11:20;134:1
**charged (1)**
111:12
**charges (1)**
124:5
**check (2)**
124:15,17
**checked (2)**
126:19;133:20
**checkmarks (2)**
119:2,4
**chest (1)**
94:13
**chief (1)**
122:5
**chiefs (1)**
122:4
**Childish (2)**
134:16,17
**chin (1)**
131:16
**choice (1)**
112:2
**choices (1)**
77:16
**choke (1)**
80:18
**choked (1)**
74:19
**chokehold (4)**
79:9,24;80:17;
103:18
**chokeholds (8)**
79:19;80:1,4,11,13,
19,20,20
**chokes (3)**
79:19;80:10,13
**choose (1)**
57:20
**chooses (1)**
57:19
**chose (1)**
53:4

cigarette (15)
32:12;61:19,25;
62:3,15;67:5;71:19,
23;72:3,9,9;86:1,2,9,
13
cigarette's (1)
86:3
circumstance (1)
108:3
circumstances (4)
16:6;95:4;106:25;
107:23
Civil (1)
4:6
civilian (1)
123:10
civilly (1)
137:14
claim (1)
136:24
claimed (1)
42:15
claims (1)
95:22
clarified (3)
79:10;87:13;97:23
clarify (15)
8:18;13:23;16:18;
19:4;20:14;21:19;
26:14;37:7;41:6,19;
43:14;52:24;104:17,
22;108:5
clarifying (1)
41:20
class (3)
11:21;104:1;122:5
classes (5)
14:9;25:1,20;
125:7,8
classified (1)
105:11
clavicle (2)
79:12;80:8
clear (5)
58:11;71:20;97:18;
118:12;128:10
cleared (1)
96:7
clearly (4)
55:3;73:25;82:6;
98:9
client (1)
89:21
clip (1)
72:5
clipping (1)
108:22
close (2)
51:3;122:23
closed (2)
20:23;104:20
clothing (1)
123:11

clue (1)
117:11
cocaine (1)
108:9
cognizant (1)
15:1
collarbone (4)
74:8;75:2,2;104:6
college (2)
5:7,10
color (1)
34:6
Columbia (12)
6:6,9,23;9:2,14;
14:4;121:21;122:2,
11;135:9,10,11
combative (6)
106:2,16,21;109:3,
6,8
combination (1)
130:20
come-alongs (1)
102:16
comfortable (1)
57:23
coming (5)
30:6;9;42:23;78:1;
99:4
command (28)
19:22,25;21:4,12,
17;22:4,15,17;23:9,
11,25;46:17;47:2,7,
15;50:1,5,15;51:1;
52:6,11;55:14;56:2;
59:23;65:12;66:8,12;
117:25
commanded (1)
47:18
commands (36)
18:9,12,15,21;19:1,
7,11;20:12;21:7,9,10;
46:6,19,23;47:5,11,
14;52:2,22;53:4;
56:19;60:15;62:7,14;
63:15;66:3,10;67:5;
69:20;82:2;83:4,11;
85:16;86:22;115:13,
17
comment (15)
112:22,24;115:10,
11,20;116:17;117:1,
20;119:22;120:2;
125:11;132:11,13,16,
19
comments (11)
114:3,4;115:14;
116:20;118:13;
119:1,11,12;125:3,3;
131:6
committing (3)
78:21;82:16;98:1
common (1)
88:4

commonplace (1)
27:22
communicate (1)
18:22
communication (6)
25:7,10,10;40:18;
126:3;134:8
Communications (2)
115:13;120:23
company (1)
5:25
competition (1)
7:21
competitions (5)
7:5,13,17;8:1,20
compilation (2)
109:15;113:21
complained (1)
136:8
complaint (9)
66:13,18;72:25;
80:23;115:8;122:21;
136:6,10;139:10
complaints (11)
136:4,7,12,15,19;
138:20,21,22,24;
139:5,16
complete (4)
11:10;32:15;63:18;
84:16
completed (2)
6:17;99:20
completely (8)
16:14;17:1,6,18;
19:13;66:5;71:8;
113:2
compliance (23)
70:18;81:21,22;
82:11;85:13,14,18;
86:17;87:8,9;88:2,3,
4,22;89:3;90:14;
91:12;93:2,9;94:15,
20,21;95:20
compliant (9)
106:20;114:6,8,21,
25;115:4,4,7;118:6
complied (2)
17:11;66:3
comply (19)
50:15;52:6;53:3;
56:19;62:16;63:2,4,
14;65:7,12,13;78:22;
82:1,20;83:4,11;
84:9;86:22;137:12
complying (5)
49:19;62:7;67:4;
82:17;97:24
compounded (1)
131:21
computer (4)
31:3;40:19,21;43:5
concern (4)
39:24;125:9,14,24

concerned (1)
36:10
concerning (2)
15:4;106:25
concerns (1)
111:17
concluded (1)
140:5
conclusion (2)
38:23;123:9
concrete (1)
62:19
condition (1)
20:6
conduct (4)
13:20;34:24;37:21;
59:11
conducted (2)
14:6;37:20
confirm (1)
53:16
confiscated (1)
123:23
Conflict (2)
115:12;116:20
confrontational (1)
120:7
Conner (1)
95:3
consequences (1)
65:6
consider (11)
15:4,16;16:23;
18:7;33:1;34:4,7,13;
47:17;103:23;109:6
consideration (1)
15:6
considered (6)
19:15;33:11;34:3;
38:10;47:22;104:22
consistent (1)
117:18
constant (1)
35:11
construction (1)
5:25
contact (13)
32:11;33:6;35:11;
51:15;60:4;63:12;
104:5;107:4;134:19,
19,20;135:8,11
contain (1)
129:4
contained (2)
128:15;129:9
contend (2)
107:9;113:3
contents (3)
124:15,17;138:25
continue (4)
44:4;62:13;63:13;
131:12
continued (3)

52:2;83:12;85:7
continuing (1)
60:14
continuously (1)
84:25
continuum (5)
17:6;19:18,19;
20:11;60:2
control (34)
20:23;21:2;46:25;
47:12;62:21;67:12;
68:1,4;70:23;71:1,2;
73:4,10;74:4;75:16;
76:18,19,21,22;78:2,
3;79:1;81:8,9,13;
82:10;83:12;84:2;
87:15;109:3;111:4;
115:12,16;116:19
controlling (1)
116:24
conversation (8)
32:13;34:19,21;
54:20;55:4;63:22;
64:19;126:6
convey (1)
133:1
cooperate (1)
66:4
cooperative (1)
16:14
copy (5)
41:15;61:20;66:13;
101:18;102:23
Corporal (6)
12:3,4,10,17,17,18
corporal's (1)
128:23
correctly (4)
21:8;23:8;29:9;
51:11
counsel (2)
4:5;138:20
count (3)
33:5;110:15;112:7
counted (1)
112:8
counterproductive (1)
76:8
County (37)
5:14;6:6,9,23;8:7;
9:2,14,16;11:3,11;
14:6;24:8;46:5;48:7;
57:9,13;58:13;64:6;
79:6,15,25;80:2,12,
14;81:18;94:25;
100:14;113:24;
120:22;121:21;
122:2,11;123:12;
135:9,10,11;136:2
County's (1)
14:4
couple (13)
8:2,4;12:5;61:19;

64:8;71:17;116:22;
117:3,6,7;131:22;
134:23;138:14
**course (8)**
14:21;16:9;97:2;
105:8;109:10;128:4,
6;131:22
**courses (1)**
25:2
**court (2)**
4:2;109:18
**covered (1)**
13:5
**COVID (3)**
131:24;132:3,6
**creed (1)**
34:6
**crimes (1)**
38:22
**criminal (4)**
10:21;32:15;
133:21,21
**crises (1)**
25:8
**criteria (1)**
8:21
**critical (1)**
48:4
**criticism (1)**
118:1
**criticizing (1)**
121:2
**Crown (1)**
128:11
**current (5)**
10:18;11:22,23;
43:10;130:25
**currently (6)**
10:13,16;14:13;
18:1;73:22;103:6
**curriculum (2)**
13:14;17:13
**custody (8)**
20:11;26:21;27:6;
69:10,14;77:5;96:2;
108:13
**cut (1)**
127:4

---

**D**

**damages (2)**
66:13,18
**damn (1)**
128:5
**danger (1)**
26:20
**Dark (3)**
28:17;30:1;31:22
**dash (1)**
43:11
**date (13)**
5:3;41:2,3;42:3,25;

43:3,6,9;69:4;114:13,
16;121:15;138:6
**dated (3)**
121:8;125:1;
126:16
**dates (2)**
6:13;12:8
**day (18)**
30:12,17;41:22;
42:7;54:20;68:24;
71:9;84:20;87:25;
99:12,14,21;111:22;
120:20;124:3;128:3;
130:11;136:8
**daylight (1)**
64:6
**days (1)**
8:20
**de- (1)**
24:8
**deadly (3)**
9:11;20:12;80:14
**dealing (5)**
15:11,20;106:16;
116:13;117:21
**Deals (1)**
106:2
**dealt (2)**
120:3,8
**death (1)**
106:8
**December (5)**
4:16;12:9,12;
28:13;118:21
**decent (1)**
130:24
**decide (8)**
28:16;29:24;42:13;
43:15;74:6;75:11;
77:11;81:23
**decided (10)**
43:17;45:8;47:3,
12,13;49:12;65:25;
77:10;78:11,17
**deciding (10)**
14:17,25;15:13,25;
16:23;17:16;46:20,
24;47:11;75:24
**decision (8)**
15:4,8;22:13;
49:15;77:22,24,25;
107:14
**deep (1)**
112:14
**de-escalate (2)**
24:21;132:24
**de-escalated (1)**
133:2
**de-escalation (9)**
24:11,14,15,17,25;
25:4,14,16,21
**Define (1)**
74:11

**defined (6)**
102:3,5;103:4;
104:7,19;107:20
**defines (1)**
108:7
**definitely (1)**
120:11
**definition (4)**
26:18;27:2;77:3;
87:7
**definitions (4)**
103:6;105:20;
106:4;108:23
**degree (9)**
23:13;56:18;75:8;
76:18;94:17;106:17,
19;109:8;117:2
**delicately (1)**
91:19
**delirium (3)**
106:9;108:9,24
**Department (6)**
121:22;122:3,11,
16,24;123:7
**dependent (2)**
17:1;19:13
**depending (2)**
10:2;20:5
**depends (1)**
15:19
**depict (1)**
77:8
**depicted (2)**
79:17;85:21
**depicts (2)**
75:5;77:7
**deponent] (1)**
140:7
**deposition (9)**
4:4,10,20;30:19;
105:17;109:16;
112:23;140:5,6
**deprivation (1)**
94:8
**deputies (3)**
57:23;59:16;124:3
**deputy (47)**
8:7;9:23,25;10:6,
10;12:15,19,21,21;
13:1,4,9,12,18,19,24,
24;14:15,22;18:2;
19:10;24:7;27:11;
57:19;99:10;110:3,
19;112:8;113:13;
114:4;115:16,17;
116:21,23;117:6;
119:12;120:16;
125:4,4,4,8;132:11,
18,23;135:4;138:15;
140:3
**describe (3)**
5:17;60:10;66:23
**described (8)**

17:22;21:7;75:6;
98:16;110:9;127:8;
132:17;136:22
**describes (1)**
110:2
**description (4)**
42:21;91:5;129:18;
130:10
**designed (5)**
89:20;94:18,20,22;
102:8
**destroy (3)**
53:15;54:8,11
**detailed (1)**
99:16
**details (3)**
111:6;112:12;
113:24
**detain (10)**
42:14;43:16,22;
44:22;45:8,21;47:13;
48:20;49:12;55:1
**detained (8)**
19:5;43:18;44:16,
21;45:16,19;47:8;
59:13
**detainee (1)**
108:23
**detect (1)**
81:8
**detention (11)**
11:12,16,19;13:18;
43:19,24;44:9;96:17,
19,23;116:9
**deteriorating (1)**
134:16
**differences (1)**
13:12
**different (19)**
7:6,7;8:19;13:15,
21;16:5;17:19;19:12,
20;26:18;46:10;
59:16,16;82:3;87:2;
106:2;114:16;119:6;
137:14
**differentiate (1)**
115:9
**differentiating (4)**
114:5,8,20,25
**differently (1)**
121:1
**difficult (2)**
67:19;69:1
**difficulties (1)**
54:22
**difficulty (1)**
55:8
**diligence (1)**
124:10
**direct (4)**
12:16;56:8;61:16,
17
**direction (2)**

29:2,4
**directions (1)**
65:7
**directly (1)**
123:19
**disabilities (1)**
71:7
**disagree (16)**
26:5;52:9;112:16,
17,25;113:2;115:10,
11;116:17;123:2;
126:4,5;129:17;
130:10;131:6,11
**disagreed (1)**
129:8
**disagreement (1)**
66:21
**disagreements (2)**
113:12,14
**discectomy (1)**
68:20
**disciplinary (2)**
129:8;135:25
**discover (1)**
41:8
**discovered (1)**
30:25
**discovery (4)**
101:12;109:10;
114:17;121:14
**discrepancy (1)**
124:10
**discussed (1)**
76:21
**discussion (2)**
121:21;122:9
**dismissed (2)**
134:4;135:13
**dispatch (1)**
135:1
**displacement (6)**
74:18;75:6,14;
77:4;103:25;104:10
**displaying (3)**
39:6;55:21,22
**disrespectful (3)**
120:6;125:18;
126:8
**dive (1)**
54:11
**Division (10)**
10:11,12,15,16,17,
22,25;11:21;113:25;
121:8
**document (18)**
30:15;32:18;39:12,
14,16;101:14,17;
109:25;110:2,4,10,
17;113:22;114:16;
118:20,22;119:17;
121:13
**documents (6)**
30:18;32:22;38:9;

109:11;113:21;
135:23
**domestic (2)**
7:12,14
**done (16)**
11:12,13;30:7;
45:2,9;46:14;83:22;
89:8;90:10,11;93:3,
5;108:7;110:25;
111:1;135:17
**door (1)**
128:5
**doors (2)**
10:2;134:23
**down (36)**
8:12,23;14:1;
30:14;37:17,19;
53:13;55:24;67:24;
68:6,8;69:16,20;
72:25;73:19;79:12;
81:1;87:22;88:5,14,
14;102:12;107:4;
110:13;111:10,20;
113:20;114:12;
115:13;116:19;
120:15;121:7;
124:11;134:23;
139:9,13
**Drills (1)**
9:12
**drive (4)**
84:6,6,12;128:6
**driver (5)**
35:1,18;42:17,20;
132:12
**drivers (1)**
42:22
**driver's (8)**
33:7;38:23;39:3,8;
42:16,19;43:6,9
**driving (6)**
28:24;29:1,2;
136:8,13;138:24
**drop (1)**
72:8
**dropped (1)**
67:24
**dropping (1)**
129:14
**drugs (1)**
32:3
**due (2)**
120:23;124:9
**DUI (3)**
7:14,24,25
**during (32)**
8:25;9:1;14:17;
15:5;16:8;17:16;
18:4,8,14;44:2,14;
45:4;60:17;66:10;
70:1;74:22;79:8,16;
80:3;90:8;95:9;
96:11;101:25;102:9;

115:18,25;116:2;
119:9,22;122:24;
131:25;136:22
**duties (1)**
64:4
**duty (2)**
123:22;128:3

# E

**Earlier (3)**
46:10;59:25;
138:19
**early (1)**
86:20
**east (4)**
29:3,6,15,16
**edits (1)**
100:11
**education (4)**
5:5;20:20;93:13;
94:6
**effect (3)**
15:9;18:16,24
**effects (2)**
93:13,16
**effort (5)**
7:18;54:13;102:13;
103:3;118:1
**efforts (1)**
120:18
**eight (2)**
7:20;129:25
**either (4)**
55:11;91:21;93:6;
136:16
**elaborate (2)**
20:19,22
**elapse (1)**
21:16
**elbow (1)**
67:24
**else (12)**
22:12;38:18;39:7;
45:4;48:3;88:11;
100:5,18,22;124:19;
126:19;134:18
**email (2)**
128:8;132:9
**empathy (3)**
125:10,14,24
**employ (5)**
79:23,24;80:20;
103:17,19
**employed (3)**
64:7;81:13;94:15
**Employee (6)**
113:24;114:14,20;
120:17;121:8,14
**employment (4)**
5:17;109:15;
135:24;136:2
**enables (1)**

25:12
**encompass (1)**
107:9
**encompassing (1)**
133:16
**encounter (3)**
45:5;85:1,8
**end (4)**
11:25;58:24;62:22;
124:13
**endanger (10)**
26:3,4,9,11,15,17,
18,24;27:2;97:5
**ended (1)**
84:7
**enforcement (14)**
6:3,25;7:2,10,15,
25;8:10,13,15;9:15;
64:3;85:1;114:24;
116:5
**engage (1)**
18:13
**engaging (1)**
18:4
**enough (4)**
22:18;50:15;65:10;
68:13
**ensues (1)**
116:6
**entails (1)**
20:22
**enter (1)**
43:3
**entertaining (1)**
34:2
**entire (6)**
51:7;66:11;84:25;
102:20,23;120:3
**entirety (1)**
130:24
**environment (1)**
83:17
**environmental (4)**
14:16;15:3,6,8
**error (1)**
41:1
**escalate (1)**
20:15
**escalating (1)**
133:3
**escalation (2)**
21:6;24:9
**escape (5)**
83:13;84:5,14,14;
85:15
**especially (2)**
16:6;64:14
**essentially (1)**
126:3
**establish (2)**
25:7,10
**estimate (1)**
27:13

**ethnic (1)**
117:21
**evaluated (2)**
20:6;123:1
**Evaluation (13)**
113:24;114:2,7,10;
115:21,22;118:11,16;
119:8,15;121:8,10;
125:11
**evaluations (3)**
120:24;121:4;
135:23
**Even (15)**
27:1,23;33:18;
44:14;54:19;67:22;
69:5;110:20;111:7;
113:15;118:15;
122:3;123:3;132:10,
14
**event (10)**
30:6;38:23;51:7;
53:17;62:22;74:23;
96:7;121:13;122:24;
125:21
**events (8)**
28:13;56:9;71:9;
108:9;111:7;125:21;
131:21;132:8
**eventually (1)**
35:2
**everybody (9)**
23:5;37:2;38:15;
64:13,19;111:12;
122:6,16;126:24
**everybody's (2)**
41:15;126:20
**everyday (1)**
108:17
**evidence (3)**
53:15;54:8,11
**evident (2)**
73:20,22
**evolving (1)**
16:3
**EVOT (2)**
128:4,6
**exact (2)**
28:6;56:10
**exactly (9)**
16:17;33:10;39:4;
75:8;76:13,14;77:6;
89:6,7
**EXAMINATION (2)**
4:12;138:17
**example (1)**
19:24
**except (1)**
119:5
**exception (1)**
80:15
**excessive (2)**
104:11;136:16
**excited (6)**

106:9;108:9,24;
115:18;116:2,6
**exciting (1)**
116:14
**excuse (9)**
12:24;14:19;46:25;
70:4;80:10;87:4;
92:15,18;125:25
**exercise (1)**
8:2
**ex-girlfriend (1)**
135:15
**Exhibit (3)**
105:16;109:16;
113:21
**exit (2)**
36:16;37:23
**expect (12)**
64:19;65:5,5,7;
85:4,9;88:6,9;89:14,
15;92:5,6
**Expectations (1)**
119:5
**experience (10)**
6:2,4,5;8:14;9:16;
54:12;55:11,13,17;
88:9
**experiences (4)**
43:1;58:15;59:9,16
**experiencing (1)**
108:8
**expert (1)**
85:1
**expired (7)**
28:18;30:1,23;
31:1,6;32:1;42:19
**explain (20)**
24:15;51:13,14;
55:8;56:13,22;57:1,5,
10,18,20,25;58:8;
59:18;67:13;70:10;
80:17;105:25;
106:18;127:11
**explained (9)**
8:5;54:7;56:16;
57:3;58:1;59:12,25;
70:6;98:11
**explaining (3)**
57:14;58:13;59:21
**explains (1)**
103:1
**explanation (1)**
57:19
**expletive (1)**
71:17
**expletives (3)**
61:20;71:19;97:17
**explorer (5)**
6:22;8:18;9:1;
90:11,23
**expressing (3)**
119:13,23;120:13
**extend (1)**

131:12
**extended (1)**
94:11
**extra (2)**
110:12,19
**eye (4)**
35:18;36:5;40:12,
14

## F

**face (4)**
20:3;68:8;81:1;
104:20
**facilitate (1)**
40:18
**facility (11)**
10:3;11:6,13,17,
18;13:19;14:4,7,8;
25:22;111:2
**fact (14)**
38:7;43:19;45:19;
55:4;77:15;78:20,20;
83:10,11;98:13;
122:18;123:9;
128:16;129:10
**factor (2)**
18:25;37:25
**factors (22)**
14:16;15:3,7,8,15,
16,24;16:12,23,24,
25;17:14,15,19,22;
25;36:4;38:10,13,16,
18;55:22
**failed (5)**
22:17;56:19;83:3;
84:9;85:16
**failing (1)**
78:22
**failure (1)**
123:23
**fair (1)**
8:3
**Fairly (2)**
11:1;86:20
**faith (1)**
124:19
**fall (2)**
102:15;106:6
**falls (1)**
104:1
**familiar (2)**
109:23;111:11
**family (1)**
134:23
**far (45)**
5:20;8:15;9:11;
12:16;13:14,22;
14:16;15:7,10;16:4;
20:6;25:8;27:22;
31:18;34:19;40:3,4;
41:2,7;45:11;56:4,8;
57:17,24;60:2;70:17;

75:9;81:8,19;87:2;
88:18;90:11;93:2;
102:16;106:21;
107:19;110:11;
111:1,3,4,19;122:15;
126:9;136:8;138:22
**fast (9)**
49:8,25;50:13;
51:3,5,12;62:11,24;
136:9
**fault (2)**
92:2;129:22
**fear (4)**
48:10;55:14;78:15,
18
**feasible (1)**
79:3
**February (1)**
11:1
**Federal (1)**
4:6
**feed (1)**
127:4
**feel (13)**
4:19;36:4;40:1;
44:22;53:19;54:1,2;
57:23;59:20;71:13;
106:14;109:20;115:8
**feeling (2)**
54:5;89:22
**feels (2)**
85:3;89:21
**fell (2)**
104:25;128:12
**felonies (1)**
55:20
**felony (1)**
27:24
**felt (8)**
53:13,18,19;54:3;
66:9;96:15;122:8;
135:6
**feud (1)**
131:13
**few (13)**
7:22;12:16;17:14;
58:5;109:12;110:1;
113:14,23;114:12;
117:16;129:21;
132:21;135:22
**field (5)**
58:15;59:9,10;
89:8;93:6
**fifteen (1)**
111:16
**fight (4)**
19:17;20:23;78:23;
83:15
**fighting (9)**
9:7;15:21,23;20:4;
26:19,22;27:1,7;
135:2
**figure (3)**

16:21;25:1;45:6
**file (1)**
109:11
**filed (2)**
41:22;66:15
**files (1)**
42:24
**filled (1)**
117:4
**finalized (2)**
100:2,8
**find (7)**
16:21;39:23;43:8;
45:22;54:14;56:1;
114:13
**finding (2)**
44:19;48:20
**fingerprint (1)**
44:20
**finish (1)**
37:11
**Fire (6)**
121:21;122:3,11,
15,24;123:7
**firearm (2)**
84:7;123:11
**firearms (2)**
13:15;38:21
**first (35)**
9:19;12:19;23:18;
28:19,24;29:5,7,14;
30:9,22;42:4;51:13,
14,18;54:10;55:23;
65:14;68:25;74:3;
89:20;99:10,12;
100:21;109:4,18,24,
25;114:2;116:3;
117:3,6,16;124:14;
135:16;136:24
**fist (1)**
104:20
**fists (1)**
20:24
**five (5)**
49:6;80:22;115:23;
117:17,18
**flee (9)**
36:22,25;37:5;
48:16;52:23;82:17;
83:5;84:5,12
**fleeing (1)**
36:23
**flesh (1)**
23:18
**floor (1)**
62:19
**flow (2)**
74:14,21
**flung (1)**
128:5
**flyin' (1)**
136:11
**fo (1)**

38:11
**follow (6)**
18:15;19:25;52:22;
85:16;138:14;140:1
**following (1)**
19:6
**follows (1)**
16:15
**footage (18)**
41:21;51:7;56:1,4,
7,8;99:11,13,15,22;
100:15,19,22,24;
101:1,8;127:19;
132:17
**force (115)**
8:25;9:6,8,9,11;
12:25;13:3,5,8;14:14,
17,21,25;15:4,8,13,
18,25;16:13,16,24;
17:4,7,16;18:2,4,4,6,
8,13,14,16,19,23;
19:2,9,10,12,20;20:2,
4,5,8,10,11,12,17;
21:7,11,17,21;22:4,
18,24;23:1,11,24;
24:9,22;26:21;27:5,9,
16;28:7,11;33:19;
46:10,11,15;59:22,
23;60:1,2,5;68:16;
78:4,8;80:14;81:19;
83:20;87:11,20;88:5;
91:7;95:1,2;98:3;
101:13,14,19,22;
102:1,3,9,20,25;
103:9;104:11,12,24;
105:13;106:21,24;
107:5,6,10,15,19,22;
108:2,7,14,15;109:2;
136:16
**forced (10)**
69:7,11;72:13;
88:14,20;90:3,20;
91:4;93:14;105:10
**forces (3)**
60:7,8,8
**forcing (10)**
89:12,12,15;91:23;
92:5;93:24;94:23;
95:11;102:12;105:3
**forearm (2)**
67:15,22
**forever (1)**
120:9
**form (10)**
22:5,8;47:4;60:5;
111:14;118:20;
123:21;124:9;
133:19;138:8
**formal (1)**
139:2
**formula (1)**
115:6
**Forsyth (1)**

14:8
**forth (2)**
18:22;134:18
**forthwith (1)**
65:8
**found (6)**
42:24;43:1;124:12;
129:22;135:4;137:19
**four (2)**
72:25;111:16
**FRAIL (1)**
127:2
**FRAILS (16)**
4:11;22:5,8;34:10;
47:4;58:17,21,25;
59:3;126:22,25;
127:6;138:14,18;
139:21,25
**frame (2)**
66:5;77:2
**free (14)**
4:19;19:5;62:9;
73:15;74:1,5;75:24;
76:3,23;77:13,17;
97:25;106:14;109:20
**freezing (1)**
11:25
**freshly (1)**
32:11
**friends (3)**
122:19,20,23
**frisk (1)**
37:20,21;38:6
**frisked (2)**
39:23;40:8
**front (28)**
28:10;29:8;39:12,
16,19;47:6;60:12,14;
61:16;78:25;79:17;
80:6;102:21,22,24;
103:6;108:10;
127:25;128:2
**frozen (1)**
80:6
**fulcrum (1)**
95:19
**full (5)**
4:22;10:4;64:6;
68:4;82:7
**fun (1)**
112:23
**further (1)**
139:25
**fuzzy (1)**
67:7

## G

**gain (17)**
60:19;62:21;66:25;
70:18,23;76:19,22;
81:20,22;82:10;
83:12;86:21;87:15;

88:21;91:12;93:9;
94:21
**gained (2)**
6:23;85:13
**gang (1)**
111:13
**gas (1)**
30:8
**gather (1)**
35:6
**gathered (2)**
35:8;36:17
**gave (11)**
37:5;47:5,7,15;
50:5,14;53:4;65:9;
66:10;126:12;138:6
**GCIC (1)**
31:2
**general (2)**
13:7;79:13
**generally (3)**
9:24;20:22;57:13
**Georgia (6)**
7:4;8:21;14:4;
42:15,21;98:2
**gesture (1)**
112:6
**gesturing (3)**
69:19;74:13;75:3
**given (27)**
16:15;19:7;21:9;
33:18;48:2,21,22;
56:18,25;63:15;64:8;
65:13;66:3;78:23;
81:25;82:2,8,20;
83:14;84:15;94:13,
14;95:4;118:15;
119:8,15;129:25
**giving (6)**
18:10;22:11;46:1;
53:9;69:19;86:23
**goes (19)**
9:11;16:4;20:11;
25:8;34:19;56:8;
57:24;60:3;70:17;
88:18;100:9;107:18,
19;110:11;111:3,4,
19;125:16;126:6
**gonna (24)**
8:9;9:4;20:8,10;
24:5;27:3;28:6;38:4;
44:1,16,21;45:5,6;
47:22,25;48:14;
61:21;63:16;78:14;
82:20;112:23;
117:21;122:7;138:2
**Good (4)**
4:14;122:19,22;
132:23
**gotcha (1)**
59:6
**gotta (1)**
131:16

**Governor's (1)**
24:13
**G-Pod (1)**
111:11
**grab (4)**
62:5;66:9;74:25;
85:2
**grabbed (31)**
23:21;50:9;51:18,
23:52:1,7,10,18;
56:12,24;60:23;61:1,
7,13,23;62:2,4,25;
63:12,21,25;64:2,10,
11,20;65:14;66:1;
67:3;74:19;75:1;
98:21
**grabbing (3)**
51:19;59:25;65:11
**grabs (1)**
64:4
**graded (1)**
8:3
**graduate (1)**
5:12
**Graham (1)**
95:3
**grand (1)**
108:12
**grasp (4)**
76:3,24;84:14;
85:15
**Green (3)**
12:3,4,18
**Greenland (2)**
11:13;14:7
**grip (3)**
75:24;83:13;84:14
**ground (39)**
60:19;62:19;67:8;
74:18;75:7,13,15,20,
22;76:1,10,17;77:4,
15,20,23;78:11,18;
79:5;81:1;82:4,8,9;
85:17;86:7;87:6,10;
89:4;93:14;94:24;
95:12;103:2,9,15;
104:2,7,10,11,15
**group (1)**
111:19
**groups (1)**
117:21
**grown (1)**
41:16
**guess (6)**
7:7;66:22;75:8;
115:6;116:18;121:5
**gun (2)**
53:25;122:3
**guy (1)**
124:4
**guys (1)**
122:2
**Gwen (1)**

112:25
**Gwendolyn (1)**
112:17

## H

**half (2)**
12:13;27:19
**halfway (1)**
107:3
**hand (82)**
32:23;33:6;49:20,
22;50:18;51:17,21,
23,25;52:1,3,6;53:2,
8;56:12,24;60:1,9,11,
23;61:1,6,6,7,7,13,
24;62:2,3,4,5,5,6,6,6,
25;63:7,8;65:16,22;
66:1,8;67:2,3,3,6,10,
12,13,20;73:6,10,12,
12,13,13,14;74:4;
75:24;76:3,18,19,20,
22,24;85:18;102:3,7,
15,17;103:15,17,23,
23;105:5,9;107:13,
16,20,23;108:3;
136:23
**handcuff (10)**
17:3;19:16;20:15;
23:7;61:4;65:24;
66:23;67:4;81:12;
82:12
**handcuffed (4)**
58:2;91:15;97:10,
12
**handcuffs (46)**
20:1;27:25;44:8,
12,23;45:22;46:3,4,
20,24;47:3,11,14;
48:21;49:12;50:3;
51:10,19;54:17;56:6,
13,14,17,23;57:3,6,6,
22;58:6,10;59:12,19,
21;60:21;62:2;67:3;
72:10;75:16;85:8;
89:10;97:11,14,16,
19;98:22;137:15
**handed (1)**
104:8
**handle (1)**
116:23
**handling (1)**
106:2
**hands (143)**
9:6;17:2,5,11;
19:16,16,24,25;
20:25;21:11,20;
22:16,19,20,22;23:3,
3,4,6,6,7,9,12,14,17,
19,20,24;24:2;32:21;
33:7;34:8,16;38:8;
39:2;46:22;47:1,8,
15;49:17,21;50:1,6,

11,16,16;51:1,8,13,
15,19;52:3,11,17,21,
22;53:1;54:10;55:14,
23,24;56:2,5;60:3,4,
15,16,16;61:9,12,18;
62:8,14,16,22;63:1,5,
14,16,17,22,25;65:8,10,
11,15,20,23,24;66:2,
12;67:5;68:17;69:2;
70:4,24;71:4,11,14,
17;72:10;73:25;74:2;
76:6,10;77:10,11,13,
13,17;78:9;82:1,5;
83:4,12;84:3;86:22;
87:15;88:22;89:9;
91:12;97:25;102:6,
10;103:4,7;104:7,15,
16,17,18,22;105:1,8;
108:11;112:6;136:23
**hands-on (1)**
8:13
**hang (2)**
88:16;122:22
**happen (7)**
21:25;22:25;47:23;
48:5;54:13;64:17;
89:7
**happened (18)**
49:18;50:12;60:10;
77:5,6,8;91:1;105:7;
111:18;115:23;
118:14;121:25;
124:1,23;127:11;
129:19;134:2,6
**happening (8)**
33:5;47:20;48:4;
57:2;73:3;75:9;
77:25;110:21
**happens (10)**
17:20,20;24:19;
36:24;43:1;55:10;
61:17;64:24;65:2;
126:9
**hard (23)**
67:6;102:3,5,7,10;
103:7,23;104:8,15,
18,22;105:9;107:13,
16,20,23;108:3;
119:12,23;120:12,17,
18;125:4
**harder (2)**
78:23;114:5
**harm (9)**
15:22,24;16:10,11;
78:12,14;83:2,6,8
**harmful (1)**
60:8
**harsh (3)**
116:12,16;120:5
**harsher (2)**
115:19;116:8
**Haynes (1)**

11,16,16;51:1,8,13,
15,19;52:3,11,17,21,
22;53:1;54:10;55:14,
23,24;56:2,5;60:3,4,
15,16,16;61:9,12,18;
62:8,16,16;61:9,12,18;
62:8,16,16;62:8,16,16;
14,16,17,22,25;64:2,
5,9,13,15,21;65:8;63:10,
11,15,17,23,
81:25;82:2,8,20;
83:14;84:15;94:13,
14;95:4;118:15;
119:8,15;129:25
**hands-on (1)**
8:13
**hang (2)**
88:16;122:22
**happen (7)**
21:25;22:25;47:23;
48:5;54:13;64:17;
89:7
**happened (18)**
49:18;50:12;60:10;
77:5,6,8;91:1;105:7;
111:18;115:23;
118:14;121:25;
124:1,23;127:11;
129:19;134:2,6
**happening (8)**
33:5;47:20;48:4;
57:2;73:3;75:9;
77:25;110:21
**happens (10)**
17:20,20;24:19;
36:24;43:1;55:10;
61:17;64:24;65:2;
126:9
**hard (23)**
67:6;102:3,5,7,10;
103:7,23;104:8,15,
18,22;105:9;107:13,
16,20,23;108:3;
119:12,23;120:12,17,
18;125:4
**harder (2)**
78:23;114:5
**harm (9)**
15:22,24;16:10,11;
78:12,14;83:2,6,8
**harmful (1)**
60:8
**harsh (3)**
116:12,16;120:5
**harsher (2)**
115:19;116:8
**Haynes (1)**

126:25
**hazardous (1)**
27:5
**head (27)**
18:1;59:15;68:13,
16;69:16,18,21,23,
24;72:13,17;74:12,
17;76:13;87:11,13,
18,20;88:5,14,18,19;
89:13;92:6;105:3;
123:21;136:14
**headed (2)**
52:24;53:3
**header (1)**
114:2
**heading (1)**
30:3
**health (1)**
25:8
**hear (1)**
58:18
**hearing (2)**
64:9;132:12
**heated (3)**
121:20;122:9,12
**held (2)**
11:20;14:9
**help (7)**
12:23;13:14;34:5;
45:25;99:25;125:6,8
**hey (1)**
139:1
**High (8)**
5:7,8,18;6:7,14;
8:23;9:15;128:7
**highest (1)**
5:5
**himself (6)**
76:25;79:2;97:25;
116:23;119:13;125:8
**hindering (1)**
60:21
**hip (3)**
66:24,25;91:6
**HIPAA (1)**
129:14
**hire (1)**
11:8
**hired (6)**
9:22,23;11:4,6,7,8
**history (4)**
68:23;69:6;133:21,
21
**hit (2)**
104:3,20
**hitting (1)**
60:21
**hog (1)**
108:23
**hog-tied (1)**
108:23
**hog-tying (1)**
106:9

**hold (5)**
11:21;28:6;51:11;
70:7;89:9
**holding (1)**
60:13
**holds (1)**
70:20
**home (3)**
7:22;8:4;42:22
**honest (1)**
118:16
**honestly (1)**
113:16
**hood (33)**
60:18;61:15;62:10,
13;66:24;68:17;
69:16,18,24;72:18;
73:17;75:12,21;
76:24;77:1;78:5,6,8;
82:3;87:12,18,20;
88:10;89:13,25;90:6,
13;91:11,14;92:2,6;
105:3;137:3
**hosted (1)**
7:6
**hot (1)**
79:20
**hour (1)**
129:25
**hours (4)**
51:4;131:14,20;
133:13
**house (2)**
111:12;135:2
**housing (1)**
10:1
**how's (1)**
113:4
**hundred (5)**
41:24;53:24;55:3;
71:22,24
**hurt (9)**
48:3,15;86:19;
88:24;89:1,25;93:20;
94:22;104:15
**hurts (1)**
93:19

**I**

**IA (1)**
138:22
**ID (2)**
44:19;121:15
**ID'd (1)**
44:21
**idea (14)**
16:20;19:20;28:4,
7;33:15;42:11;45:15;
63:24;68:23;69:5;
100:17;114:18;
117:13,19
**identification (2)**

36:15;44:3
**identified (1)**
44:17
**identify (4)**
43:20;45:20;46:1;
48:1
**identity (1)**
44:13
**ie (1)**
116:14
**illegal (5)**
32:5,7,24;34:18;
53:14
**illegally (1)**
38:21
**image (2)**
68:9,11
**immediately (6)**
55:15;61:13,23;
62:1;77:2;110:19
**impact (1)**
21:3
**imply (1)**
104:11
**implying (1)**
77:16
**improve (1)**
120:19
**improvement (2)**
119:3,8
**improving (1)**
120:17
**inability (1)**
54:23
**inaudible (7)**
4:9;13:21;48:22;
102:13;110:19;
133:15;135:25
**in-car (3)**
31:2;43:10,13
**Incident (43)**
30:16;48:4;68:20;
74:3;95:22;99:11,19;
100:16,19;108:14;
110:7;111:19;112:9;
121:18,19;122:1,10,
13,25;123:24;124:1;
127:8,12;128:11;
129:7,12,13,15,18,
18;130:1,5,8,15,19;
131:17,17;132:17;
133:8;134:2,4,23;
139:14
**incidents (3)**
99:16;110:9;
131:25
**include (2)**
102:8;119:2
**included (5)**
7:13;66:17;103:3,
15;104:15
**includes (2)**
87:11

**including (2)**
93:25;123:3
**inconsistent (1)**
59:22
**incorrect (2)**
112:20,21
**incur (2)**
88:1;93:25
**in-custody (1)**
106:8
**indication (1)**
36:18
**indications (1)**
36:21
**indicative (2)**
32:14,23
**indicators (1)**
71:20
**individual (9)**
15:11;48:14;54:9;
57:19;100:24;
122:23;123:7;
131:20,20
**individual's (1)**
15:20
**ineffective (1)**
82:5
**infer (2)**
68:9,14
**inflict (17)**
16:11;81:11,15,20,
23;82:14;85:10;
86:25;89:16,20;
90:14;92:7;93:8;
94:21;102:8,13;
103:3
**inflicted (8)**
85:13,20;86:6,10;
87:8;89:2,21,22
**inflicting (2)**
81:21;86:15
**infliction (1)**
92:1
**inflicts (1)**
90:1
**inform (1)**
57:17
**information (21)**
35:7,9;36:17;
40:12,14,19,20,23;
41:7;42:20,22;43:4,
20;44:4,18;45:22;
46:1;48:21;118:17;
128:14;139:23
**initial (5)**
66:15;67:2;107:4;
122:21;135:6
**Initially (2)**
42:14;65:21
**initiate (2)**
22:3,18
**initiating (1)**
21:11

**Initiative (1)**
24:13
**injure (2)**
82:21;83:25
**injuries (1)**
95:21
**injury (5)**
48:4;87:1;93:25,
25;94:2
**inmate (9)**
110:3,11;111:10,
21,21;114:6,21;
123:24;136:16
**inmate's (1)**
111:7
**insane (1)**
104:11
**inside (13)**
10:3;35:13;36:8;
45:23;66:24;111:1,
14;116:15;117:18;
127:14,19,21;132:7
**insignificant (1)**
111:6
**instance (2)**
21:10;30:7
**instant (2)**
16:7;21:19
**instantaneous (4)**
50:10,25;56:23;
57:1
**instantaneously (1)**
52:11
**Instead (6)**
49:19;50:17;52:21;
65:14,20,22
**instinctively (1)**
85:9
**instruct (2)**
72:8;93:12
**instructed (8)**
22:23;47:17;53:1;
65:15,20;71:17;
80:11;137:17
**instructing (1)**
63:19
**instruction (4)**
93:13,23;94:4,6
**instructions (2)**
16:15;18:10
**instructor (2)**
25:24;122:5
**instructors (1)**
8:16
**intake (2)**
10:2;124:2,3
**intend (1)**

16:22
**intended (7)**
43:22;44:5;49:13;
55:1;98:6;115:19;
116:8
**intending (1)**
50:2
**intention (4)**
83:10;84:5,19;
91:13
**intentional (6)**
81:5,6;86:17;88:2,
4;91:25
**intentionally (5)**
75:19;81:23;82:14;
87:8;88:25
**intentions (6)**
44:25;45:15;84:18,
20,21;132:23
**interact (3)**
44:10;45:3,3
**interacting (2)**
44:12;54:25
**interaction (2)**
15:19;110:11
**interactions (1)**
28:14
**interfere (1)**
94:17,19
**interfered (4)**
74:14,20;80:9;
103:12
**interference (1)**
103:18
**interject (1)**
44:10
**interjecting (1)**
34:21
**internal (3)**
109:11,15;139:9
**interpersonal (2)**
119:7,9
**interpret (1)**
77:7
**interpretation (1)**
131:7
**interrupt (1)**
126:18
**interruption (1)**
127:5
**interview (2)**
35:1;44:4
**into (39)**
20:10;26:21;27:6;
34:21;38:18;41:4;
49:20;51:17,21;
52:22;53:2;54:11;
57:6;60:20;62:3;
65:3;68:14,16;69:10,
14,18,21,23;70:23;
73:7;75:16;77:5;
82:10;87:14;88:19,
23;89:12,13;91:8;

94:24;95:12;108:13;
110:14;129:22
**introduce (1)**
7:2
**introduced (1)**
7:12
**introduction (1)**
6:24
**investigation (3)**
10:18,20;135:5
**Investigations (2)**
10:16;109:12
**investigative (2)**
10:22,25
**investigator (1)**
14:11
**involuntary (2)**
32:25;33:9
**involve (5)**
21:1;79:7,15;
99:16;135:15
**involved (5)**
6:3;17:14;116:22;
117:7;121:20
**involves (2)**
123:22;129:12
**involving (3)**
33:18;46:15;
129:13
**issue (7)**
23:9;46:16,19;
47:14;59:23;66:7;
122:17
**issued (3)**
22:15;46:6;51:1
**issues (2)**
79:20;132:12
**issuing (4)**
21:16;22:4;23:25;
56:2
**items (6)**
40:5,7;53:13,21,
22;124:7

**J**

**jail (11)**
13:16;27:25;96:5;
111:4;114:14;116:3,
5;117:13,14,18;124:3
**jailer (15)**
8:7;9:23,25;10:6;
11:3,11;12:21;13:4,8,
13,18,24;110:3;
113:13;117:6
**Jails (1)**
121:8
**January (3)**
118:21;130:15;
132:6
**job (7)**
8:7;9:24;11:3,7;
117:4;124:19;133:18

**jobs (1)**
6:1
**Johnson (5)**
112:18,19,25;
113:13,17
**Jones (5)**
29:3,6,15,16,19
**judgmental (2)**
9:8,9
**July (3)**
110:17;112:3;
129:12
**June (1)**
123:22
**junior (1)**
6:14
**justified (1)**
80:14
**justify (1)**
108:15

**K**

**Katherine (1)**
31:14
**keep (14)**
27:10;35:11,18;
36:5;40:12;79:10;
80:5;88:19;91:3;
92:20,20;103:11,11;
129:23
**keeping (1)**
40:14
**keeps (1)**
71:5
**kept (1)**
34:20
**key (1)**
13:11
**kicked (1)**
102:4
**kicks (1)**
104:21
**kids (1)**
8:23
**Kind (29)**
6:1,5,16;7:1,1;8:6,
10;12:7;15:3;18:16;
19:14;32:24;36:23;
43:4;55:2;60:13;
62:8;67:6;79:14;
80:15;87:8;89:2;
102:11;104:17;
115:20;120:3,8;
122:5;126:9
**kinda (1)**
61:14;70:13;76:7;
125:20;131:9
**kinds (1)**
139:7
**kitchen (2)**
110:15;112:4
**knee (21)**

70:6;81:3,10;
82:13;83:8;86:7,11;
92:13,16,23;93:15,
24;94:7,23,23;95:11,
13;102:12;103:1;
104:21;105:10
**knife (2)**
54:3,5
**knives (2)**
54:1,2
**knowledge (4)**
100:21,23;103:1;
136:20
**knows (2)**
64:13;84:24
**Kyle (8)**
4:14

**L**

**labeled (1)**
105:18
**lack (3)**
94:1,2;125:24
**laid (1)**
67:22
**Lakeside (2)**
5:9,12
**landed (2)**
62:20;82:9
**language (1)**
93:5
**large (1)**
53:22
**larger (1)**
20:7
**Larry (20)**
4:15;28:14,16,20;
29:4,14,21,24;30:4,9;
31:7;43:15;72:12,16;
98:16;101:20,23,25;
106:5;107:9
**last (16)**
12:3,5;25:25;
44:14,15,15;55:12;
72:5;73:15,23;74:1;
112:22,24;113:15;
126:12;133:18
**later (2)**
73:13;137:19
**latest (1)**
124:5
**law (14)**
6:3,25;7:2,4,10;
8:10,13,14,21;9:15;
64:3;85:1;114:24;
116:5
**lawful (10)**
15:9;18:16,21,22,
24;22:11;49:19;
57:18;64:3;91:20
**laws (1)**
7:13

**lawsuit (3)**
30:20;41:22;66:15
**lay (1)**
88:10
**laying (4)**
81:1;86:11;88:14,
19
**lead (4)**
38:4,18;45:9;78:22
**leading (1)**
106:6
**leads (1)**
83:13
**leaning (2)**
70:23;75:5
**learn (8)**
24:25;25:20;70:12;
81:7;93:1,10;118:9;
132:23
**learned (3)**
21:14,15,15
**Learning (3)**
6:7,22;59:17
**least (1)**
116:1
**leaving (3)**
45:4;127:15;
129:14
**led (4)**
38:5,13,16;134:6
**left (36)**
49:11;51:17,19,20,
21;60:23;61:1;62:3,
4,5;63:7;65:21;67:2,
9,12;68:1;69:20;
70:16;73:5,10,12,12,
13,13,14;74:4;75:23;
76:18,21,23;81:13;
86:14;94:11,12;
124:6;128:3
**leg (2)**
95:15,18
**legs (3)**
66:25;70:6;104:14
**lengthy (1)**
131:2
**less (6)**
23:17;27:20;28:1,
2,3;139:1
**level (12)**
5:5;7:6;17:7,7;
20:2,4,16,24;22:24;
23:1,11;26:21
**levels (4)**
19:12,14,20;46:10
**leverage (10)**
60:13;66:25;69:9,
14;70:22;81:9;85:17;
87:14;95:14,19
**liar (2)**
137:25;138:4
**license (8)**
33:7;38:23;39:3,6,

8;42:16;43:6,9
**licenses (1)**
42:19
**lie (1)**
55:11
**Lieutenant (6)**
122:20;123:4;
125:13;131:7,8;
132:18
**Life (5)**
6:7,22;59:16;
120:3;123:20
**light (2)**
29:19;121:3
**lights (1)**
39:10
**likely (1)**
111:17
**limited (2)**
48:16;93:25
**line (2)**
52:8;89:8
**lines (3)**
25:10;104:23;
105:7
**list (6)**
16:5;17:18,21,24;
25:2;103:4
**listened (1)**
72:5
**listening (1)**
126:22
**little (9)**
6:1;13:14;21:21;
43:14;67:7;93:8;
110:11;132:14;
134:22
**lived (2)**
134:23,24
**local (3)**
13:18,21;42:24
**located (1)**
67:23
**location (2)**
14:16;40:17
**lock (3)**
89:5;111:10;
127:20
**locked (3)**
74:15;110:12;
111:20
**locks (4)**
21:2;87:2;102:16;
104:1
**log (1)**
139:10
**long (12)**
8:15;10:6;12:11;
29:20;31:24;49:21;
50:5;53:6;106:14;
119:18;130:11;
131:22
**longer (1)**

73:13
**look (8)**
34:22;67:24;
100:25;101:4;102:2;
108:1,12;115:7
**looked (3)**
16:5;30:14;131:25
**looking (15)**
30:15,16;66:20;
76:2;92:12;101:17;
106:10,13;107:3;
108:19;112:1;
115:12,13;116:20;
119:11
**looks (11)**
114:13;119:3;
121:7,9;122:25;
126:15;129:13;
130:5,16,22;133:18
**lost (1)**
76:21
**lot (13)**
20:8;21:25;22:25;
33:3,4;42:22;56:11;
62:20;88:11;111:18;
122:22;137:14,21
**lots (1)**
125:5
**loud (6)**
112:6,14;115:19;
116:7,10,16
**lunch (2)**
110:18,22
**lying (2)**
43:1;137:22

**M**

**magazines (1)**
128:1
**magical (1)**
115:6
**maintaining (1)**
111:1
**makes (6)**
15:21,23;64:7;
65:3;84:22;106:21
**making (19)**
15:14;16:9;17:10;
19:2;24:9;25:17;
26:2,9,16;35:17;
36:1;37:22;46:11;
57:13;60:4;72:22;
97:9;120:18;126:20
**man (4)**
41:16;45:1;91:18;
92:22
**managed (2)**
73:15;76:23
**maneuver (5)**
81:7;82:13;93:1,
10;94:23
**maneuvers (1)**

102:8
**manner (7)**
68:6;79:17;98:16,
18,20,24,25
**many (13)**
7:19;27:10,13;
28:10,11,11;29:12;
48:3;50:12;51:4;
52:14;91:2;133:23
**March (1)**
41:18
**mark (3)**
109:14;128:19,24
**marked (4)**
64:5;105:16;
109:17;119:6
**martial (1)**
20:21
**mask (3)**
131:25;132:3,6
**massive (1)**
91:7
**matter (6)**
50:12;51:3;62:23;
106:6;113:16;122:18
**matters (1)**
33:18
**may (20)**
21:17;22:6,9;
29:24;33:15;34:7;
36:18;38:13;45:14;
48:10;64:20;67:19;
86:25;88:3;118:2,15;
121:15;135:17,18;
139:5
**maybe (12)**
6:15;12:13;26:18;
27:2;33:5;48:25;
62:23;112:10,11;
129:1,3;134:15
**mean (38)**
8:17,17;15:1,2;
16:3,4,18,25;25:4;
27:3;28:9;31:18,20;
44:7;51:11;53:13;
66:15;70:25;77:24;
78:12;84:24;89:19;
92:15,21;99:4;
115:22;116:11;
117:17,18;119:21;
120:2;129:10;
130:14;132:25;
133:1;134:11;136:4;
138:1
**meaning (2)**
60:3;74:5
**means (11)**
15:7;20:19;23:19;
26:5,6;64:14;111:6;
113:8;119:4;135:5,8
**meant (2)**
44:17;126:8
**media (1)**

79:20
**medical (4)**
68:23;69:4,6;96:1
**meet (2)**
74:16;75:2
**Meets (1)**
119:5
**member (1)**
136:16
**members (1)**
111:13
**memorandum (1)**
132:9
**memory (2)**
13:7;119:19
**mental (1)**
25:8
**mentioned (4)**
8:9;136:5,7;139:19
**merely (4)**
6:24;36:7;94:20;
108:10
**merged (2)**
100:13,13
**met (1)**
68:25
**metal (1)**
53:20
**metallic (1)**
40:5
**methamphetamine (1)**
124:5
**Michau (2)**
12:10,17
**mics (1)**
126:20
**middle (3)**
4:24;27:4;125:2
**midst (1)**
116:14
**might (13)**
6:18;33:1,23;
36:22,25;37:5;54:7;
78:23;82:21;106:13;
121:12;125:17,17
**military (1)**
20:21
**millisecond (1)**
76:12
**mind (9)**
37:2;45:16;48:22;
49:5,7;55:2;84:4;
99:1;112:22
**mine (5)**
20:6,7;73:18;92:3;
129:1
**minor (1)**
66:22
**minute (4)**
21:22,22,22;49:6
**minutes (2)**
51:4;135:19
**misconduct (1)**

136:1
**misconstrued (2)**
125:17;126:13
**misdemeanor (3)**
78:21;82:16;98:2
**mislead (1)**
7:11
**missing (1)**
72:21
**misspell (1)**
44:15
**misspelled (1)**
44:15
**mistake (2)**
119:13,24
**Mistakes (3)**
53:18;120:1,11
**mistaking (1)**
12:18
**mistyped (1)**
41:17
**misunderstand (4)**
42:2,5,7,10
**misunderstanding (1)**
6:18
**Mom (1)**
134:25
**moment (11)**
16:6;21:19;48:20;
64:21;74:2;83:8;
85:12,21;86:5,10;
138:9
**moments (3)**
58:5;67:7;73:12
**momentum (1)**
75:22
**money (10)**
65:17;71:16;
123:23;124:6,10,12;
136:25;137:4,8,23
**months (7)**
12:5;116:3;117:3,
6,16;129:21;131:22
**more (32)**
20:8;27:14,15,19;
33:8;39:16;45:22;
48:20;52:5,18;53:7,
9;57:22;64:8;71:17,
19;72:15;83:20;
110:13;111:17,18;
112:6;114:12;
122:10;125:9,14;
135:22;137:14;
138:11,25;139:5,15
**most (8)**
27:24;31:24;35:25;
42:20;55:17;59:10;
78:24;111:11
**mostly (2)**
8:20,20
**mother (2)**
134:21,23
**motion (1)**

56:23
**mouth (1)**
32:12
**move (5)**
32:22;49:1,4;68:7;
109:21
**moved (5)**
10:11,19;12:7;
51:18;123:20
**movements (2)**
83:1,5
**moves (4)**
98:6,8,9,11
**moving (5)**
50:2;72:25;116:19;
121:7;134:20
**much (18)**
6:20;13:11;15:6,
11;19:15;20:7,8,9,10;
34:23;38:2;48:16;
52:14;68:10,12;
109:21;117:18;
137:17
**multiple (14)**
39:14;59:15,16;
63:15;65:13;79:11;
82:2;86:12;87:16;
97:23;118:19;
130:16,21,22
**murder (1)**
111:13
**must (1)**
21:9,10
**muted (1)**
126:20
**mutual (1)**
103:3
**myself (8)**
15:19;22:14;45:4,
24;48:3;91:15;
120:13;134:18

**N**

**name (24)**
4:14,22,24;5:1;
25:24;31:7,10;36:15;
39:17,17;42:24,25;
44:15,15,16;54:20;
55:9,12;63:23;70:2;
90:19;111:8,21;
121:14
**names (1)**
90:21
**Narcotics (4)**
10:23,24;14:10;
38:20
**narrative (2)**
129:8,10
**narratives (2)**
130:22,23
**national (1)**
7:6

**nationwide (1)**
42:16
**natural (1)**
93:22
**nature (16)**
13:10;15:21;19:8;
20:2;21:3;23:21;
47:7;70:21;75:1;
96:12;102:16;
104:21;106:21;
112:15;125:19;139:3
**NCIC (1)**
31:12
**necessarily (3)**
24:17;125:19;
128:16
**necessary (7)**
17:4;18:23;26:21;
27:6;28:9;52:4;109:3
**necessity (1)**
15:9
**neck (30)**
74:7,8,10,11,12,16,
20,23,24,25;75:1,2;
79:8,10,11,16;80:3,6,
7;92:13,15,18,20;
103:9,10,12,12,14,
17;104:5
**need (11)**
4:17;27:16;43:6;
44:11,22;66:9;
109:21;112:6;125:8,
14;126:3
**needed (6)**
28:8;36:5;47:9;
77:15;111:10;122:17
**needless (2)**
26:6,7
**needlessly (4)**
26:2,4;133:4,5
**needs (5)**
114:5;119:3,8;
125:9;132:23
**neglected (1)**
123:22
**negligence (1)**
124:16
**neighborhood (1)**
96:22
**nervous (1)**
55:13
**nervousness (1)**
55:11
**nevertheless (1)**
96:15
**news (2)**
33:18;79:20
**next (22)**
38:4;49:18;60:10;
113:20,22;115:12;
117:20,24;118:4,6,9,
19,19;121:13;
123:21;124:24;

125:1;126:15;129:1,
12;130:5,15
**NI (1)**
119:6
**Nobody (2)**
100:25;123:3
**noncompliant (7)**
81:20;114:6,8,21,
25;115:5,5
**None (5)**
39:21;65:18;88:21;
108:16;127:23
**nor (12)**
20:20,21;62:8;
79:22;89:20;90:14,
15;91:10,25;94:16,
18;100:23
**normal (1)**
94:17
**note (1)**
131:7
**notes (1)**
39:18
**nother (1)**
20:4
**notice (3)**
4:5;132:19,21
**noticed (3)**
29:22;30:9,22
**November (2)**
10:8,9
**nowhere (1)**
86:3
**number (7)**
21:9;28:5,7;52:14;
115:13;119:7,11
**numerous (4)**
27:8;38:21;55:20,
20

## O

**oath (2)**
4:2;89:18
**Object (5)**
22:5,8;34:10;47:4;
104:9
**objected (1)**
87:19
**objections (1)**
4:10
**objectively (1)**
109:2
**obstruction (3)**
78:21;82:16;98:2
**obvious (1)**
124:14
**Obviously (5)**
41:4,16;63:5;
115:23;118:14
**occasion (1)**
54:4
**occasions (1)**

82:3
**occupants (2)**
35:1;38:3
**occurred (4)**
4:16;19:6;69:5;
90:22
**occurring (1)**
121:15
**odd (2)**
6:1;41:17
**off (55)**
14:7;15:8,9;16:5;
17:18,21,24;18:1;
36:24;39:12;43:14,
19;49:11;53:24;
54:13;59:15;60:18,
18;62:17;65:19,21;
67:1,8,17;68:3;71:5;
73:6,16,20,23,25;
75:12,21;76:24;77:1,
25;78:1;79:2;84:6;
96:6,8,9,16;97:14,16;
110:20;111:9;
113:11;118:23;
120:9;124:4;129:14;
135:3;136:14;137:18
**offender (1)**
24:3
**offense (5)**
24:4,6;78:21;
82:16;98:1
**Office (40)**
5:15,19,21;6:3,10;
8:7;9:14,17,20;10:7,
14;11:3,11;24:8;
46:5;48:7;57:9,13;
59:1;79:7,15,25;80:2,
12,14;81:18;88:17;
94:7;95:1;100:15;
101:1,18;112:5;
113:18,24;120:22;
123:12;132:8;135:8;
136:3
**officer (14)**
7:10;8:17;18:7;
20:20;26:1,8,23;64:3,
10,12,16,20;88:13;
90:2
**officers (2)**
8:13;9:5
**officer's (1)**
93:15
**official (2)**
58:8;64:4
**offset (1)**
104:14
**often (2)**
27:15;28:7
**old (1)**
114:10
**once (17)**
11:6,7;20:25;44:1,
5,8;61:16;77:1;79:2;

82:8;85:16;89:3,8;
96:9;100:13;101:6;
133:24
**One (65)**
7:24,25;8:1;12:6;
15:15;17:19,20;20:2;
21:22;24:21;29:13;
44:14;46:14;48:14;
58:23;60:17;62:5,6;
63:25;64:2;70:1,3,4;
72:15;74:2;76:7,11;
78:1;79:1;88:16;
109:18;110:14;
111:11,14,20;113:15;
114:22,23;115:25;
117:20;118:4,6,9;
119:5,5,6;121:24;
122:2,10;123:7;
124:3;129:4,24;
131:19,19,20,21;
133:13;135:18;
136:8,8,12;137:2,21;
138:23
**ones (2)**
12:14;30:20;
136:16,19
**one's (1)**
117:24
**ongoing (2)**
131:9;133:9
**online (2)**
25:22;37:14
**only (17)**
9:7;43:13;47:15;
67:25,25;76:23;77:8;
80:15;89:2;107:16,
23;108:2;119:5;
132:8;135:7;138:20;
139:13
**onto (7)**
69:24;75:7;77:23;
78:5,6,8;87:20
**open (2)**
25:10;84:7
**operate (2)**
59:10,11
**operated (1)**
58:16
**operation (1)**
126:17
**Operations (2)**
105:18;108:17
**opinion (9)**
53:9;71:3;98:17,
20;106:19;113:4;
123:7;125:14;133:3
**opportunities (3)**
48:3;65:13;85:15
**opportunity (19)**
31:23,25;48:15,15,
16,22;50:15;52:17;
56:18;64:15;78:23;
81:25;82:20;83:14,

16;84:16;94:13,14;
99:2
**opposed (3)**
11:19;13:13;75:24
**opposing (1)**
138:20
**opposite (2)**
63:18;65:7
**oral (1)**
97:18
**order (10)**
11:2;12:18;24:19;
43:4;49:19;75:25;
76:4;111:1;134:18;
135:11
**ordered (1)**
110:19
**originally (1)**
43:21
**others (2)**
11:17;38:1
**otherwise (2)**
53:5;128:5
**out (64)**
11:13;16:21,21;
23:18;25:1,9;30:13,
17;35:2,5,18,21,25;
36:1,5,11,19,22;37:1,
9,10,12,16;38:1,6,11,
12;43:8;44:20;45:6;
47:6;48:20;51:23;
52:3;60:9,23;61:24;
62:2,25;66:8;72:9;
73:15;76:12;93:7;
105:23;110:25;
111:9;117:4;121:12;
122:22;123:18;
125:5,20;128:5,12;
132:10;137:2,14,16,
19;139:5,7,16,24
**outcome (2)**
24:18;25:14
**outlines (1)**
31:18
**outside (4)**
116:5,5;122:20;
132:7
**over (41)**
8:21,21;9:7;10:19;
12:25;14:10;21:5;
27:3;28:16;29:24;
30:7;31:17,19,23;
32:12,13;39:5,6;
48:8;58:21;60:20;
78:2,3;79:11;85:17;
88:24,25;89:10;
90:11;96:7,10;105:7;
110:15;111:2,4;
113:15;115:23;
117:17;128:5;
131:21;139:10
**overall (5)**
8:2,3,4;120:15;

125:1
**overpower (1)**
86:21
**own (6)**
46:7;55:9;56:25;
63:13;66:6;77:19
**owner (1)**
31:11
**oxygen (3)**
94:1,2,9

## P

**page (28)**
39:16;66:17;72:25;
80:22;106:4,9,12;
107:4,18,24,25;
108:1,5,6;109:25;
118:19;121:12,13;
123:14,21;124:24;
125:1;126:15;
128:13;129:1,12;
133:18,19
**pages (5)**
102:24;113:22;
114:12;118:19;
130:16
**paid (2)**
6:4;131:9
**pain (52)**
81:11,15,20,21,23;
82:11,14;85:10,13,
14,18,21;86:6,9,15,
17,25;87:5,7,8,9;
88:1,2,4,9,12;89:2,
16,20,21,22;90:1,13,
14,18;91:13,14,23;
92:1,2,7;93:2,9;94:5,
15,20,21;95:20,24;
102:8,14;103:3
**painful (1)**
91:16
**paint (1)**
91:9
**paperwork (1)**
117:13
**paragraph (5)**
110:17;112:1,3;
124:14;132:22
**park (1)**
127:14
**parked (2)**
28:25;128:12
**parking (2)**
62:20;88:11
**parole (1)**
126:17
**part (12)**
13:5;24:13;27:21;
31:24;39:11;48:24;
60:2;61:14;66:21;
67:12;106:16;135:16
**participant (1)**

24:20
**participate (1)**
6:20
**participation (1)**
9:13
**particular (7)**
30:3;37:5;111:20;
115:22;116:12;
121:24;128:3
**particularly (2)**
29:23;136:4
**parts (2)**
108:22;110:8
**party (1)**
24:20
**passed (1)**
52:15
**passing (3)**
56:1,4;139:1
**past (1)**
116:1
**pat (1)**
37:19
**path (1)**
63:13
**Patrol (39)**
10:11,12,15,20;
13:15;35:7,16;43:5,
11;44:9;45:23,25;
46:21,25;47:12;
49:13;51:9;55:7;
60:13,18;61:15;
62:10,13,18;64:5;
65:11;66:24;68:7;
86:16;89:12,25;
90:20;105:3,4,18;
124:4;129:13;135:1,
2
**Patrolling (4)**
28:21,22,23;128:2
**Patrols (1)**
10:17
**patted (2)**
37:17;53:12
**pavement (1)**
73:8
**pay (1)**
15:10
**Peace (1)**
8:17
**peaceful (1)**
25:14
**peacefully (2)**
57:3;65:25
**people (28)**
7:19;8:14;9:4;
26:11;33:4;34:4;
35:25;36:1;38:1;
55:11,18,20;59:11;
90:21;111:16;
116:15;120:4,4,5,9,9,
21;122:18;123:19;
125:9,10,15,15

**per (1)**
25:15
**perceived (6)**
82:18;84:3,10;
98:1,4;126:9
**perceives (1)**
90:18
**percent (11)**
28:3,12;41:24;
53:24;55:3;71:22,24;
111:18;112:18,21;
127:24
**perception (2)**
98:4,12
**perfect (3)**
64:7;93:3;99:7
**perforce (1)**
120:15
**perform (2)**
7:17;38:6
**performance (9)**
64:4;118:20;
120:24;121:3,16;
125:2;126:17;131:3;
135:23
**perhaps (2)**
46:8;68:8
**period (6)**
21:16,18;55:16;
108:11,12;119:9
**periods (1)**
94:11
**permissible (1)**
4:6
**permission (3)**
122:4,16,17
**permit (1)**
123:10
**perpetrator (1)**
14:23
**person (32)**
22:1,16;23:9;
25:11;26:3,10;27:9;
31:22;38:9;40:1;
43:8;48:14;50:7;
54:14;57:10,14,18;
64:8,11,14;65:3;
89:16;90:19;100:14;
106:22;109:3,7;
115:4,4,5,5;122:21
**personal (1)**
124:7
**personally (1)**
7:24
**personnel (1)**
109:11
**persons (2)**
25:8;106:17
**person's (4)**
85:10;111:14;
115:7,8
**phone (4)**
110:21;134:8,21;

138:24
**phones (2)**
110:20;111:5
**photo (3)**
67:6,9;74:22
**photograph (6)**
67:14;70:3;75:4;
80:25;85:22;92:12
**photographs (1)**
97:3
**phrase (2)**
16:8;138:3
**physical (47)**
15:13,17,22,24;
16:1,10;17:9;20:6;
22:1;27:9;42:21;
45:10,11;46:16;
51:15;71:7;78:12,15;
83:1,8,15;86:25;97:4,
4,5,21,21;98:5,6,8,9,
11;102:1,3;103:7;
104:19;107:12,16,19;
108:3;116:14,20,22,
24;117:7,15;137:20
**physically (6)**
16:11;20:4;60:4;
64:10;67:19;69:1
**physiological (2)**
93:13,18
**pick (1)**
74:17
**picture (35)**
36:15;42:21;66:17,
20;68:15;73:1,1,3,9,
11,12,16,19,23,24;
74:1,2,3,5;75:9;76:2,
9,16,17,23;77:7,8;
80:6,22,23;81:14;
89:7,20;91:9;95:16
**pictures (2)**
68:5;82:6
**pinned (1)**
91:6
**pipe (1)**
94:19
**pistol (2)**
9:8,10
**place (93)**
12:6;13:17;14:5;
17:2,4;19:24,25;
22:22;23:4,6,17;
24:19;30:3,6,9;
34:20;38:22;44:11;
45:20;46:20;47:11,
13;50:3,6,18;51:7,12,
19;52:14;53:1,6;
54:9;55:14;56:5,12;
57:1,25;58:6;60:11,
15,16,20;61:3,8,9,12,
18;62:6,7,11,12,14,
16,22;63:13;64:5,15;
66:5,12;67:5;68:17;
70:1,25;72:9;74:23;

75:16;76:12,14;
77:12;82:1;83:4,20;
86:20;87:9;88:21;
89:9,19;90:11;91:5,8,
10;94:16;106:3;
109:4;121:12;
127:14,18;131:13,21;
134:8,16,17;135:5
**placed (34)**
18:22;39:9;44:8,8;
45:5;46:3;47:3;
51:9,10;54:16;55:1;
56:6,14,17,23;57:2,6;
58:9,14;59:12,21;
62:3;65:15;66:24;
83:8;85:8;89:24;
90:5;91:11,14,18,19;
134:19;137:15
**places (1)**
134:9
**placing (18)**
23:14;24:1;45:22;
46:4,20;49:12;52:21;
57:6;60:15;65:21,22;
79:7;86:24;90:13;
94:23;95:11,13;
103:1
**play (1)**
86:3
**player (1)**
89:23
**players (1)**
9:5
**playing (1)**
90:8
**please (7)**
4:18,19,22;5:17;
90:19,22;108:1
**plenty (1)**
53:3
**pm] (1)**
140:5
**pocket (34)**
40:6;49:20,22;
50:18;51:17,18,21,
23,24;52:1,4;53:2,8,
11,12,13,21,22;54:6;
60:9,23;61:24;62:2,4,
4;63:1;65:4,17,22;
66:1,9;136:24,25;
137:5
**pockets (8)**
40:1;52:22;53:13,
17,20;54:11;64:15;
65:16
**pod (2)**
111:14,20
**pods (1)**
111:12
**point (60)**
18:16,23;19:17;
21:2;23:2,2,2;37:6;
44:14;45:9,13;60:17,

18;62:21;63:15;
65:16,17;66:2;67:2;
70:1,19,19;71:1,2,7;
74:6;75:8,10,11,23;
76:13;77:9,12;78:4,
15,17,17;79:4;80:9;
81:8,9;82:7,23;83:2;
84:8,12,18,22;86:3,
19;89:1;95:19;97:6;
107:3;109:4;115:25;
119:17;124:20;
134:21;137:19,20
**points (1)**
104:1
**police (23)**
14:3;18:7;20:20;
26:1;33:2,8,12,13,16,
19,23;34:5,8,15;
59:17;64:20;69:8,12;
81:19;93:11,12;
96:13;99:25
**policies (1)**
80:12
**policing (1)**
33:20
**policy (41)**
57:12,17,24;58:3,5,
8;59:22;80:1,2,4;
95:1,2;101:13,18,19;
102:20,23,25;103:19;
105:17,19,22,25;
106:1,6,14,18,24;
107:8,9,10,15,22;
108:3,6,18;109:6;
111:3;132:2,5,9
**politely (2)**
57:4;127:13
**poor (2)**
112:2,2
**popping (1)**
42:24
**population (1)**
10:1
**portion (8)**
25:9;74:12,13,16;
106:4,23;120:2;
128:25
**portions (2)**
108:21,25
**posed (5)**
15:12,17;16:1;
45:10;97:3
**posing (1)**
17:9
**position (27)**
9:22;10:4,15,18;
11:10;12:21;14:11;
27:11;70:13;73:17;
76:25;79:3;81:2;
82:7,10;89:5;93:14,
21;94:8,11,13,25;
95:12,14;102:13;
103:2;105:2

**positional (2)**
94:10;106:8
**positions (2)**
10:14,17
**positive (2)**
117:20,24
**possessed (1)**
38:21
**possible (3)**
36:9;63:20;72:2
**possibly (1)**
48:16
**post (5)**
8:3,15,16,18,18
**practice (4)**
21:15;59:17,20;
108:16
**practices (1)**
91:15
**precursor (1)**
129:24
**preface (1)**
134:22
**prepare (1)**
99:25
**prepared (1)**
124:9
**preparing (1)**
8:20
**pressed (1)**
73:18
**pressure (10)**
21:1;67:15;68:1,
10,12,13;69:19;81:2,
8;104:1
**pretty (22)**
7:18;13:11;27:7;
34:23;38:2;42:7;
49:24;50:10,25;51:5;
52:10;58:11;62:24;
71:19;115:2;116:10,
10,16;117:18;
122:12;130:25;131:1
**prevent (1)**
83:19
**previous (8)**
4:10;73:11;76:17;
107:18,25;108:1,4,6
**previously (7)**
19:8;38:20;43:18;
50:10,20;68:19;
105:16
**printout (1)**
31:13
**prior (8)**
6:2;11:4;12:3;
46:24;85:12,14,21;
91:16
**privy (1)**
139:23
**proactive (1)**
125:4
**Probably (1)**

72:7
**Probationary (4)**
113:24;114:13,20;
121:8
**problem (6)**
59:4,8;64:3;
117:21;133:3;137:16
**Procedure (1)**
4:7
**procedures (1)**
118:7
**proceeded (1)**
122:7
**process (7)**
6:19;25:6;45:17;
92:1;104:25;128:6;
131:12
**processes (1)**
7:1
**produced (5)**
101:12;105:18;
114:17;118:18;
121:14
**profusely (2)**
32:11,20
**program (14)**
6:6,9,12,17,19,22;
7:3,11;8:11;9:1,14;
90:11,23,25
**programs (1)**
118:6
**prohibited (1)**
106:3
**prone (7)**
81:1;93:14;94:12,
25;95:12;102:13;
103:2
**proof (1)**
137:21
**property (2)**
124:8,12
**propose (1)**
4:9
**proved (1)**
82:5
**provide (4)**
8:10;42:20;48:17;
93:12
**provided (8)**
30:20,21;41:5,7,
18;42:25;59:14;
109:10
**provides (1)**
107:22
**providing (1)**
43:20
**psychosis (1)**
108:9
**public (1)**
136:17
**pull (26)**
20:1,14;28:16;
29:24;31:19,22;

42:17;48:8;56:9;
61:14;62:9;63:11,12;
78:22;82:11;83:13;
84:24;85:9,16;89:4;
98:5,12,13,15,21;
99:16
**pulled (15)**
29:18;31:17;39:5;
41:10;76:3;83:3,24;
84:1,9;85:2;105:16;
107:25;108:4;122:6;
127:19
**pulling (4)**
21:1;30:7;97:25;
98:23
**punch (1)**
20:3
**punched (3)**
102:5;104:3,19
**punished (1)**
111:15
**punishment (1)**
111:19
**purport (1)**
101:12
**purpose (3)**
43:25;75:18;90:15
**purposes (1)**
4:6
**pursuant (1)**
4:5
**push (9)**
67:16,17;68:3;
69:15;71:5;72:17;
73:6,16;76:24
**pushed (9)**
60:17;65:11;73:6;
75:21;77:1,24;86:16;
88:20;91:6
**pushes (2)**
62:17;67:8
**pushing (8)**
67:1;68:6;69:20;
73:20,23;87:22;
94:24;105:4
**put (94)**
9:4;17:11;19:16;
20:1;21:11,19;22:16,
20;23:3,9,20,24;
26:20;27:3,4,25;
28:5;46:22,24,24;
47:1,3,8,11,15;49:13,
17,21,22;50:1,11,15,
16;51:1,8,13,14,15;
52:2,6,11,14,17;
55:23,24;56:2;57:14;
58:13;60:1;63:1,5,16,
17,21;64:9,13,20;
65:8,10,16;66:2;
67:20;69:2,24;71:4,
11,14,17;72:9;74:6,9;
75:6,25;76:10;77:10,
11,23;78:11,18;79:2;

80:3,22;81:11;86:21;
87:17;92:6;98:22;
108:11;124:8,18;
131:24;132:3;
136:23,23
**putting (16)**
9:6;22:19;23:6,14;
24:2;48:21;53:8;
58:9;60:4;65:20,23;
76:25;79:15;82:13;
94:7;104:5

---

## Q

**quantity (1)**
28:5
**quick (1)**
49:5
**quickly (4)**
77:2,5;118:10;
127:17
**quite (5)**
15:7;34:20;56:8;
58:16;134:15
**quote (4)**
51:11;61:16,17;
62:24
**quote/unquote (2)**
60:7;134:22
**quotes (2)**
56:8;99:17

---

## R

**race (1)**
34:5
**racial (1)**
96:12
**radar (1)**
111:7
**ran (1)**
7:25;31:2,4,14;
127:14
**Randy (1)**
4:9
**range (1)**
128:3
**rapidly (3)**
12:7;16:3;52:4
**rather (5)**
78:13;123:17;
126:10;131:1,11
**RCSO (1)**
118:20
**reach (1)**
65:3
**reactions (3)**
39:5,8,9
**read (4)**
39:11;45:16;54:23;
84:4
**real (6)**
12:7;27:9;44:3;

49:8;70:24;127:17

**reality (1)**
116:5

**realize (1)**
89:18

**really (19)**
6:1;9:7;15:19;
34:21;36:23;57:1;
60:21;89:11,21;99:7;
106:10;107:21;
108:24;115:9;
120:25;122:19;
126:5;129:2;137:18

**real-world (1)**
9:3

**rear-ended (1)**
130:13

**reason (14)**
26:10,14,17,25;
33:4;34:17;40:16;
44:11;45:13;48:10;
53:9;78:18;129:20;
137:11

**reasonable (12)**
16:12,16;18:7;
22:3;25:14;50:14;
52:16;53:7;54:15;
95:4;106:22;109:2

**reasons (3)**
26:15;76:20;84:15

**reassessed (1)**
16:4

**rebound (1)**
94:14

**recall (62)**
12:11;25:24;28:19;
29:2,4;30:5,11,12;
31:4,9,10;32:3;
36:20;37:6;40:6;
42:7;43:11;53:23,24;
54:2,3,5;72:11;78:8;
95:25;96:3;100:20;
110:5,7,8,9;111:5,21,
22,24;112:9,13;
113:14,15;114:7;
115:21,22,24;117:15;
119:8,15,16,16;
121:18,19;123:24;
125:11;127:8;
129:15,20;130:8,19;
132:10;136:5,7,14;
138:25

**receive (7)**
6:16;8:24;12:24,
25;13:20;14:15;
93:23

**received (13)**
5:6;12:20;13:8,9;
14:19;19:10;25:16;
86:24;94:4,6;95:22;
115:20;134:21

**receiving (2)**
114:7,10

**recent (2)**
11:1;33:18

**recently (2)**
10:19;30:7

**recess (1)**
49:8

**re-clarify (1)**
16:19

**recollection (2)**
51:6,6

**recommended (1)**
133:12

**record (2)**
4:22;135:24

**record] (3)**
49:10;99:9;135:21

**records (1)**
109:15

**redirect (2)**
62:18,19

**redirected (2)**
73:7;75:22

**redirecting (1)**
83:18

**refer (1)**
120:22

**reference (4)**
90:12;95:3;107:24;
133:20

**referenced (1)**
107:19

**referencing (1)**
117:19

**referred (1)**
89:6

**referring (9)**
37:13;39:14;79:10,
18;80:7;86:4,5;
103:11;133:14

**refuse (3)**
19:24;61:12;63:2

**refused (9)**
60:12,17;61:9;
63:2;66:2;77:12;
82:2;108:10;131:24

**refusing (4)**
71:4,10,14;132:2

**regain (2)**
73:4;84:2

**regained (1)**
73:10

**regard (2)**
125:21;131:3

**regarding (9)**
4:9;14:14,15;18:2;
21:6;24:25;106:25;
124:24;136:20

**regardless (6)**
24:3,6;34:5;76:20;
116:11;124:6

**registered (1)**
31:13

**registration (7)**

28:17;29:17,21;
30:1;31:8,11;42:18

**regular (2)**
40:6;53:21

**regularly (1)**
56:8

**related (5)**
8:24;53:15;55:22;
101:13;135:24

**relates (1)**
139:10

**relationship (1)**
134:16

**relative (1)**
111:22

**relatively (1)**
52:4

**releasing (1)**
76:7

**relevant (2)**
113:8,9

**reliable (1)**
44:17

**religion (1)**
34:6

**relying (1)**
32:18

**remain (1)**
85:24

**remained (1)**
35:13

**remains (1)**
69:13

**remember (18)**
7:23;28:13;29:9,
20;31:12;32:17;
51:11;59:14;114:18;
117:10;118:11,13,15,
22,25;119:20,20;
120:18

**remotely (1)**
111:22

**remove (1)**
51:25

**Removed (2)**
51:24;62:4

**repeat (2)**
61:21;72:15

**repeatedly (3)**
60:15;66:12;80:5

**rephrase (5)**
4:19;14:20;16:18;
48:25;83:16

**Report (44)**
30:16;41:2,4,7,8,
10,12,14,14;61:16,
21;99:16,17,19,23,
23,25;100:2,6,9,11,
12;101:14,20,22;
105:13;106:25;
107:6,11,16,22;
108:2,15;118:20;
120:16;125:23;

126:2,4,5,11,16;
127:9;128:15;129:17

**REPORTER (1)**
109:18

**reporter] (1)**
4:3

**reports (1)**
117:12

**representing (1)**
123:11

**represents (1)**
76:11

**reprimanded (1)**
122:23

**re-pulled (1)**
108:5

**requests (1)**
53:4

**require (5)**
14:11;21:16;46:6;
59:23;132:6

**required (11)**
11:16,18;12:21;
13:12;43:3;105:14;
106:25;107:11,16,23;
108:2

**requirement (2)**
21:8,14

**resemble (1)**
53:25

**reserved (1)**
140:6

**resist (6)**
19:17;84:23;91:20;
98:16,18,25

**resisted (3)**
98:19,20,24

**resistence (1)**
17:7

**resisting (7)**
26:19,22;27:1,7;
78:20;88:25;92:1

**resolved (2)**
133:8,10

**respect (1)**
123:18

**respectful (1)**
117:25

**respectfully (2)**
113:11;127:13

**respectively (1)**
51:20

**respond (6)**
18:11,21;19:11;
22:17;23:10;25:12

**responded (4)**
21:12;71:18;128:8;
132:14

**responding (4)**
7:14,14;19:1;25:11

**response (10)**
8:2;9:11;19:22;
33:3,9,25;39:11,11,

19;62:15

**responsibilities (1)**
9:25

**Restate (1)**
49:2

**restrain (3)**
106:9,22;109:3

**restrained (1)**
85:25

**restraints (1)**
114:4

**resulted (1)**
77:20

**resulting (2)**
56:21;77:13

**retrieve (2)**
40:23;43:6

**retrieved (1)**
43:4

**review (12)**
56:7,7;99:13,15,
22;100:2,15,18;
106:14;109:21;
124:5;125:3

**reviewed (9)**
56:1,4;100:7,12,22,
24;130:23;132:16;
135:24

**reviewing (2)**
51:6;131:1

**reviews (2)**
100:4,9

**revoked (3)**
38:24;39:3;42:18

**revolt (1)**
116:15

**RICHARD (4)**
4:2,4,23,25

**Richmond (25)**
5:14;8:7;9:16;11:3,
11;14:6;24:7;46:5;
48:7;57:9,12;58:12;
79:6,15,25;80:2,12,
13;81:17;94:25;
100:14;113:23;
120:22;123:11;136:2

**ride (1)**
127:25

**rifle (1)**
128:1

**Right (54)**
9:10;19:23;32:16;
40:21;41:9;42:8;
50:19,20;53:21;
56:19,25;58:11;59:3,
6;61:5,6,7,7;62:5,6;
67:3,6,13,14,18,20,
25;68:7;69:19;70:5;
73:6,7;74:24,25;
75:3;76:2,16,19,20;
78:5;79:21;81:10,12;
85:13,14;99:8;
101:10;108:10;

109:14;112:7;
114:22;121:25;
127:6;139:21
**rise (1)**
111:16
**risk (1)**
87:2
**Road (11)**
10:11,12,15,17,20;
11:14;13:15;14:7;
27:4;29:5;124:4
**roadside (2)**
44:4,9
**role (8)**
9:5;10:22;12:15,
19,20;14:12;89:23;
90:8
**roof (1)**
72:13
**room (2)**
110:12;124:12
**rough (1)**
7:5
**roughly (1)**
51:10
**Roundtree (2)**
4:7;132:6
**Roundtree's (1)**
105:17
**route (3)**
56:19,20,21
**routine (2)**
25:17;36:1
**rude (2)**
120:6;126:8
**Rules (1)**
4:6
**run (5)**
22:2;40:19,20;
52:23;127:18
**rundown (1)**
134:11
**running (4)**
128:18;129:11,14,
23
**RUSSELL (21)**
4:2,5,8,14,23,25;
88:13;99:10;114:4;
115:16,17;116:21,23;
119:12;120:16;
125:4,5,8;132:11,23;
140:3

---

**S**

**safe (2)**
28:2;90:2
**safely (1)**
44:10
**safer (1)**
57:23
**safety (21)**
15:13,18;16:2;

36:7,11;45:10;48:11,
23;72:16;78:16,19;
82:15;83:25;84:3;
97:5,7,8;98:7,9,10;
114:2
**same (31)**
13:9,11,22,22;
20:9;23:16,24,24:2;
32:1;39:2,9;40:19;
55:21;65:22;66:11;
69:13;85:24;99:12,
13,21;104:1,23;
105:6;107:14;
111:16;115:6;
120:16;126:6,12;
131:8,8
**sarcastic (1)**
125:17
**sat (2)**
139:9,13
**satisfactory (1)**
119:2
**saw (8)**
25:2;28:19;29:17,
21;30:14;34:8;39:14;
119:17
**saying (26)**
7:10;16:24;33:22,
23;53:5;54:9;63:21;
65:10;73:23;76:9;
80:6;86:8;92:19,20,
20;100:5;101:2;
111:17;112:6;126:6;
137:11,12,19,25;
138:1,3
**say-so (1)**
111:4
**scanner (1)**
44:20
**scared (7)**
33:1,7,12,13,16,22;
34:4
**scenario (5)**
7:25;8:20;22:12;
26:23;91:15
**scenarios (6)**
7:5;9:3,5;89:23;
90:8,24
**scene (3)**
96:7;107:14;
123:18
**scheme (1)**
108:13
**school (7)**
5:7,8,18;6:7,14;
8:23;9:15
**Scott (176)**
4:7,15;28:14,16;
29:24;32:10,10,10,
12;33:15,15;34:21;
35:2;36:11;37:4,16,
19;38:6;39:1,5,6,7,
23;40:8,11,13;41:15,

24;42:2,10,11,13,14;
43:15,22;44:1,8,12;
45:8;46:20;47:5,18,
18;48:10,13;49:12,
16,19,22;50:1,2,5,14;
51:14,25;52:5,17;
54:22,25;55:3,22,25;
57:2,2;60:12,14,17,
20;61:12,17,18;62:3,
10,13;63:16,20;
65:10,15,16,17,18,
19;66:2,8,23;67:4,4,
20;68:10,12,19,24;
69:2,9;70:22;71:2,9,
13,22;72:2,8,12,16;
73:4,10;74:14,19,20;
75:7,12,15;76:19,23;
77:4,12,15,16,17,23;
78:10,18;79:13;81:1,
15,24,25;82:3,4,8,15;
83:7;84:11;85:14,17,
21;86:6,8,10,13,15;
87:5;88:1;89:9;
90:15;91:6,11,13,14,
23;93:9;95:22,24;
96:5,16;97:3;98:16;
101:20,23,25;102:4,
4,8;106:5;107:1,10,
11;108:8,10,13,15,
20;109:6;136:22;
137:17,22;138:6
**Scotts (3)**
31:16;32:3;34:7
**Scott's (44)**
28:20;29:4,15,21;
30:4,9,22;31:7;38:5,
5,23;39:17;40:20;
56:12;60:9,11;62:21;
66:6,25;67:9,15,19;
68:6,23;69:7,16;
70:16;71:7;74:7,10,
21,23;75:23;76:18,
21;77:19;78:5;81:9,
12;83:18;89:12;
92:13;100:22;136:24
**Scouts (3)**
6:8,21,21
**scratch (1)**
78:16
**screen (6)**
66:18;79:17;80:7;
101:10;109:13,21
**screening (1)**
133:19
**scroll (1)**
114:12
**scrolling (2)**
113:20;120:15
**se (1)**
25:15
**search (1)**
43:8
**searched (1)**

48:2
**seat (1)**
128:2
**second (6)**
55:16;77:6,7;
88:16;106:12;110:16
**seconds (25)**
21:24,25;22:3,13,
17,17,20,25;23:10,
17;50:12;51:3,4,5,10,
12;52:6,14,18;53:5,9;
54:15;55:19;62:23;
64:8
**secret (1)**
70:24
**section (4)**
108:4,6;124:3;
125:2
**secure (1)**
128:4
**secured (3)**
44:1,5,7
**seeing (1)**
114:18
**seem (1)**
129:4
**seizure (2)**
19:6;60:5
**self-explanatory (1)**
115:2
**send (2)**
11:8;135:1
**sense (3)**
34:20;64:7;88:4
**sent (4)**
100:10;110:12;
121:3;135:1
**sentence (4)**
37:11;114:22,23;
133:1
**sentences (1)**
108:21
**Sergeant (5)**
12:1;112:17,19;
113:12,17
**sergeants (1)**
131:8
**serious (1)**
83:20
**served (2)**
41:9;66:16
**service (1)**
96:9
**serving (1)**
110:18
**set (1)**
21:18
**several (9)**
19:12;47:5;97:2;
104:18;113:21,22;
116:15;121:21,23
**shaking (9)**
32:11,20,21,23;

33:11;34:9,16;38:8;
39:2
**shape (1)**
138:8
**share (1)**
109:13
**sheriff (17)**
10:10;12:15,19,22;
13:1,9,12,19,24;
14:15,22;18:3;19:10;
24:7;27:11;105:17;
132:5
**Sheriff's (37)**
5:15,19,20;6:3,9;
8:7;9:14,17,19;10:7,
14;11:3,11;24:8;
46:5;48:7;57:9,13;
79:6,15,25;80:2,12,
14;81:18;94:7;95:1;
100:14;101:1,18;
113:18,24;120:22;
123:12;132:8;135:7;
136:3
**shift (1)**
124:9
**Shirley (1)**
112:4
**shooter (2)**
8:1;9:12
**short (4)**
62:11;99:2;104:21;
135:17
**shortly (4)**
81:13;99:12,20;
137:15
**shot (3)**
73:16,24;76:11
**shotgun (2)**
127:22,25
**shoulder (12)**
74:16,16;79:12;
80:8;81:11;92:14,17;
94:1,2,22;95:13,17
**shoulders (3)**
67:23;92:18,23
**show (9)**
31:7;36:21;42:20;
67:11;97:7;102:20;
108:1;125:9,14
**showed (6)**
31:6,10,14;74:4;
76:17;82:6
**showing (4)**
6:17;80:22;97:3;
125:24
**shown (2)**
81:1;109:25
**shows (4)**
67:9;68:5;76:2;
126:2
**side**
10:20;29:8;68:1;
69:20;74:25;93:8

**sign (2)**
130:3;133:17
**signature (7)**
121:9,10;128:22,
23;129:4;130:3,16
**signatures (1)**
125:3
**signed (6)**
115:25;118:14;
123:20;124:8;
131:13;133:20
**significant (2)**
35:20;108:14
**signing (1)**
140:6
**signs (3)**
36:18,21,23
**Silas (3)**
122:20;123:4;
132:18
**similar (3)**
13:8,10;123:21
**simple (2)**
27:8,22
**simply (1)**
68:17
**simulator (2)**
9:10,10
**simulators (1)**
9:8
**simultaneously (1)**
63:21
**single (1)**
119:4
**sit (4)**
16:4;17:21,24;46:7
**situation (29)**
16:3,6;24:18,21,23,
24;25:13,17;27:4;
32:16;46:4,15;51:12;
52:19,20;66:4;83:17;
86:20;89:10;90:9;
91:2,16;96:11;108:8;
116:13;127:13,18;
133:1;137:21
**situational (1)**
17:18
**situations (7)**
115:17,18;116:2,4,
13;130:25;133:4
**six (1)**
12:5
**size (1)**
20:5
**Skills (4)**
116:20;119:7,9;
126:3
**slam (13)**
68:8,13;69:18,21,
23;87:13,19;88:15,
18,20,23;104:12,13
**slammed (1)**
91:3

**slamming (3)**
91:8;104:6,9
**slightly (1)**
116:23
**slung (1)**
127:14
**small (1)**
53:22
**smaller (2)**
20:8,9
**smoke (7)**
61:19,24;62:2,15;
71:18,23;86:13
**snatch (2)**
20:2;83:12
**snatched (4)**
43:16;73:14,15;
84:2
**snatching (4)**
73:5;82:17;97:24;
98:23
**soft (17)**
19:15;20:25;23:3,
11,19;60:3;102:15,
17;103:4,15,23;
104:7,16,17;105:1,4,
8
**sold (1)**
5:25
**somebody (49)**
19:23;22:12;24:1,
5;25:7;26:15;27:3,6;
33:6,23;35:21;36:5;
45:4;46:15;48:3,14,
15;56:5;57:5,21,25;
58:9,13;59:1;60:3,4;
64:4;65:6,8;80:18;
81:20;84:25;85:2,9;
88:17;89:15;90:13;
92:5;93:14;100:5,21;
115:7;124:19;
125:23;132:16;
134:18;136:8;139:1,
2
**somebody's (13)**
39:9;43:1;55:13;
59:11,25;86:25;88:5;
93:24;94:7,24;
102:12;103:9;105:3
**somehow (1)**
135:8
**someone (4)**
46:4;58:21;59:18,
20
**someone's (3)**
80:3;103:2;104:14
**sometime (1)**
119:13
**sometimes (8)**
35:24;37:14;89:7;
119:24;120:21;
126:8,13;131:16
**somewhere (2)**

11:8;13:21
**sophomore (1)**
6:14
**sorry (24)**
6:14;11:25;17:23;
22:7;28:22;32:13;
37:11,14;42:18;46:9;
51:9;56:20;58:7,17,
19,25;59:6;64:25;
72:15,21;88:17;
107:2;108:4;127:4
**sort (5)**
32:15;48:4;80:18;
103:17;119:3
**sorted (2)**
137:14,16
**sound (2)**
125:17,18
**sounds (4)**
115:19;116:8,11;
128:15
**south (1)**
38:15
**speak (2)**
22:12;120:20
**speaking (2)**
9:24;39:2
**specialized (1)**
14:9
**specific (17)**
6:13;10:21;11:17;
17:13;21:9;22:14;
37:4,25;40:16;48:13,
13;49:24;77:3;95:2;
108:5;113:5;136:6
**specifically (4)**
51:5;58:3;119:11;
139:11
**specify (1)**
95:2
**speed (1)**
128:7
**spell (1)**
55:12
**spelling (2)**
44:14;55:9
**spin (1)**
62:9
**spine (1)**
68:20
**spoke (1)**
89:23
**sponsored (1)**
6:21
**sponsors (1)**
6:23
**spotlight (1)**
40:15
**spotted (4)**
28:24;29:5,7;30:4
**spun (1)**
61:15
**staffs (1)**

110:15
**staling (1)**
134:7
**stalking (3)**
134:1,3,14
**stamps (1)**
51:7
**stance (1)**
15:23
**stances (1)**
15:21
**stand (5)**
40:13,16;46:7;
47:6;107:12
**Standard (1)**
8:17
**standing (4)**
73:17;77:1;79:2;
111:8
**standpoint (1)**
36:7
**start (6)**
6:12;10:24;11:7;
18:9;21:5,20
**started (3)**
9:19;71:15;97:9
**startled (6)**
63:21;64:1,11,16,
24;65:1
**starts (4)**
21:7;107:6;118:20;
121:14
**state (11)**
4:22;7:6;8:17;14:3;
8;42:17,22;98:2;
114:4;134:20,25
**stated (3)**
41:15;112:5,7
**statement (9)**
72:22;110:16;
123:13;124:13,22,24;
132:22;133:6,7
**states (1)**
42:20
**State's (1)**
25:23
**station (1)**
30:8
**statistic (1)**
27:18
**statistics (1)**
28:10
**stature (1)**
20:5
**step (11)**
19:17,19;20:25;
35:16;36:16;37:10,
12,23;38:11;47:6;
48:19
**stepped (2)**
37:9;38:11
**steps (2)**
20:12;65:25

**Stevenson (1)**
112:4
**sticker (4)**
28:18;29:18,21;
31:2
**still (31)**
10:12;13:5,22,22;
14:13;42:19;44:2;
45:25;46:2;59:5;
66:1;67:6;68:3,9;
69:5;71:10;73:16,24;
76:11,22;80:8;84:19;
86:19,20;102:15;
103:25;107:12;
113:17;126:21,24;
130:25
**stop (18)**
21:10;25:18;30:13,
17;33:3,8;34:23,25;
36:2;37:3,6,22;
38:19;48:8;66:8;
77:11;82:1;96:22
**stopped (2)**
30:8;77:9
**stops (3)**
7:14;35:17;96:19
**story (1)**
127:17
**straight (3)**
89:5;93:7;127:23
**Street (2)**
29:17;135:3
**stress (7)**
33:3,9;39:5,8,9,10;
55:21
**strike (5)**
21:5;83:19;105:11;
112:22;126:1
**strikes (8)**
20:24;21:3;70:20;
103:7;104:19,21;
105:9;108:14
**striking (3)**
21:20;60:21;83:19
**stronger (1)**
120:17
**struck (2)**
102:4;104:2
**struggle (1)**
43:17
**struggled (2)**
108:12;115:9
**struggling (2)**
70:25;137:3
**stuff (11)**
7:7;8:21,22;9:8,11;
32:22;104:25;111:5;
122:22;128:4,8
**subject (37)**
15:12,17,20;16:1,9,
13,14,22,24;17:2,3,
16;18:15,18,20,25;
19:2,4,11,21;20:7,8,

9,14;21:12,17;22:4;
23:13,23;26:19,22,
24;27:16;37:23;
48:19;115:12;116:19

**subjective (2)**
121:23;123:6

**subjects (4)**
18:10;106:2;115:1,
1

**subject's (3)**
16:25;17:1;43:3

**submitted (5)**
100:3,4;101:5,6,7

**subset (1)**
6:22

**substantiate (1)**
138:2

**sufficient (3)**
19:1;84:16;94:16

**suffocate (1)**
94:12

**summarize (1)**
113:23

**summary (2)**
120:16;125:2

**super (1)**
70:24

**supervised (1)**
123:19

**Supervision (3)**
10:1;19:5;113:6

**supervisor (17)**
11:22,23;12:2,3,4,
9,11;100:3,9,11;
112:2;113:2,3,7;
121:24;122:10;
123:19

**supervisors (7)**
12:14,16,17;
107:14;118:1;
121:21,23

**supposed (4)**
15:1;122:14,15;
126:19

**sure (36)**
6:13;12:5,8;15:7;
41:1,2;42:2,5,7,10;
58:11;60:5;71:24;
72:21;75:8,23;84:17,
19,19,22;86:8,9,12,
14;102:21;116:16;
118:7,10,14;119:17;
126:21,23;127:4,20;
129:2;135:20

**surgery (3)**
68:20,20;91:18

**surrounded (1)**
83:17

**surroundings (6)**
14:17,23,25;15:2,3,
10

**suspect (1)**
70:14

**suspects (2)**
45:21;48:8

**suspect's (2)**
79:8,16

**suspended (3)**
39:6;42:18,18

**suspension (1)**
129:25

**suspicion (4)**
36:25;37:5;38:13,
16

**swing (2)**
19:17;78:25

**switched (2)**
12:25;14:10

**sworn (1)**
4:2

**synonymous (1)**
88:20

**system (6)**
42:16;43:10;44:17;
100:4,10;101:5

**systems (1)**
46:2

## T

**tactic (1)**
25:15

**tactics (3)**
8:22,24;21:2

**tag (4)**
30:23,25;31:15;
32:1

**talk (20)**
18:10,15,18;25:12;
32:14,22;33:3;34:14,
22;35:6;44:1,10,13;
45:6;55:6;71:15;
121:1;125:15;126:7;
139:13

**talked (4)**
46:10;90:9;129:24;
133:14

**talking (17)**
13:23;18:9,10;
25:11;26:19;27:23;
37:8;44:25;58:21;
79:13;88:13,14;
90:24;116:13;
125:10,15,25

**talks (1)**
125:9

**tangent (1)**
113:11

**task (1)**
84:16

**taught (7)**
13:13;25:5;48:7;
57:8;81:8,17;93:2

**Taylor (8)**
31:14;32:13;34:20;
38:8;44:2,10,18,19

**Taylor's (1)**
39:17

**teach (1)**
25:2

**team (3)**
7:18,19;8:2

**Tech (1)**
5:11

**technical (1)**
70:20

**technique (37)**
20:25;23:3;24:15,
15,17;25:1;70:2,10,
12,24;75:6,14;77:4,
14,14;79:7,14;85:10;
86:17;88:2,4;90:1,
14;94:15;95:6,8;
102:11,18;103:15,23,
24;104:16,16,22;
105:8;107:17,23

**techniques (18)**
24:9;25:4;60:3;
82:11;87:9;95:3;
102:4,7,15;103:4;
104:7,8,18;105:1,5,9;
107:13,20

**television (1)**
110:20

**televisions (1)**
111:5

**telling (10)**
23:16;41:11,16;
46:6,7;47:1;51:15;
60:16;64:4;71:20

**tells (1)**
47:2

**ten (2)**
28:3;111:16

**tend (1)**
13:25

**tended (1)**
116:2

**tends (1)**
115:17

**term (2)**
70:7,20

**terminated (1)**
103:19

**terrified (1)**
34:14

**Terry (1)**
37:20,21;38:6

**test (1)**
119:19

**testified (8)**
50:10,25;63:11;
82:22;84:17;86:5;
87:17;138:19

**testify (4)**
39:19;52:10;65:1;
108:18

**testimony (46)**
39:1;43:21;48:19;

58:4,10;61:23;62:1;
64:10,18;65:9;66:4;
68:11,14;69:13,15,
22;71:10;72:12;73:9;
74:9;77:19;81:14;
83:7;84:11;85:20,24;
87:4,5,24;89:3,14,24;
90:3,5;91:10,22;
95:15;102:7,17,25;
104:5;105:13;109:5,
9;112:19;135:16

**textbook (4)**
89:6,8;93:5,6

**thee (2)**
119:3;139:7

**theirs (2)**
20:7,7

**theological (1)**
93:16

**theory (2)**
20:10;93:16

**thereafter (1)**
99:20

**therefore (1)**
106:20

**thinking (1)**
45:17

**third (5)**
28:1,2;112:1,3;
116:19

**though (6)**
7:18;54:19;67:22;
94:15;110:20;122:3

**thought (2)**
54:7;137:22

**thousand (1)**
17:19

**threat (10)**
15:13,17;16:1;
17:9;45:10;46:16;
97:4;98:1,3,9

**threaten (11)**
48:11,23;72:16,16,
24;78:10;83:25;97:8,
12;98:7,10

**threatened (5)**
22:1;72:12;82:15,
15;97:7

**threatening (1)**
16:10

**threats (15)**
15:22,24;17:10;
22:2;78:12,13;82:18;
84:3,10;97:4,9,11,18,
20,21

**three (27)**
7:20;12:7;21:21,
24,25;22:3,13,16,17,
20,25;23:10,17;33:5;
52:6,18;53:5,9;
54:15;55:16,19;
66:17;92:8,10;
111:15;116:3;135:19

**threshold (1)**
128:7

**threw (3)**
49:20;103:14;
124:18

**Throughout (8)**
58:15;74:2;78:24;
84:25;85:7;90:25,25;
104:25

**throw (2)**
75:13;77:15

**throwing (1)**
77:20

**thrown (2)**
20:24;105:9

**tied (1)**
108:23

**Til (2)**
10:8;73:24

**times (16)**
28:11,11;33:6;
39:14;63:15;79:11;
86:12;87:16;91:2;
92:8,11;97:2,23;
104:18;128:7;133:23

**tint (2)**
31:19,21

**tinted (1)**
28:17;30:1

**tired (1)**
92:22

**today (3)**
113:10;139:17,19

**together (1)**
111:14

**told (33)**
9:19;12:15;13:17;
34:16;40:16;42:4;
46:14;47:1;49:11;
50:17,23;51:8;53:19;
54:9;55:22;58:8,12;
60:23;61:18;62:25;
63:1,7;64:20;65:6,
23;85:19;95:5,8;
97:6;129:23;135:3;
136:23;137:7

**tone (14)**
119:13,14,23,24;
120:2,2,8,13,13,17,
19;125:16;126:6,13

**took (29)**
12:6;13:17;16:18;
49:20;51:7,12;52:14;
53:6,6;56:19,20,20,
20;57:4;65:21;66:5;
75:19;76:12;86:20;
91:5,8,10;109:4;
110:14;131:21,23;
134:8,16;135:5

**top (11)**
18:1;59:15;67:23;
70:5;74:15;82:9;
87:14;105:20;

118:23;125:2;136:14

**topic (1)**
43:14
**touch (2)**
23:23;24:5
**touched (2)**
50:9;79:20
**touching (5)**
23:13,20;27:9;
60:3;74:25
**toward (11)**
40:8;45:12,14;
49:20,22;50:2;60:14;
65:25;69:16;87:22;
120:17
**towards (1)**
40:11
**track (1)**
27:10
**traffic (11)**
7:14;25:18;34:23,
25;35:17,17;36:1;
37:22;38:19;48:8;
130:6
**trafficking (1)**
124:4
**trained (21)**
11:6;14:22,24;
15:4,12,16,25;17:8;
18:3,7,13;24:8,14;
58:6,12;70:14;79:6,
14,22,24;80:19
**training (66)**
7:7;8:9,10,17,24;
9:15;11:2,9,10,13,15,
16,17,18,18,19,21;
12:20,24,25;13:3,7,9,
14:2,4,5,6,9,11,14,15,
19,21;16:12;17:13;
18:2;19:2,10;20:20;
21:6;24:7,11,25;25:3,
16,21,22;46:5;48:6;
58:15;59:9,14;85:3;
86:24;90:24;93:23;
95:5;120:23;121:3,5
**transition (2)**
13:24;14:2
**transmission (1)**
128:12
**transported (1)**
96:4
**transporting (1)**
96:16
**traveling (7)**
29:5,10,14,15,16,
20;33:24
**tray (1)**
110:19
**trays (9)**
110:12,13,14,18,
22;111:2,10;112:7,8
**trembling (2)**

33:7;38:8
**trend (1)**
132:20
**trends (1)**
132:21
**tried (18)**
46:19;61:3;63:12,
13;65:6;69:15,18,20,
23;71:15;79:4;83:1;
84:2;85:15;87:9,15;
88:25;91:12
**tries (3)**
62:8;65:4;137:17
**trigger (1)**
38:24
**triggers (1)**
39:5
**Trillingham (1)**
12:17
**Trinity (2)**
112:4,13
**tripping (1)**
27:3
**trophies (3)**
7:22,23;8:4
**trouble (3)**
114:8,20,25
**true (3)**
24:3;54:19;138:21
**trunk (1)**
128:4
**truthfully (1)**
28:12
**try (23)**
26:17;40:20;45:7;
48:15;50:18;54:8;
61:7;69:9,14,24;
78:4;81:23;82:14;
83:12,22;84:6,6;
85:10;113:22;
120:20;123:18;
126:13;131:11
**trying (80)**
16:11,20,21;18:10;
19:20;20:15;25:1,3;
27:5;28:7;32:13,14,
21,22;45:21;53:14;
58:19;59:5,18;61:19,
24;62:2,6,15;66:23,
25;67:3,16;68:16,17;
70:18,23;71:2,5,16,
18,23;73:13;76:6,9,
10,19,22;77:9,11;
78:8,9,21;82:17;
84:13,14,22;86:7,13,
18,21;87:11,13,17,
20;88:21;90:16;91:9,
20;92:5;97:21;98:5,
12,13,15,21;105:22;
109:22;110:12;
118:17;128:6;
132:25;136:25;
137:7,22

**turn (14)**
17:2,4,11;19:23;
21:10;46:22;49:22;
50:18;55:24;65:23;
96:8,9,16;110:20
**turned (2)**
53:2;96:6
**turns (1)**
65:4
**twice (3)**
34:11;42:9;126:7
**twist (2)**
70:15;102:12
**twisted (1)**
70:17
**twisting (2)**
86:14;103:3
**two (12)**
12:7;21:10,22;
72:7;105:20;111:15;
115:9;119:12;
122:21;131:25;
135:18,19
**type (12)**
9:11;10:21;11:15,
17;19:9;27:9;36:14;
70:7,20;74:20;80:10;
124:15
**typed (5)**
41:3,4,12,15;133:7
**types (5)**
7:7;8:19;42:19;
80:10;106:2
**Typically (21)**
14:6;20:23;21:1;
23:4;25:7;26:17;
39:10;42:23,25;
45:24;46:3;54:2,11;
55:10;89:5;93:4;
96:9;99:15;104:12;
111:14;127:24
**typo (3)**
41:6,8,20

## U

**unacceptable (1)**
124:16
**unaware (3)**
71:8;139:5,8
**under (44)**
4:6;6:21;16:12;
18:20,22;19:1,4,5,9;
23:5,14;24:1;39:10;
43:18;55:1;57:15;
58:1,9,13,14;59:11,
22;60:1;76:18;78:2;
80:12;89:18;101:19;
106:6,24;107:8,10;
108:2;109:6;111:3;
114:2;119:4,6,7;
125:3;131:19

**undergo (1)**
11:2
**underlined (2)**
114:3;116:21
**underneath (1)**
74:12
**understandings (1)**
95:21
**understands (1)**
114:4
**understood (1)**
42:11
**uniform (2)**
64:6;118:4
**unintelligible (8)**
25:25;27:15;50:6;
99:20;107:5;122:8;
131:1;135:5
**unlawful (1)**
136:20
**Unless (3)**
61:21;80:14;
104:19
**unlocked (2)**
127:16,20
**un-muted (1)**
58:24
**unpaid (1)**
6:5
**unreasonable (1)**
21:21
**unsatisfactory (3)**
121:16;126:16;
131:3
**unsure (1)**
84:21
**up (78)**
15:21,23;19:17,19;
20:12,25;27:3;29:18;
34:14;38:19;41:10;
42:17,20,23,24;44:9;
45:9;48:25;56:21;
60:17,19;62:10;
63:25;64:2;67:1,7,16,
17;68:24;69:4;70:13,
15,17;71:5,9;73:6,16,
18,25;74:17;77:24;
79:2,5,5;84:21;
88:23;89:8;91:6;
93:5;97:6;99:4;
105:16;106:6;
107:25;108:4,6;
110:13,15;111:14,16,
112:18;123:1,15,17,
20;125:24;127:15,
25;128:10;129:7;
130:22;131:18;
134:20;138:14,20;
139:1,16;140:1
**upon (26)**
16:13;17:1,6;
19:10,13,21;27:16;
85:21;86:15;87:12;

88:5;89:15,16;91:19;
92:6,13,23;93:24;
94:7,21,24;95:11;
102:8;103:2;105:3,
10
**upper (18)**
68:7,14;69:16,21,
23,24;72:13,17;81:2;
82:14;83:9;86:7,11;
87:12,18,20,22;
89:13;92:6,13,15,18;
93:24;94:7,24;95:11;
105:3
**upset (1)**
122:3
**upward (1)**
95:19
**use (87)**
7:10;8:6,25;9:8,9,
10;12:25;13:3,5,8;
14:14,17,21,25;15:4,
8,13,25;16:12,16,23;
17:3,16;18:2,3,4,6,
13,16,18;19:2,10;
20:5,8,10,17;22:4,18;
23:11,24;24:8;26:20;
27:5,8,16;33:19;
56:10;59:22;60:1,5,7,
7,8;74:17;75:5;79:7;
80:1,4,12,13,21;
81:19;83:17,20;
87:19;95:1,2;97:16;
101:13,14,19,22;
102:9,20,25;105:13;
106:22,24;107:5,6,
10,15,22;108:2,7,15;
114:4
**used (30)**
18:23;19:13,21;
28:9,11;46:11;60:13;
61:19;69:9,13;70:21;
71:19;75:14;77:3;
81:9;82:13;85:10,17;
90:1;95:3,9;96:13;
98:3;102:1;103:25;
107:13,13;108:14,16;
135:7
**uses (1)**
68:3
**using (22)**
9:5;15:18;18:8,14;
21:17,20;24:9,21;
46:11,15;59:23;70:3;
73:5;74:1;87:14;
88:19;91:3,4,9;
104:14;110:21;
136:16
**usually (4)**
23:16,23;57:5,7

## V

**vague (1)**

112:12

**Vaguely (1)**
31:18

**varied (1)**
7:20

**vehicle (91)**
28:20,25;29:4,7,10,
12,15,18,21,22;30:8,
22;31:11,13,17,19,
21;32:4,6;34:8;35:3,
5,7,7,13,16,18,22,25;
36:1,6,11,19,22;37:1,
10,12,16,23,24;38:1,
6;40:9,11;44:2;
46:21,25,25;47:12,
19,19,25;48:12,17,
20;49:13;52:23,24;
53:3;65:21;66:1;
69:8,9,12,13,17,19,
21,23,25;72:14,18;
73:20;75:19,21;78:5,
6,9;86:16;87:12,18,
21,23;88:5;89:13;
90:4,20;91:24;92:5;
129:14,14

**vehicles (2)**
46:7;126:17

**verbal (33)**
15:21,24;17:10;
18:9,12;19:22;20:11;
21:4,7,9,16;22:2,4,
15;23:9,25;46:6,16,
19,23;47:2,10,14;
59:23;63:14;66:8;
78:13;83:11;97:20;
110:2,5;113:12;
115:13

**verbalize (1)**
78:13

**verbally (4)**
16:10;82:18,22,24

**verbiage (1)**
21:15

**verified (1)**
124:19

**verify (3)**
42:15;44:13;
123:23

**verifying (1)**
46:2

**versa (1)**
25:12

**versed (2)**
80:20;116:4

**version (4)**
7:15;8:12;26:4,7

**versus (11)**
4:7;13:15;20:7,7,8;
28:11;41:3;43:25;
95:3;111:20;124:11

**vice (1)**
25:11

**victim (1)**

134:22

**Victoria (1)**
128:11

**video (11)**
11:25;43:12;48:24;
58:23;62:12;86:12;
124:14;126:19;
127:4,19;132:17

**view (1)**
99:10

**violated (1)**
132:2

**violation (12)**
28:17;121:15;
123:15,21,22;124:22;
126:16;127:9;131:2,
3,18;133:11

**violations (1)**
35:17

**violence (5)**
7:12;17:10;22:1;
45:11,20

**violent (5)**
27:23;36:19;45:12;
60:7;111:12

**violently (1)**
45:14

**visual (1)**
35:11

**vividly (2)**
31:12;129:20

**voice (17)**
111:17;112:6,14;
115:17,18;116:7,10,
10,16;120:6,8,21,25;
121:2,5;125:16,20

## W

**waiting (1)**
48:5

**walk (10)**
25:13;40:8,11;
47:18;48:11;50:19;
59:1;64:16;65:4;
88:17

**walked (1)**
47:19

**walking (1)**
66:8

**wallet (3)**
124:7,15,17

**wallets (1)**
124:11

**walls (1)**
116:5

**wants (1)**
71:21

**warrants (1)**
39:7

**waste (1)**
113:11

**watch (2)**

35:6,8

**watched (3)**
41:21;42:6;86:12

**watching (1)**
124:14

**watered (1)**
8:12

**watered-down (1)**
7:15

**way (34)**
16:8;20:11,12;
22:10,10;43:8;44:20;
48:3;56:13;57:22;
58:16;59:10;60:22;
66:23;72:13;74:20,
24;78:1,10;80:18;
82:15;83:2;85:25;
86:6;94:19;96:19,23;
109:21;122:14;
126:7,10;128:1;
138:3,8

**weaponless (4)**
102:1,3,9;107:19

**weapon-like (1)**
40:5

**weapons (9)**
21:3;37:20,21;
38:14,15;40:3,4;
53:16;108:16

**wearing (1)**
123:11

**website (1)**
25:23

**wee (1)**
122:18

**week (2)**
100:15,19

**weeks (2)**
72:7;131:22

**weight (4)**
62:18;70:21,21;
83:18

**weights (1)**
73:8

**weren't (7)**
9:5,6;68:11;71:6;
84:17;122:13;138:8

**what's (8)**
5:3,5;15:10;36:12;
48:2;57:2;73:3;95:4

**whatsoever (3)**
39:21;85:3;115:1

**whenever (3)**
56:6;99:6;120:20

**When's (1)**
72:5

**whereas (2)**
34:20;129:21

**whichever (1)**
44:20

**white (1)**
33:24

**whole (8)**

20:4;67:16;74:3;
104:9;109:9;125:16;
133:1;134:11

**whoop (1)**
97:16

**Who's (2)**
11:22;33:23

**wife (7)**
37:4;44:12;65:18;
71:16;137:1,8,23

**wife's (1)**
39:2

**Wilds (1)**
112:8

**willing (1)**
24:20

**win (1)**
7:21

**wind (2)**
62:10;67:7

**window (7)**
21:22,22,22,24;
22:3;53:6;55:6

**windows (3)**
28:17;30:1;31:16

**within (9)**
22:16,20;55:16,19;
100:15,19;104:7;
116:3;117:16

**without (10)**
16:11;20:23;22:11;
27:8;43:9;60:21;
85:3;108:13;111:17;
124:9

**WITNESS (18)**
22:7;49:5,8;58:17,
23;59:2,4,6;99:1,4,7;
126:18,23;127:1,3;
135:20;138:13,16

**woman (1)**
33:24

**wondering (1)**
100:7

**word (5)**
7:8;87:19;91:3;
104:13;138:2

**wording (2)**
112:2;132:10

**words (6)**
56:10;88:20;91:4,
9;97:14;107:4

**work (15)**
6:2;8:14;9:16;
10:6;20:20;58:19;
59:5;114:5;122:20;
125:9,15;126:3,14;
129:14;135:19

**worked (3)**
5:20,25;81:22

**worker (2)**
112:4,13

**working (11)**
5:14;6:2;9:19;

10:22,24;110:3;
116:8;117:16;
120:17,18;124:2

**works (3)**
113:17;122:2;
125:4

**world (1)**
53:12

**wound (5)**
56:21;60:19;70:13;
79:5;134:20

**wrap (3)**
75:25;103:8,17

**wrapped (2)**
103:10,14

**wrapping (1)**
103:11

**wrench (1)**
86:18

**wrestling (5)**
20:3,16,19;82:3,4

**wrist (4)**
21:2;23:21;102:16;
104:1

**write (8)**
54:23;99:19;100:6;
123:17,20;128:24;
129:3;133:11

**writeup (1)**
131:13,21;139:2

**writing (3)**
99:22,23;112:20

**written (13)**
112:18;115:24;
123:1,15;124:11;
125:21,24;127:15;
129:7;130:22;
131:18;133:19;
138:22

**wrong (3)**
23:23;118:2;138:6

**wrote (5)**
41:12;113:1;123:3;
124:21;128:25

## Y

**y'all (7)**
7:21;11:18;13:13,
20;54:19;63:22;
88:16

**year (6)**
5:12;6:14,14;11:1;
12:13;132:6

**yearly (3)**
13:6,25;14:5

**years (4)**
110:1;115:23;
117:17,19

**yell (1)**
112:14

**yelled (1)**
137:2

**yelling (3)**
71:15;112:5,13
**Yep (1)**
117:9
**young (1)**
115:17

---

## Z

---

**Zoom (3)**
58:20;59:5;105:23

---

## 1

---

**1,000 (1)**
112:21
**1:17 (1)**
30:13
**1:20-CV-00159 (1)**
4:8
**10/7/91 (1)**
5:4
**100 (5)**
16:5;28:12;111:18;
112:18;127:24
**11th (1)**
130:15
**12/1/2019 (1)**
125:1
**12/29/15 (1)**
121:8
**13th (2)**
29:17,18
**16 (4)**
131:13,20,20;
133:13
**1968 (2)**
41:18,18
**1st (1)**
118:21

---

## 2

---

**2 (1)**
115:13
**2008 (1)**
128:11
**2010 (3)**
5:13,18;134:15
**2011 (1)**
134:15
**2015 (6)**
5:16,18;9:20,22;
110:17;112:4
**2016 (4)**
118:21,21;119:22;
121:13
**2017 (4)**
10:8,9;121:15;
123:22
**2019 (6)**
4:16;12:9,12,13;
28:13;41:17

**2020 (3)**
126:16;129:13;
130:5
**2021 (1)**
130:15
**20th (2)**
41:18;126:16
**21sat (1)**
123:22
**23rd (2)**
12:12;28:13
**24th (1)**
130:5
**25th (1)**
110:17
**26th (1)**
112:3
**2nd (1)**
129:12

---

## 3

---

**3.7-1 (1)**
123:22
**3/19/2019 (1)**
41:12
**3/20/1968 (3)**
41:5,25;42:8
**3/20/2019 (2)**
41:4,16
**30th (1)**
121:15
**31st (1)**
118:21

---

## 4

---

**4.26 (2)**
121:16;131:2
**4:40 (1)**
140:5
**40 (4)**
51:10,11;62:23,24

---

## 5

---

**5.2 (1)**
105:18
**5.2-3 (1)**
108:19
**5:45 (1)**
124:8
**50 (2)**
27:14,15

---

## 7

---

**700 (1)**
102:24

---

## 8

---

**8/2020 (1)**

129:7

---

## 9

---

**9 (1)**
119:7
**911 (1)**
134:8